# EXHIBIT 1

1  Jeffrey J. Angelovich (admitted *Pro Hac Vice*)
   Bradley E. Beckworth (admitted *Pro Hac Vice*)
2  Susan Whatley (admitted *Pro Hac Vice*)
   NIX, PATTERSON & ROACH, L.L.P.
3  205 Linda Drive
   Daingerfield, Texas 75638
4  Telephone:  903-645-7333
   Facsimile:  903-645-4415
5  BBeckworth@nixlawfirm.com
   JAngelovich@nixlawfirm.com
6  SusanWhatley@nixlawfirm.com

7  George L. McWilliams (admitted *Pro Hac Vice*)      Laurence D. King (State Bar No. 206423)
   Sean Rommel (admitted *Pro Hac Vice*)               Linda M. Fong (State Bar No. 124232)
8  PATTON, ROBERTS, MCWILLIAMS                         KAPLAN FOX & KILSHEIMER LLP
   & CAPSHAW, LLP                                      555 Montgomery Street, Suite 1501
9  Century Bank Plaza                                  San Francisco, CA 94111
   2900 St. Michael Drive, Suite 400                   Telephone:  415-772-4700
10 Texarkana, TX 75505-6128                            Facsimile:  415-772-4707
   Telephone:  903-334-7000                            LKing@KaplanFox.com
11 Facsimile:  903-330-7007                            LFong@KaplanFox.com
   gmcwilliams@pattonroberts.com
12 srommel@pattonroberts.com

13 Co-Lead Counsel                                     Liaison Counsel

14

15                   UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                      SAN FRANCISCO DIVISION

18

19 PRENA SMAJLAJ, individually and on behalf )    Consolidated Case No.:  3:05-CV-02042-CRB
   of all others similarly situated,         )
20                                           )    **AMENDED CONSOLIDATED CLASS**
                                             )    **ACTION COMPLAINT**
21                 Plaintiff,                )
                                             )
22          v.                               )
                                             )
23 BROCADE COMMUNICATIONS SYSTEMS,)
   INC, GREGORY L. REYES, ANTONIO            )
24 CANOVA, LARRY W. SONSINI, SETH D.         )
   NEIMAN AND NEAL DEMPSEY,                  )
25                                           )
                                             )
26                 Defendants.               )
                                             )
27 _____)

28

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                          No.: 3:05-CV-02042-CRB

Court-appointed Lead Plaintiff, the Arkansas Public Employees Retirement System ("APERS" or "Lead Plaintiff"), brings this federal securities law class action complaint ("Complaint") individually and on behalf of all other purchasers of common stock of Brocade Communications Systems, Inc. ("Brocade" or the "Company") between May 18, 2000 and May 15, 2005, inclusive (the "Class Period"), and alleges the following:[1]

## I.    INTRODUCTION

1.    Lead Plaintiff brings this action pursuant to §§ 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t-1, and 78t(a), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), on its own behalf and on behalf of all other persons or entities who purchased or otherwise acquired Brocade common stock during the Class Period.  Defendants are Brocade; Brocade's former Chief Executive Officer ("CEO"), Gregory Reyes ("Reyes"); former Chief Financial Officer ("CFO"), Antonio Canova ("Canova"); former Audit Committee Member, Larry W. Sonsini ("Sonsini"); and Former Compensation and Audit Committee Members, Seth D. Neiman ("Neiman") and Neal Dempsey ("Dempsey").

2.    APERS asserts these claims on behalf of itself and a class consisting of all those who purchased Brocade securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

---

[1]  Lead Plaintiff's allegations are based on information and belief, except as to those allegations concerning Lead Plaintiff, which are based upon personal knowledge.  Lead Plaintiff's information and belief is based upon, among other things: (a) the investigation conducted by and through its attorneys; (b) review and analysis of filings made by Brocade with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Brocade; (d) interviews with former Brocade employees; (e) findings and pleadings filed by the SEC and United States Department of Justice ("DOJ") regarding the civil and criminal federal proceedings against certain former officers and employees of Brocade; (f) court filings by Defendants; (g) documents filed in certain legal proceedings regarding Defendant Larry Sonsini's involvement in the Hewlett-Packard pretexting scandal; and (h) other publicly available information about Brocade. Most of the facts supporting the allegations contained herein are known only to Defendants (defined herein) or are within their control.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    No.: 3:05-CV-02042-CRB

3.     This case is one of the first shareholder actions filed to address fraudulent accounting for and disclosure of backdated and/or mispriced stock option grants.  In the months since this case was filed, the headlines have been filled with reports of Silicon Valley executives run amuck.  Day by day, the financial statements of public companies are revealed to be a fraud.  Well over 100 companies have announced they are under external and/or internal investigation for manipulating financial statements by fraudulently accounting for backdated and illegal stock option grants.  Improper stock option backdating is rapidly being revealed as one of the most pervasive corporate scandals of our time.  And, at the genesis of it all, was Brocade.

4.     This is a case about pure corporate greed.  It is a case about a CEO, Greg Reyes, who was not satisfied with being enormously rich but, instead, attempted to gorge himself by carrying out a massive scheme to fleece shareholders out of their hard-earned dollars.  It is a case about a CFO, Antonio Canova, who, after discovering the fraud, sought to cover-up and facilitate, rather than expose the fraud.  It is a case about an outside director, Silicon Valley lawyer Larry Sonsini, who was so riddled with conflicts of interests—as a member of the Company's board of directors, named partner at the Company's outside legal counsel, private investor in the Company, board member of numerous other companies involved in options backdating scandals of their own, personal friend and advisor to Reyes, and the person who gave Reyes unfettered power to act as a committee of one for handing out stock option grants—that he stood by and deliberately allowed Reyes to run roughshod over the Company in violation of the law.  And this is a case about the two members of Brocade's Compensation Committee, Seth Neiman and Neal Dempsey, who not only ignored the glaring red flags that signified that Reyes was committing egregious accounting fraud, but also facilitated his efforts to backdate massive stock option grants to himself.  Put simply, this is a classic example of pigs at the trough.

5.     Indeed, when the United States Senate Committee on Finance held hearings and heard testimony on this precise issue on September 6, 2006, Finance Committee Chairman, Senator Grassley summarized the problem best:

> Today, we will hear about behavior at some of our largest companies
> that is such a threat.  It is behavior that, to put it bluntly, is disgusting
> and repulsive.  It is behavior that ignores the concept of an honest

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

day's work for an honest day's pay and replaces it with a phrase that we hear all too often today, "I'm going to get mine." Even worse in this situation, most of the perpetrators had already gotten "theirs" in the form of six- and seven-figure packages of which most working Americans can only dream. But apparently that was not enough for some.

Instead, shareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs—through a process called "back-dating"—to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves.

6.   The detailed facts set forth below specifically establish that Brocade, its now-indicted CEO, Reyes, its former CFO, Canova, and its now-indicted Vice President of Human Resources ("HR"), Stephanie Jensen, "got theirs" by carrying out a pervasive scheme, artifice and device to rip off investors through fraudulently granting, recording, accounting for and disclosing stock option grants to Brocade's newly hired employees, current employees, and executives. The purpose of their fraud was to inflate Brocade's stock price by hiding the negative impact of unlawful stock option grants on Brocade's earnings per share, income, compensation expenses and related tax expenses. This Complaint explains how Reyes, Canova and Jensen carried out this scheme, artifice and device, and how it resulted in pervasive, widespread violations of Generally Accepted Accounting Principles ("GAAP"). This Complaint also establishes that three members of Brocade's Audit Committee—Sonsini, Dempsey and Neiman—not only consciously allowed Reyes to commit fraud, but actually took profits from the resulting inflated stock price. As a result, Brocade restated every single financial statement it issued for fiscal years 2000-2004 (the "Financial Statements") because they were materially false and misleading when made. Moreover, Brocade entered into a $7 million settlement with the SEC, the SEC filed civil fraud charges against Reyes, Canova and Jensen, the DOJ filed a criminal complaint against Reyes and Jensen, and a federal Grand Jury has indicted Reyes and Jensen for securities fraud.

7.   After becoming a public company in May 1999, Brocade quickly expanded, both in revenues and in the size of its operation. This quick growth occurred at a time when competition for talented employees was fierce, and stock options were the preeminent method of attracting skilled employees in Silicon Valley. Due to this fierce competition, and because Brocade was short

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1  on cash to pay high salaries, Brocade made liberal use of stock option grants throughout the Class

2  Period, the timing of which were critical.

3          8.      Publicly traded companies may, under certain specific circumstances, award their

4  employees stock option grants. A stock option grant gives an employee the right to purchase shares

5  of the company at a specific price (an "exercise price" or "strike price") on or after a specific date.

6  For example, if a company gives an employee 100 options with an exercise price of $10 per share,

7  this means that the employee can buy 100 shares for a total of $1,000, irrespective of what the real

8  price of the Company's stock is on the date the options are exercised.  Thus, if the option has vested

9  and the current price is greater than the exercise price, the employee can exercise his option to buy

10  the stock at the strike price and then sell the stock immediately for a gain.  For example, if the

11  current market price of the stock rose to $100 per share, the employee could exercise his option to

12  buy the stock at $10 per share, but sell it immediately thereafter for an instant profit of $90 per

13  share, or $9,000.

14          9.      When a company grants an employee stock options, it must do so under a written

15  stock option plan filed with the SEC and disclosed to the public.  Any grants awarded pursuant to

16  such a plan must also be properly accounted for and disclosed as required by GAAP.  During the

17  Class Period, Brocade accounted for non-statutory stock option grants under the intrinsic value

18  method pursuant to Accounting Principle Bulletin No. 25.  Under APB No. 25, the Company was

19  allowed <u>not to disclose</u> as a compensation expense any non-statutory option grant <u>if, and only if</u>:

20  (1) the exercise price was equivalent to the market price on the grant date <u>and</u> (2) the measurement

21  date of the grant was certain.  The measurement date is certain when, and only when, the grant is:

22  (1) fixed <u>and</u> (2) determinable.  However, any time Brocade gave out an option grant where the

23  exercise price was less than the market price on the date of the grant, or the measurement date was

24  not certain, the Company was required to account for and disclose any such grant as a compensation

25  expense under the variable accounting method required by APB No. 25.  Brocade admitted that

26  these rules were applicable in its SEC 2005 year-end Form 10-K.

27          10.     This is so because gains such as the one described in the example above are a form

28  of extra compensation and, therefore, may have an impact on the company's earnings per share, net

income, compensation expenses, related tax expenses and other items. Thus, it is imperative that when a company awards option grants to its employees, it do so in compliance with its publicly filed stock option plan and that it account for such grants appropriately under GAAP and APB No. 25. Otherwise, investors will not have an accurate picture of the company's finances.

11. Consequently, the date of the grant and/or the date all terms and conditions of the grant become final (the measurement date) are of immense importance. This is especially true if the company's stock price is on the rise. Consider, for example, Brocade's stock price from May 24, 2000 through July 24, 2000. During this 60-day period, Brocade's common stock rose from $94.00 on May 24, 2000, to $159.50 on June 23, 2000, to $201.81 on July 24, 2000. Assuming that the Company gave a newly hired employee a stock option grant of 100,000 shares with a start date of May 24, 2000, the employee's exercise price for her options would be $94.00 per share. If the employee exercised those options after vesting, when the Company's stock price was up to $200.00, she would make a profit of $10,781,000.00. However, if the employee's option grant date did not occur until June 23, 2001, which was only 30 days later, her exercise price would be $159.50 and her profit would by reduced to $4,231,000.00. Therefore, a change in the grant date of an employee's stock options at Brocade of just 30 days at the beginning of the Class Period could have a staggering impact on the value of those options—in this example, a difference of $6,530,000.00.

12. These option grants gave employees the right to buy Brocade's stock at a set price. The value of these options equaled or exceeded salaries to many Brocade employees and officers. This was so because Brocade's stock price rose dramatically on a daily basis during the early part of the Class Period (and the strike price was tied to the Company's stock price on the date of the grant).

13. Throughout the Class Period, Brocade had stock option plans, including the Company's Non-Statutory Stock Option Plan ("NSO Plan" or the "Plan"), which imposed specific rules for non-statutory stock option grants to employees and consultants. The NSO Plan, which was to be administered by either the Board of Directors or a Committee, gave the administrator of the Plan the sole authority to, among other things, determine: (1) who may receive option grants, (2) the number of shares granted by such options, and (3) the exercise price for such options. From

1   2000 through 2004, this authority belonged solely to Reyes with respect to option grants to non-

2   executive employees; whereas option grants to executive employees required the approval of a

3   "Compensation Committee," which consisted of Neiman and Dempsey.

4          14.    As the sole member of a committee of one acting as administrator of the Plan, Reyes

5   used the virtually unchecked authority delegated to him by Sonsini, Dempsey and Neiman to

6   promulgate a fraud that hid the true cost to Brocade of recruiting and retaining employees with

7   stock option-based compensation.  In short, the scheme was designed to grant "in the money" stock

8   options to employees by falsifying the dates on which the grants were made, thereby granting

9   options with below-market strike prices.  Reyes, with the assistance of Canova and Jensen, carried

10  out this scheme by directing various individuals in Brocade's Human Resources Department—

11  which Reyes concedes was understaffed and unprepared to deal with the volume of hiring and stock

12  option grants—to prepare documentation reflecting false start dates for employees.  Using the

13  magic of hindsight, Reyes and Jensen would choose an employee's start date, and thus the option

14  grant date, to correspond with Brocade's lowest closing stock price during a particular period,

15  thereby granting employees instant gains and profits.

16         15.    Reyes and Canova had another trick up their sleeve—in Reyes' role as the

17  "Compensation Committee of One," he, with the blessing of Neiman and Dempsey, was able to

18  control the grants of options to himself, Canova, and other Brocade executives.  Reyes used this

19  power, with the help of Neiman and Dempsey, to backdate options grants to Brocade executives at

20  times strategically selected to take advantage of a brief drop in Brocade's stock price.  Knowing that

21  options documents manipulated by Reyes and falsely recorded by the Human Resources

22  Department would be relied upon to prepare Financial Statements, Reyes knowingly caused

23  Brocade to fail to record expenses related to the grants in its Financial Statements.  Reyes, Canova

24  and their controlled person, Jensen, also knowingly or deliberately manipulated the dates upon

25  which options were reported as granted in order to strategically award grants at lower exercise

26  prices in violation of GAAP and federal securities laws.

27         16.    Meanwhile, Sonsini was riddled with conflicts of interest that prohibited him from

28  carrying out the duties he owed to Brocade's shareholders.  Brocade's Code of Ethics, Audit

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                     No.: 3:05-CV-02042-CRB

1  Committee Charter, Proxy Statements filed with the SEC, and the Sarbanes-Oxley Act of 2002 all

2  imposed upon Sonsini a duty to provide oversight of Reyes and Canova to ensure that the Company

3  had adequate safeguards and controls in place and that they complied with GAAP and federal

4  securities laws.  Sonsini deliberately disregarded those duties when he anointed Reyes with the

5  unchecked power to hand out stock option grants as a "committee of one."  From that point forward,

6  throughout the entire Class Period, Sonsini never stopped Reyes and/or deliberately disregarded

7  Reyes' massive fraudulent accounting scheme.  Sonsini stood to lose significant credibility,

8  business, and potential monetary gains, if he exposed Reyes for breaking the law as a result of

9  abusing this power.

10     17.    Indeed, Sonsini not only gave Reyes this power, but was also the named partner of

11  the law firm that served as Brocade's outside counsel.  Sonsini and his firm made millions of dollars

12  off of Brocade as its outside counsel, had a substantial investment in Brocade, did legal work for

13  over 30 companies that are also alleged to have manipulated their options programs, served as a

14  director on the boards of half a dozen such companies, and received at least one conspicuously

15  timed option grant from one such company.  Sonsini thus knew that if he watched Reyes closely or

16  intervened to stop his unlawful conduct, both Sonsini and his law firm could lose millions in fees

17  from and investments in Brocade, and would be exposed for his involvement with numerous other

18  companies alleged to have participated in illicit option backdating schemes.  Sonsini also knew that,

19  although he owed a duty to Brocade's shareholders to ensure that Reyes complied with GAAP and

20  federal securities laws, he and his firm had a duty to Reyes and Brocade to keep confidential any

21  information they obtained in their role as counsel.  As a result, Sonsini chose to stand by and do

22  nothing to stop Reyes or warn Brocade's investors about the true nature and consequences of

23  Brocade's stock option grants.

24     18.    This scheme began to unravel in 2004 when a former Brocade employee and alleged

25  recipient of backdated option grants, Daniel Cudgma, had a disagreement with Reyes and

26  threatened to expose Defendants' use of backdated options grants.  Cudgma was eventually

27  terminated and, according to legal documents reviewed by APERS from Court filings in

28  Massachussets state court, Brocade filed for foreclosure against Cudgma in April 2004.  According

to sources cited in a WALL STREET JOURNAL article dated July 20, 2006, Cudgma contacted an attorney regarding Defendants' use of backdated options.  Cudgma's attorney then contacted Brocade's former General Counsel, Mark Cochran, and informed him that Cudgma was planning to contact the SEC regarding Brocade's use of backdated option grants. Thereafter, according to the WALL STREET JOURNAL, Cochran contacted Defendant Sonsini's law firm, Wilson, Sonsini, Goodrich & Rosati ("WSGR"), which, in turn, contacted Brocade's Audit Committee.

19.    Brocade's Audit Committee decided to begin an internal investigation into Cudgma's allegations.  However, to conduct this investigation, the Audit Committee brought in new—and independent—legal counsel, Morrison & Foerster, to head the investigation.  Morrison & Foerster, in turn, engaged a new accounting team, PricewaterhouseCoopers ("PWC"), to conduct a forensic accounting investigation into the matter.  In essence, Brocade had to bring in new, independent outsiders to do the job that Brocade, its legal counsel and its Audit Committee Members failed to do in the first place.

20.    According to documents filed by Brocade in the pending derivative litigation, the initial internal investigation began on November 1, 2004 and continued through the end of January 2005.  The internal investigators interviewed thirty current and former employees, many of whom worked in the same department(s) as Lead Plaintiff's confidential sources, and reviewed approximately 850,000 pages of documents obtained from twenty-five former employees and the Company's central repository.  According to Brocade, these employees and documents came from "numerous relevant departments" including the human resources department.

21.    At the conclusion of this three-month internal investigation, the Company determined that the way in which Brocade accounted for stock option grants in publicly-filed statements during the Class Period was incorrect and required restatement.  In a BUSINESSWEEK article, the author cites Reyes as stating that, upon completion of Brocade's first internal investigation, he was informed by Defendant Sonsini that the Audit Committee had determined that the evidence regarding Reyes' involvement in the accounting violations was "overwhelming and conclusive."  Peter Burrows, *Brocade Stung by Stock Options*, BUSINESSWEEK, Feb. 13, 2006.  Although Reyes disputed this conclusion, he stepped down as CEO shortly after this conversation.

22.     On January 6, 2005, the Company began a series of public disclosures, in which it admitted that it incorrectly accounted for historical stock-based compensation charges relating to: (i) grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000, and (ii) grants that were made to persons engaged on a part-time basis prior to their new hire full-time employment during the period August 2000 to October 2002.  The Company admitted that it had overstated net income for 2000 of over $1 billion.  The Company filed a formal restatement on January 24, 2005.

23.     The Company also announced the further restatement of its financial results for 2002-2004, admitting that upon completion of the internal review, the Audit Committee further determined that there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003. As a result, the Company recorded additional stock-based compensation charges relating to many of its stock option grants from the periods 1999 through the third quarter of fiscal 2003.

24.     Unfortunately, while it was a step in the right direction, this was just the tip of the iceberg.  Brocade had to initiate a second internal investigation.  This second investigation lasted six months and focused more directly on Brocade's accounting for stock-based compensation to employees on leaves of absences and in transition roles prior to leaving Brocade—conduct that APERS' confidential sources depicted as a direct part of Brocade's overall fraudulent scheme.  The second investigation resulted in more employee interviews and the review of over two million pages of internal documents.  The conclusions reached as a result of this second investigation resulted in yet another restatement of Brocade's Financial Statements.

25.     On May 16, 2005, the Company announced yet another restatement in an 8-K that revealed that the Financial Statements in question did not accurately portray Brocade's financial results for the relevant period and, therefore, should not be relied upon. The Company announced that it would again restate its financial results for 2001-2004 to record additional stock-based compensation expenses.  On that same day, Brocade issued a press release (expressly incorporated

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

into its May 16, 2005 8-K) that further expounded on the Restatement and estimated that it could include an additional $52 million in stock-based compensation expenses.

26.     In January 2005, Reyes resigned from his role as Chairman and CEO.  He stayed on as a consultant for the Company until he was terminated in July 2005.  Canova subsequently resigned from his position in December 2005.

27.     On or about May 16, 2005, Brocade announced that the SEC had begun investigating Brocade's accounting and disclosure of stock option grants.  Brocade also acknowledged that same day that the DOJ was working with the SEC in a joint investigation regarding these issues.  Brocade announced on or about June 1, 2005 that the SEC had upgraded its investigation into a formal investigation.  On March 8, 2006, Brocade announced that it had entered into a formal settlement agreement with the SEC for $7 million.

28.     On July 20, 2006, the SEC filed a civil complaint against Reyes and Canova, as well as Jensen. The SEC complaint charged Reyes with backdating options he doled out as a "committee of one" to hundreds of employees, boosting the potential value of the options and concealing millions of dollars of compensation expenses from shareholders.  The complaint further alleged that Canova enabled the backdating scheme to continue undetected by ignoring facts that called into question the integrity of Brocade's Financial Statements based on its options grants.

29.     On the same date, the U.S. Attorney for the Northern District of California filed a criminal complaint against Reyes and Jensen alleging a single count of securities fraud, which carries a maximum penalty of 20 years in prison and a $5 million fine.  The criminal complaint was supported by the affidavit of FBI Agent Joseph Schadler. On August 9, 2006, United States Magistrate Judge Chen denied Reyes' motion to dismiss the criminal complaint against him.

30.     On August 10, 2006, Reyes was charged with 12 additional counts of securities fraud in a federal Indictment.  These charges included conspiracy, securities fraud, mail fraud, falsifying books and making false statements to accountants.  Jensen also was indicted on eight counts of conspiracy, securities fraud, mail fraud and falsifying books.

31. The fraud claims alleged herein, brought pursuant to the Exchange Act, are asserted against those Defendants who directly participated in and/or deliberately disregarded the fraudulent scheme described herein.

## II.    PARTIES

### A.    **Lead Plaintiff**

32. Lead Plaintiff, APERS, is a public pension fund established for the benefit of the current and retired employees of the state of Arkansas. APERS provides benefits to thousands of members and their beneficiaries. APERS has over $4.9 billion in assets under management. As set forth in the certification attached as Exhibit 1, APERS purchased publicly traded securities of Brocade at artificially inflated prices during the Class Period and suffered losses as a result of the federal securities law violations alleged herein.

### B.    **Defendants**

#### 1.    *The Company*

33. Defendant Brocade designs, develops, markets, sells and supports data storage networking products and services. Brocade was incorporated under the laws of Delaware in 1995, with its principal executive offices located in San Jose, California. On or about May 24, 1999, Brocade commenced an initial public offering of 3,250,000 of its shares of common stock at an offering price of $19 per share. During the Class Period, Brocade's shares traded on the NASDAQ under the symbol "BRCD."

#### 2.    *The Officer Defendants:  Reyes and Canova*

34. Defendant Reyes was, from July 1998 to May 2001, Brocade's President and CEO. In May 2001, Reyes expanded his role to Chairman of Brocade's Board of Directors (the "Board") and CEO. In January 2005, Reyes resigned from his position as CEO and Chairman, remaining at the Company as a director and a consultant to the Board and the new CEO until July 2005.

35. Defendant Canova was, from 2000 to May 2001, Brocade's Vice President of Finance. In May 2001, Canova's role was expanded to CFO and Vice President, Administration. On December 15, 2005, Canova resigned from his position as CFO and principal accounting officer of the Company.

36.     At all relevant times, Reyes and Canova acted as controlling persons over Brocade's Vice President of Human Resources, Stephanie Jensen, who reported directly to and worked directly with, Reyes and Canova regarding stock option grants.

37.     Defendants Reyes and Canova are referred to individually by name or, when referred to collectively, as the "Officer Defendants."

### *3.     Larry Sonsini*

38.     Defendant Sonsini was a member of the Board from at least 1999 until March 2005. He served on Brocade's Nominating and Corporate Governance Committee from 2002 through March 2004.  Sonsini served on the Audit Committee from 2002 through 2003.  Sonsini signed the Company's Form 10-K for Fiscal Years 1999, 2000, 2001, 2002, 2003 and 2004.

### *4.     Neiman and Dempsey*

39.     Defendant Neiman was Chairman of the Board from August 1995 until May 2001, and has continued to serve on the Board through the present.  He served on Brocade's Audit Committee from at least 1999 through the end of the Class Period.  He has served on Brocade's Compensation Committee from at least 1999 through the present.  Neiman signed the Company's Form 10-K for Fiscal Years 1999, 2000, 2001, 2002, 2003, 2004, and 2005.

40.     Defendant Dempsey has been a member of the Board from December 1996 through the end of the Class Period.  He has served on Brocade's Nominating and Corporate Governance Committee from 2002 through the present.  He has served on Brocade's Audit Committee from at least 1999 through the present.  He has served on Brocade's Compensation Committee from at least 1999 through the present, and has served as its Chairman since January 2005.  Dempsey signed the Company's Form 10-K for Fiscal Years 1999, 2000, 2001, 2002, 2003, 2004 and 2005.

### III.     JURISDICTION AND VENUE

41.      The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

42.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act.

43.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §

1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Brocade conducts business in this District.

44. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### IV. BROCADE USED A PERVASIVE SCHEME WHEREBY IT IMPROPERLY ISSUED MASSIVE STOCK OPTION GRANTS AND HID THE TRUTH REGARDING THE NEGATIVE FINANCIAL IMPACT OF THIS SCHEME

45. Defendants carried out this scheme as follows:

### A. Brocade's 1999 Non-Statutory Stock Option Plan

46. In September of 1999, Brocade's Board of Directors approved the Company's NSO Plan. *See* Brocade's SEC Form 10-K filed on January 31, 2005, p. 73 n.11. The NSO Plan provides for the grant of non-statutory stock options to employees and consultants. *Id*. The NSO Plan was attached as Exhibit 10.8 to Brocade's 1999 year-end SEC Form 10-K and was operative at all times during the Class Period.

47. Pursuant to Paragraph 2(a) of the NSO Plan, the Plan "Administrator" is defined as "the Board or any of its Committees as shall be administering the Plan." *Id*. Thus, the Board was charged with the duty to administer the Plan either by itself or by delegating such powers to distinct committees. Pursuant to paragraph 4(a) of the NSO Plan, the Plan "shall be administered by the Board or (ii) a Committee, which Committee shall be constituted to satisfy Applicable laws." *Id*. Paragraph 4(b)(i-vi) of the NSO Plan further gives the Board or Committee the sole authority to, among other things, determine: (1) who may receive option grants, (2) the number of shares granted by such options, and (3) the exercise price for such options. Further, pursuant to paragraph 4(x), the NSO Plan gives the Board or its Committee the power to authorize any person to execute on behalf of the Company any instrument to effect the grant of an option previously granted by the Board or Committee.

48. As is set forth in detail below, Brocade's Restatement, Defendant Reyes' own

admissions, the information provided by Lead Plaintiff's confidential sources (the "Confidential Sources"), Brocade's pleadings in other matters, and the allegations set forth in the SEC's Civil Complaint, the DOJ's Criminal Complaint, and the Indictment, all establish that Brocade, Reyes, Canova, Sonsini, Dempsey and Neiman knowingly or deliberately disregarded the express written requirements of the Company's Stock Option Plans and GAAP, and manipulated the dates upon which options were reported as granted under the NSO Plan in order to strategically award grants at lower exercise prices but hide the true cost of such grants in violation of GAAP and federal securities laws.  Their reasons for carrying out this scheme were fairly straightforward.

49.     In the rapidly rising market for tech companies immediately preceding and during the Class Period, the granting of stock options, particularly non-statutory options, was the preeminent issue in the competition for skilled labor.  Many workers in the industry, particularly those working in the greater San Francisco Bay Area, were less concerned with their compensation than with the availability and particulars of stock option packages.  As the Confidential Sources explain below, competition for employees with the "right skill set" in the tech industry was fierce.  Throughout the early part of the Class Period, Brocade was short on cash to pay high salaries.  Thus, one of the only ways Brocade could obtain and retain attractive employees was to offer lucrative stock option grants.  Stock option grants were of equal, if not superior, importance than salary to prospective employees, Brocade's Officers, and the Company itself.

50.     From the perspective of prospective employee recruits, if Brocade gave the employee stock option grants with low exercise prices and then Brocade's stock rose, the employee's options would be of significant value.  The timing of stock option grants was critical because:  (1) Brocade's stock price was rising dramatically on a daily basis during the early part of the Class Period (and the strike price was tied to the Company's stock price on the date of the grant), and (2) the options could not be exercised until they became vested (which was a process that occurred by vesting a percentage of the grant each year over a set period of time until 100 percent of the grant became vested).   If an option vested, the employee could exercise his or her options and collect the difference between the stock price and the exercise price, which could mean great personal wealth.

51.     From the perspective of Brocade, a new public start-up tech company, it needed to use stock option grants to meet the demands of the labor market.  Brocade was short on actual cash to pay salaries and taxes but, at least from 2000 through 2004, was high on potential.  The Officer Defendants determined that they could manipulate the Company's publicly filed Stock Option Plans in order to hire new employees without expending great sums of cash.  They also decided they could mislead investors by hiding the negative impact these grants would have on the Company's Financial Statements (in the form of lower net income and earnings per share and higher compensation expenses and related tax expenses).

52.     From the perspective of the Officer Defendants, options were attractive for another reason.  They each knew that they could set themselves up to make millions by combining their inside knowledge of the Company with their ability to manipulate the Company's stock option plans as Officers of the Company.  The Officer Defendants used the option process to selectively grant themselves massive amounts of options whenever the stock price hit a low point and was primed to rise again.  Their reason in granting themselves options in this manner was simple:  get the options at the lowest exercise price possible.  As explained in detail in Section IV.(G), *infra*, the Officer Defendants granted themselves these options at unusually conspicuous times, in unusually conspicuous amounts, and made millions in the process.  Time and time again, these Defendants granted themselves options at the most favorable price and on the most favorable date possible, just before the stock price began to rise again.  The timing of these grants was not the result of a mere fortuity; it was done with perfect hindsight.

53.     Throughout the Class Period, Reyes, Canova and Jensen used all means necessary to meet the seemingly insatiable demands of employees for stock options and to create opportunities to make themselves very rich.  Brocade and the Officer Defendants carried out this scheme, while Sonsini, Neiman, and Dempsey stood by with deliberate recklessness in letting them do it.  Indeed, the Officer Defendants doled out options with utter disregard for the rules, Brocade's own Stock Option Plans, or the effect these grants would have on its shareholders when the truth about Defendants' scheme was revealed to the investing public.  This led to systematic abuses at Brocade in its administering of and reported expensing of its stock-based compensation systems.

54. For example, according to the Confidential Sources listed below, as well as the allegations asserted in the SEC Civil Complaint, DOJ Criminal Complaint, and the Indictment, in order to make option packages more attractive, Brocade's Executive Officers promulgated and carried out a pervasive scheme whereby they would systematically backdate option grants, give employees false start dates, or sign an employee on as a current employee and then immediately place that employee on a leave of absence (even though the employee was still actually working for another company), so that Brocade could grant the employee options at the earliest date, and lowest exercise prices possible. These practices were particularly important at a company like Brocade where, during much of the Class Period, the stock price was steadily rising on a daily basis, and the exercise price of options, which was tied to the market value of the Company's stock on the day of the grant, could increase dramatically over a period as short as one day, thereby reducing the potential spread between the exercise price and sales price.

55. Indeed, as evidenced by the daily stock price of Brocade throughout the Class Period—as shown in the charts below—Brocade's stock price rose rapidly, often gaining as much as 50% in value over periods as short as 30 days, and was adjusted for by a 2:1 split three times. For example: Brocade's stock rose from $114 per share to $206 per share between May 19, 2000 and July 18, 2000; from a split adjusted $74 per share to $108 per share from December 22, 2000 through January 29, 2000; and from a split adjusted $20.33 per share to $38.11 per share from September 17, 2001 through December 22, 2001. During this time, according to the Confidential Sources listed below, Brocade manipulated the start dates of new employees in order to grant options at the earliest date possible in order to secure the lowest strike price, even though this conduct violated the Company's own Stock Option Plans.

56. Lead Plaintiff has set forth specific detailed allegations regarding the Officer Defendants' direct involvement in this scheme based upon numerous Confidential Sources (listed below as "CS ___"). These allegations are set forth in full in Section IV.(F)(1), *infra*. A brief summary of how some of these Confidential Sources described Reyes', Canova's and their controlled person, Jensen's, involvement in this scheme, and how it operated, is as follows:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT      No.: 3:05-CV-02042-CRB

CS 1 became a full time Brocade employee in the Recruiting Department in 2000. CS 1 described Brocade's procedures for granting stock options to new employees. CS 1 was involved in bringing in new hires and then giving them their offer letters, which set forth the terms of the employment and compensation, including stock options, being offered. According to CS 1, due to the competitive job market during early 2000 through 2002, Brocade needed to lure new employees by offering stock option grants. New hires were concerned about the date the options would be granted because the Company's stock price was rising on a daily basis. Brocade was eager to use options to get these new employees to work there. Brocade did not want to have to pay large salaries, however, due to the large compensation costs. CS 1 described in detail the methods used by Brocade to manipulate the Company's Stock Option Plans. These methods included: backdating (giving a false, earlier date than the actual date) the dates of offer letters and stock option grant dates so that the new employees could take advantage of lower exercise prices; placing favored employees on leaves of absences so that their options could vest when they would not have if they had simply been terminated or quit before the vesting date; giving employees false start dates, so that their options could be granted by *ad hoc* "Board meetings" even though the employee did not actually work at Brocade yet; guaranteeing certain highly-recruited employees specific gains on their option grants by backdating those grants so that they would be "in the money"; and "repatriating" stock to the Company so that it could then issue new option grants. As set forth below, CS 1 provided numerous specific examples of such practices, many of which directly involved Reyes and Canova.

CS 2 worked in the Recruitment Department at Brocade from 2001-2003. The Recruitment Department was a part of the Human Resources Department, and consisted of ten employees or less. It was through this department that Defendants carried out much of their scheme. According to CS 2, CS 2 reported to Vice President Stephanie Jensen ("Jensen"), who worked directly with Canova and Reyes regarding option grants. According to CS 2, Jensen, Canova and Reyes had the Recruiting Department issue "offer letters" to new employees which fixed the employee's option grant date and exercise price at the date of the offer, not on the date they actually started working for Brocade.

CS 3 worked in the Human Resources Department from 2002 through 2003 and was supervised by Jensen. CS 3 also worked with Recruiting Supervisor Margie Lee ("Lee"). Lead Plaintiff learned that Lee is represented by counsel because she was questioned by the SEC in connection with Brocade's stock option grants during the Class Period. According to CS 3, Jensen worked directly with Reyes. CS 3 generated and delivered the paper work for new hire's option grants and benefit packages. According to CS 3, it was very difficult to secure new employees without granting options as this was a significant issue to most recruits. Brocade thus gave out options to new recruits with a grant date and exercise price set not by the date they actually began working at Brocade but, instead, by the date they were hired. Additionally, according to CS 3, if a recruit was required to give notice or work for a prolonged period of time for his old

employer, Brocade would bring in the recruit to fill out employment paperwork and give the recruit a false "start date" as of the date the paperwork was filled out, and then place the recruit on a "leave of absence" while he or she completed their prior employment. According to CS 3, Brocade's sole purpose in doing this was to get the recruit options at the lowest price and earliest date possible.

CS 4 worked in recruiting at Brocade from 2002 through 2005. CS 4 worked directly with Jensen who worked directly with Reyes. According to CS 4, CS 4 was trained to entice new recruits to come to work at Brocade by "pitching" to them that they could get early start dates so that they could get lower option exercise prices. CS 4 was told by CS 4's supervisors that Brocade had done this since at least as early as 2000 due to the rapidly increasing stock price. CS 4 stated that the Company would bring the recruit in to sign paperwork so the recruit could get an official start date, even though, on average, recruits would not begin work at Brocade for up to four weeks from the date they were hired. The "Board" would then have an *ad hoc* meeting immediately after the recruit filled out the paperwork to grant options, even though the recruit had not yet started work at Brocade. According to CS 4, the "Board" always was actually either: (1) Reyes and Jensen or (2) Reyes and Canova.

CS 5 worked in the Human Resources Department in 2001. According to CS 5, who worked directly with Canova and Chief Information Officer James Cates, Reyes was personally aware of and directly involved in the option grants to all new hires.

CS 9 was an executive at Brocade from 2000 through 2004, who worked directly with Reyes and then Canova. According to CS 9, each of these Defendants was directly involved in the decision making process of deciding the timing and terms of options grants for CS 9 and the employees working under CS 9's supervision.

57. Additionally, Brocade rewarded new hires and existing employees with significant monetary loans, which were secured with nothing more than the employee's unexercised options as collateral. Under these loan agreements, the Company would loan money to an employee, and the employee would in return agree to exercise or cash in his or her options when the loan came due. However, the loan agreements also required the employee to pay the loan in full, pursuant to an acceleration clause, if the employee quit working for Brocade or was terminated by the Company. This method of loaning money to employees was particularly risky to the Company because if an employee quit or was terminated before his or her options had fully vested, he or she could not actually exercise the options. Further, if the options were underwater when the acceleration clause kicked in, the options used as collateral would be worthless. As such, the Company and the employees who received these loans had a tremendous and unusual incentive to manipulate the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1  process of granting options to recipients of loans such that the grant date would be as early as

2  possible and the exercise price would be as low as possible, in order to: (1) make the options vest

3  earlier and (2) increase the likelihood that any such options would be above water in the event the

4  acceleration clause ever kicked in.  Brocade never told the public that these loans were secured by

5  such option grants and that, as such, if the options used as collateral were not vested or were not "in

6  the money," the Company would be without any real recourse.

7       58.     Knowing that the granting of options can severely misrepresent earnings if not

8  properly accounted for, Brocade and the Officer Defendants ignored and blatantly violated the

9  express requirements of Brocade's own Stock Option Plans, GAAP, and federal securities laws and

10  proceeded to give themselves and many employees an unprecedented percentage of the company in

11  stock options.  Shareholders were blissfully ignorant of the true costs that these stock option grants

12  were wreaking on the Company because Defendants omitted the material truth about what the

13  Company was doing from all of its Financial Statements issued during the Class Period.

14       59.     To make matters worse, those who were charged with ensuring that Brocade was

15  reporting its financial results fairly and accurately—the Company's internal Audit Committee—

16  recklessly abdicated their responsibilities to the investing public by turning a blind eye to what was

17  there, just beneath the surface, if they had only chosen to look.

18  **B.    Brocade, Reyes, Canova, Jensen, Sonsini, Dempsey and Neiman Knew the Proper**
       **Manner for Accounting for Stock Options**
19

20       60.     The accounting principles in place during the Class Period regarding accounting for

21  stock options were clear, simple and unambiguous.  APB No. 25 required companies to record as a

22  compensation cost the difference between the fair value of the underlying stock and the exercise

23  price of the option.  Under APB No. 25, compensation cost is the quoted market price of the stock

24  on the grant date *less* the amount the employee must pay to acquire the stock (exercise price).

25  Opinion 25, ¶ 10.  The only circumstance permitting a company to not record any cost arises when

26  employee stock options are granted at a price equal to or greater than the market price on the date of

27  the grant and the measurement date of the option grant date is certain.  The measurement date is

28  certain only when the date of the grant is fixed and determinable.  If all conditions are not met, then

the company must use the variable accounting method, which requires disclosure of the grant as a compensation expense each quarter.

61.     The foregoing paragraph constitutes the entirety of the accounting rules regarding option grants with which Brocade was required to comply.  Thus, throughout the Class Period, it was very simple to conduct the required computation of what was a compensation expense under APB No. 25:  quoted market price - exercise price = compensation cost.  If the product of the equation is zero (market price = exercise price), the option has been granted "at-the-money" and no compensation cost was required to be recorded.  If the product of the equation is a negative number (market price < exercise price), the option has been granted "out-of-the-money" and no compensation cost was required to be recorded.  However, if the product of the equation is a positive number (market price > exercise price), the option has been granted "in-the-money" and the product of the equation must be recorded as compensation cost.

62.     Paul J. McNulty, Deputy Attorney General, U.S. Department of Justice, summarized the applicable accounting rules and Brocade's nefarious conduct before the Senate Committee on Finance on September 6, 2006:

- A grant of in-the-money options is compensation, and should be treated as an expense by the corporation and should be deducted from reported revenue.

- Grants of options at-the-money or out-of-the-money are not considered an expense of the corporation.

- If a company backdates options and prices them in-the-money without properly disclosing this fact, the corporation is falsifying its books and records, fraudulently decreasing expenses and falsely inflating profits.

- Backdating of options conceals the fact that employees are being given the right to purchase the underlying stock at a discount, which misrepresents the employee's compensation.

- The sale of the underlying stock to these favored employees at a discount to the market price dilutes the value of shares held by stockholders.

- When options are surreptitiously backdated, the corporation will file false and misleading reports and financial statements with the SEC, and by doing so will disseminate false and fraudulent information to the investing public.

- Secretly backdating options to a date with a lower exercise price may lead to the filing of false tax returns by the corporation if the true nature of the option is misrepresented.

1   Statement of Paul McNulty, Senate Committee on Finance, September 6, 2006.

2        63.     The proper application of APB No. 25 is that simple. And, Brocade, Reyes, Canova,

3   Jensen, Dempsey, Neiman and Sonsini all knew it was that simple. Indeed, in the *Notes to*

4   *Financial Statements* contained in Brocade's 10-K for fiscal year 1999, the Company—and thus its

5   officers and directors—admitted that it understood this simple rule, and further understood its effect

6   on Brocade's financials:

7          Brocade accounts for the Plans and the Purchase Plan in accordance with APB No.
       25 **whereby the difference between the exercise price and the fair value at the**
8          **date of the grant is recognized as compensation expense**. Had compensation been
       determined under the provisions of SFAS No. 123, net income (loss) would have
9          decreased or increased, respectively, to the following pro forma amounts, (in
       thousands except per share data: [2]

10                                  \* \* \*

11         The fair value of each option grant was estimated on the date of the grant using the
12         Black-Scholes option pricing model. . . .

13  *Notes to Financial Statements*, Brocade's 10-K for fiscal year 1999, at pp. 44-45 (emphasis added).

14       64.     As officers and directors of the Company, Reyes, Canova, Sonsini, Dempsey and

15  Neiman were charged with knowing the Company was required to use the very accounting

16  rules that appeared in Brocade's public filings. Further, Brocade's Code of Ethics requires officers

17  and directors to gain sufficient familiarity with the rules and regulations relevant to their duties.

18  Moreover, Sonsini is a prominent lawyer who, together with his law firm, was intimately involved

19  with Brocade and, in fact, wrote opinion letters regarding Registration Statements related to

20  Brocade's Stock Option Plan. Reyes was a micro-manager with respect to stock option grants

21  pursuant to the power given to him by Sonsini, Dempsey and Neiman. Canova is a CPA charged

22  with understanding basic accounting rules such as APB No. 25. Further, as described in detail

23  below, Lead Plaintiff's Confidential Sources and the documents filed by the SEC and DOJ in the

24  civil and criminal actions against Reyes and Canova establish that each of them knew not only how

25

26  _____

27  [2]Defendants cannot claim compliance with Standard No. 123, because the "compensation costs"
    were still based on documents fraudulently altered by Reyes, Canova and Jensen. Thus, the
28  Restatement.

to account for stock option grants, but also that violating these rules and the Company's own internal policies would cause the Company's financial results to be misleading.

**C.** **Sonsini, Dempsey and Neiman Accepted A Duty to Ensure That Brocade, Reyes and Canova Complied with All Applicable Accounting Rules**

65.     Brocade's publicly filed Stock Option Plans specifically charged Brocade's Board of Directors with the responsibility to carry out those Plans in compliance with the language of the Plans themselves and with federal securities laws. These duties included ensuring that the Company had a Compensation Committee and that any and all stock option grants were approved by that Committee, made in compliance with the Stock Option Plans, and recorded and disclosed as required by GAAP and federal securities laws.  At all relevant times, Dempsey and Neiman were members of the Compensation Committee and Sonsini was a member of Brocade's Board of Directors and Audit Committee.

66.     In its 2001 Schedule 14A Proxy Statement filed with the SEC, Brocade stated that the Audit Committee Defendants were charged with ensuring that Brocade's Financial Statements complied with GAAP:

> The audit committee makes recommendations to the Company's Board of Directors regarding the selection of independent auditors, reviews the results and scope of audit and other services provided by the Company's independent auditors **and reviews the accounting principles and auditing practices and procedures to be used for the Company's financial statements**.

Thus, Sonsini, Dempsey and Neiman had the specific duty to ensure (1) that all option grants were handed out in strict compliance with Brocade's Stock Option Plans and (2) that all such grants were properly recorded, accounted for and disclosed.

67.     Congress expanded upon the duties of Sonsini, Dempsey and Neiman when it passed the Sarbanes-Oxley Act of 2002:

> The audit committee, composed of members of the board of directors, plays a critical role in providing oversight over and serving as a check and balance on a company's financial reporting system. **The audit committee provides independent review and oversight of a company's financial reporting processes, internal controls and independent auditors.** It provides a forum separate from management in which auditors and other interested parties can candidly discuss concerns. **By effectively carrying out its functions and responsibilities, the audit committee helps to ensure that management properly develops and adheres to a sound system of internal controls, that**

**procedures are in place to objectively assess management's practices and internal controls**, and that the outside auditors, through their own review, objectively assess the company's financial reporting practices.

68. Brocade's Stock Option Plans specifically charged Brocade's Board of Directors with the responsibility of carrying out the Company's Stock Option Plans according to the requirements of the Plans and in compliance with the federal securities laws.

69. Moreover, Brocade's "Code of Ethics" specifically charged Reyes, Canova, Sonsini, Dempsey, and Neiman with <u>knowing or acquiring sufficient knowledge</u> regarding their duties to ensure that they would comply with applicable federal laws regarding full and fair disclosure to Brocade's shareholders:

This Code of Business Conduct and Ethics (this "Code") has been adopted by the Board of Directors of Brocade Communications Systems, Inc. (the "Company") and is applicable to all directors, officers and employees of the Company and its direct and indirect subsidiaries. This Code is designed to help ensure compliance with legal requirements and our standards of business conduct. All directors, officers and employees are expected to read and understand this Code, uphold these standards in day-to-day activities, and comply with all applicable policies and procedures. The applicability of this Code to directors, officers and employees located outside of the United States is subject to applicable local laws of the respective countries in which such individuals reside.

This Code seeks to deter wrongdoing and to promote:

*****

C. Full, fair, accurate, timely, and understandable disclosure in all public communications made by the Company, including but not limited to reports and documents that the Company files with, or furnishes or submits to, the Securities and Exchange Commission (the "SEC");

*****

D. Compliance with the language and spirit of all applicable governmental laws, rules and regulations;

III. YOUR RESPONSIBILITIES TO THE COMPANY AND ITS STOCKHOLDERS

A. General Standards of Conduct

The Company expects all officers and employees to exercise good judgment when conducting Company business and to maintain an efficient, positive and harmonious work environment and business organization. These standards apply while working on our premises, at offsite locations where our business is being conducted, at Company-sponsored business and social events, and at all other places where you are acting as a representative of the Company. Officers and

employees who engage in misconduct, or whose performance is unsatisfactory, may be subject to corrective action, up to and including termination of service. You should review the Company's employee handbook (which is located on the Company's intranet) for more detailed information.

B.    Applicable Laws

All directors, officers and employees must comply with all applicable laws, regulations, rules and regulatory orders.  Directors, officers and employees located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act and the United States Export Control Act, in addition to applicable local laws.  Each director, officer and employee must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the Legal Department on specific Company policies and procedures.  Violations of laws, regulations, rules or orders by a director, officer or employee may result in criminal or civil liability, as well as to discipline by the Company (up to and including termination of service), for such individual.  Such individual violations may also subject the Company to loss of business and civil and criminal liabilities.

C.    Quality of Public Disclosure

The Company has a responsibility to communicate effectively with stockholders so that they are provided with full and accurate information, in all material respects, about the Company's financial condition and results of operations.  All of the Company's public communications, including but not limited to reports and documents filed with, or furnished or submitted to, the SEC, shall include full, fair, accurate, timely and understandable disclosures in every instance.  If you become aware of or suspect any improper transaction, accounting or auditing practice within the Company, or if you believe that the Company's internal accounting and disclosure controls are deficient, or that the Company is not providing full, fair, accurate, timely and understandable disclosures in its filings with the SEC or in other public communications, you must report the matter immediately to the Company's General Counsel, or the Chairperson or other designated representative of the Audit Committee in accordance with the Company's Financial Integrity and Nonretaliation Policy. Executive officers must obtain the approval of the Nominating and Corporate Governance Committee of the Board of Directors prior to accepting any outside directorship.  Such approval may be conditioned upon the completion of specified actions.  Any compensation you receive should be commensurate with your responsibilities and will belong to you unless you are serving as a director of another company at the request, or on behalf, of the Company.

Brocade Code of Ethics Sections I and II.

70.    Accordingly, Brocade's own Code of Ethics required Reyes, Canova, Sonsini, Neiman and Dempsey to acquire sufficient knowledge regarding all matters related to their duties—which clearly included stock option grants and related accounting consequences—so that they could ensure that the law was followed and that proper public disclosures were made to Brocade's

investors.

71.     Moreover, as the sole members of Brocade's Compensation Committee, Neiman and Dempsey had a non-delegable duty to oversee all executive option grants and were charged with ensuring that Brocade's public disclosure of such compensation complied with federal law.  Neiman and Dempsey also were charged with overseeing option-based compensation to non-executive employees even if the power to award such options was given to a subcommittee, which in this case was Reyes.  Indeed, Brocade's Compensation Committee Charter imposed, *inter alia*, the following duties upon Reyes and Neiman:

Purpose

The purpose of the Compensation Committee of the Board of Directors (the "Board") of Brocade Communications Systems, Inc. (the "Company") shall be to discharge the Board's responsibilities relating to compensation of the Company's executive officers.  The  Compensation Committee has overall responsibility for (i) overseeing the Company's compensation and benefits policies generally; (ii) overseeing, evaluating and approving executive officer compensation plans, policies and programs; and (iii) preparing the report on executive compensation that is required by Securities and Exchange Commission rules to be included in the Company's annual proxy statement.

********

Authority and Responsibilities

In addition to any other responsibilities which may be assigned from time to time by the Board, the Compensation Committee is authorized to undertake, and has responsibility for, the following matters.

Compensation Policies

The Compensation Committee shall review and approve the Company's compensation and benefits policies generally (subject, if applicable, to stockholder ratification), including reviewing and approving any incentive compensation plans and equity-based plans of the Company. The Compensation Committee shall report the results of such review and any action it takes with respect to the Company's compensation and benefits policies to the Board.

Executive Compensation

The Compensation Committee shall, for each of the Company's executive officers, review and approve such executive officer's (i) annual base salary level; (ii) annual incentive compensation; (iii) long-term incentive compensation; (iv)

25

employment, severance and change-in-control agreements, if any; and (v) any other compensation, ongoing perquisites or special benefit items.  In so reviewing and approving executive compensation, the Compensation Committee shall:

*****

determine any long-term incentive component of each executive's compensation based on awards given to such executive in past years, the Company's performance, stockholder return and the value of similar incentive awards relative to such targets at comparable companies and such other factors as the Compensation Committee deems appropriate and in the best interests of the Company.

The Compensation Committee shall report the results of such review and any action it takes with respect to the compensation of the Company's executive officers to the Board.

Except for grants and awards to executive officers of the Company, the Compensation Committee may delegate to one or more officers of the Company its authority to make grants and awards under the Company's incentive compensation or other equity-based plans as the Compensation Committee deems appropriate and in accordance with the terms of such plans.

Disclosure

The Compensation Committee shall prepare the report on executive compensation that is required by Securities and Exchange Commission rules to be included in the Company's annual proxy statement.

Brocade's Charter for the Compensation Committee of the Board of Directors.

72.     Of all the Board's committees, the Audit Committee and the Compensation Committee had the greatest responsibility for the oversight of Brocade's accounting for and disclosure of stock option grants and for the implementation of, and compliance with, internal processes, controls and procedures regarding those grants.  As members of the Audit Committee (Sonsini, Dempsey and Neiman) and Compensation Committee (Dempsey and Neiman), Sonsini, Dempsey and Neiman were required to have a detailed understanding of the Company, the adequacy of its financial systems and internal controls regarding option grants as a form of compensation, and applicable federal laws regarding complete and accurate disclosure of stock option-based compensation.  Moreover, pursuant to the express language of the Compensation

Committee Charter, Neiman and Dempsey necessarily made any and all option grants to executives—many of which, as demonstrated in detail below, were unlawfully backdated.

**D.**   **Sonsini, Dempsey and Neiman Armed Reyes with Unfettered Power to Act as A Committee of One for Option Grants**

73.   Nevertheless, Sonsini, Dempsey and Neiman knowingly disregarded their duties to the Company—and its investors—by granting Reyes unfettered power to act as a "Committee of One" for awarding stock options. On February 13, 2006, Peter Burrows[3] of BUSINESSWEEK published an article entitled *Brocade Stung by Stock Options*. In this article, BUSINESSWEEK reported that Reyes admitted that it would have been within his powers to approve the option grants at issue in Brocade's Restatement because Brocade's Board of Directors gave him "sweeping powers" to give out options beginning in 1999. According to the author, Reyes stated that Sonsini, an advisor to the Company since before it went public, urged the Board to make Reyes a "committee of one" for granting options. This fact was later confirmed by Reyes and his attorneys in a July 20, 2006 interview with the WALL STREET JOURNAL.

74.   Thus, Reyes admitted that he was directly involved in the granting of non-statutory stock options under the Company's Stock Option Plans, which were the subject of Brocade's Restatement. Moreover, this power was granted to Reyes by three people: Sonsini and the Compensation Committee (which consisted solely of Neiman and Demsey).

75.   SEC Commissioner Roel C. Campos gave a speech directed to this very issue—and directly related to Brocade—on August 15, 2006. In his speech, Mr. Campos stated that one of the two biggest "don'ts" for directors is "don't assign critical board functions to 'committees of one,' unless you're extremely careful to adopt procedures to ensure that there are appropriate checks and balances in place." *See* "How to Be An Effective Board Member," Speech by SEC Commissioner

---

[3] Not surprisingly, BUSINESSWEEK reported on October 2, 2006 that Peter Burrows "is one of the reporters whose private phone records were sought by investigators for Hewlett-Packard." *See* Peter Burrows, *Sonsini Under Scrutiny*, BUSINESSWEEK, Oct. 2, 2006. Sonsini's involvement in the Hewlett-Packard pretexting scandal is discussed in Section IV.(H), *infra*.

Roel C. Campos, Boston, Mass., August 15, 2006.[4]  Mr. Campos went on to say that even if such committees of one are not *per se* unlawful, "it's a signal to the company's officers that directors are not taking their obligations as a director seriously and are willing to let expediency guide their decision-making."  *Id.*

76.    Such is exactly what happened at Brocade.  Sonsini, Dempsey, and Neiman knowingly gave and/or permitted Reyes to act as a "Committee of One" for administering stock option grants.  Sonsini, Dempsey and Neiman knowingly watched as a majority of the Company's compensation was paid in the form of stock option grants.  And, Sonsini, Dempsey and Neiman knowingly allowed all of this to happen when they were <u>anything but</u> careful to adopt procedures to ensure that there were appropriate checks and balances in place to guarantee that any options granted pursuant to this power were granted, accounted for, and disclosed in compliance with the law.

**E.    <u>Sonsini, Dempsey and Neiman Knowingly Failed to Adopt and Maintain Adequate Internal Controls, Safeguards and Procedures to Prevent Reyes From Abusing The Power They Gave Him</u>**

77.    Indeed, in violation of their duties as Audit Committee and Compensation Committee Members, and despite the fact that they gave Reyes complete control to act as a "Committee of One," Sonsini, Dempsey, Neiman and Brocade have admitted that Brocade's internal controls and disclosure procedures regarding Brocade's stock option granting process were not only flawed during the Class Period but were, for the most part, utterly non-existent.  *See* Brocade Form 10-K filed January 31, 2005 at pp. 83-84, Item 9A.  Brocade admitted that its current Chief Executive Officer (Michael Klayko) and Defendant Canova concluded that "there existed material weaknesses in our disclosure controls and procedures in fiscal year 2003 and prior years." *Id*.  Brocade further admitted that these control inadequacies were not remedied until the fourth quarter of Brocade's fiscal year 2003 and that Brocade's disclosure procedures and controls

---

[4] The full text of this speech can be found at:
http://www.sec.gov/news/speech/2006/spch081506rcc.htm

regarding the granting of stock options were not operating effectively until October 30, 2004. *Id.* Brocade further announced that significant changes were made to its Disclosure Controls and Internal Controls over Financial Reporting and the stock option grant process, which were not in place during all or part of the Class Period. *Id.* According to the express language of the Restatement, these changes include:

Changes from December 2002 through October 30, 2004

1. Improvements in Disclosure Controls and Internal Controls over Financial Reporting:

- Brocade has improved the documentation of its significant accounting policies, which are reviewed with Brocade's Audit Committee and Brocade's independent auditors.

- Improvements have been made to the Audit Committee charter and committee functions. The Audit Committee charter was expanded to include in its scope the responsibility to review and approve all new or changes to, significant accounting policies and positions. In addition, Brocade has expanded both the number of Audit Committee meetings from four to eight standing meetings, and the duration of those meetings. This allows a more in-depth review of complex accounting issues.

- Brocade periodically meets with its independent auditors to review all significant business issues and associated accounting implications, and any new or changed accounting policies.

2. Improvements in Internal Controls over the stock option grant process:

- Brocade has implemented cross functional teams composed of members of Brocade's legal, accounting and human resources departments to develop improvements in the stock option granting process.

- Brocade made personnel changes in areas associated with the stock option granting process to increase the levels of experience of the personnel involved.

- Brocade formalized guidelines relating to the size and vesting schedule of stock option grants for all new employee and on-going employee grants.

- Brocade improved the documentation of the actions of the Compensation Committee and Subcommittee regarding stock option granting.

- Brocade increased the frequency of stock option grants, moving to grants on a two to three week routine cycle, and significantly reduced the processing time between grant dates and the delivery of option paperwork to employees.

Changes Subsequent to October 30, 2004

29

Brocade continues to implement remedial measures in response to the specific accounting and reporting issues identified by the Audit Committee internal review. These remedial measures include personnel and procedural changes to improve the controls over the financial reporting and the stock option granting process. Subsequent to October 30, 2004, the Company has implemented the following additional internal control improvements over its stock option granting process:

- Increased the Compensation Committee of the Board of Directors from one independent member to three independent members.

- The Compensation Committee refined and limited delegation of authority to a Subcommittee to grant stock options.

- Documented into a formal written policy its stock option granting process.

- Created a fixed schedule for new hire grants and recurring non-executive grants on the same day of each month.

- Adopted a policy of not granting executive officers options when trading is restricted for executives under the Company's Insider Trading Policy.

78. Brocade's statements regarding the changes to its internal controls processes and disclosures for stock option grants is an implicit admission that these controls, processes and procedures were not present during the Class Period, which, as described more fully herein, not only violated its own Stock Option Plans, but also directly led to the Company's false accounting for and disclosure of stock option grants throughout the Class Period. These admissions constitute additional evidence of Defendants' deliberate recklessness and, more specifically, that the Audit Committee Defendants acted with actual knowledge of these accounting violations or were at the very least deliberately reckless.

**F.    Defendants Created and Carried Out a Pervasive Scheme To Defraud Investors**

> *1.    Lead Plaintiff's Confidential Sources Describe Defendants' Scheme and Establish That Reyes, Canova and their Controlled Person, Jensen, Were Directly Involved In And Actually Aware Of The Accounting Violations At Issue At All Relevant Times*

79. Lead Plaintiff has obtained information from several confidential sources who were directly involved in the stock option grant process. These confidential sources, when taken in isolation or viewed collectively, establish that Brocade and the Officer Defendants were aware of,

and indeed directly involved in, the accounting violations that formed the basis of Brocade's Restatement.

80.     Many of the confidential sources described below worked in the Human Resources Department at Brocade during all or relevant parts of the Class Period.  Because of the relative paucity of employees holding certain positions at the Company during this time, it would be all but impossible to give the specific job title of each such confidential source, or the source's precise employment start/end dates without making the source's true identity readily ascertainable. Accordingly, in the interest of protecting the identity of these sources, the name, gender, specific job title of each such source, and the exact start/stop date of each source's employment are not given.  Rather, Lead Plaintiff has referred to each source by a source number (*e.g.*, "CS 1") and has set forth specific detail regarding each source's job duties, years worked, and other corroborating facts, to substantiate that each such source was in a position to know what he or she has disclosed to Lead Plaintiff.  Lead Plaintiff will provide the Court with a list specifically stating the name, contact information, job title, and specific start/stop dates of employment for each such confidential source under seal for *in camera* review, should the Court so require.

81.     ***Confidential Source 1 ("CS 1"):***     CS 1 was employed by Brocade in the Recruiting Department from the beginning of 2000 through late 2002.

82.     CS 1 worked with such Recruiters as Laurie DeGange, Lisa Shone and Christie Louie.  In 2000, CS 1 and this team reported to Maggie Bannerman ("Bannerman"), who was manager of the Recruiting Department.  Bannerman left in approximately April 2001.  Bannerman was replaced by Theresa Uchida ("Uchida"), who is the current Director of the "Global Talent Group" for Brocade.  During the 2000 to 2002 timeframe, Uchida reported to Vice President of Human Resources ("HR"), Jensen.  Greg Kayes ("Kayes"), the Manager of Recruitment, also reported to Uchida.  According to CS 1, Kayes and Uchida had come to work at Brocade after working together at Cisco.

83.     CS 1 stated that CS 1 was familiar with recent media reports regarding governmental investigations into Brocade's practices with regard to the pricing of employee stock option grants. CS 1 then stated that during CS 1's tenure at Brocade, the Company regularly manipulated the stock

option grant process in several ways, including backdating the Company's offer letters to new

employee candidates, in order to provide particularly desirable job candidates with additional

incentives to join Brocade by using this practice to offer the benefit of probable lower strike prices

for option grants. CS 1 described the scheme in detail as follows.

84.     CS 1 described three primary ways that Brocade recruited new hires, noting that each

method resulted in the same scheme of backdating offer letters for particularly desirable candidates.

The three methods were described as follows:

> a.     A job requisition was created by organization management, which defined the job description. Brocade had in place written guidelines dictating salary ranges and numbers of shares of stock options to be granted per each category of worker. This requisition request was submitted to the Recruitment Department, which then "opens up a req" (inputs the details into the Recruitment Department system). In many cases, the Recruitment Department then utilized the services of search firms ("head hunters") – one regular vendor was Heidrich & Struggles. Such firms were paid 35% of the employment "package" for placement with Brocade as its "retainer."

> b.     In addition to the "retained" type of recruiting firm, there were also contingent types of recruiting vendors, where Brocade only paid a fee if a candidate brought to Brocade was actually the candidate that was hired.

> c.     Brocade used its own recruiters to hire new candidates. This method was considered to be a less expensive method and therefore was the method Brocade used most frequently.

85.     CS 1 stated that the HR Department also could generate proposed offers and offer

letters, but usually during 2000 through 2002, such was done by the Recruiters. CS 1 stated that

offer letters typically had the salary, number of options granted, and bonus structure that Brocade

would pay as compensation over a period of time. Prior to sending out the offer letter to the

candidate, the Recruiters circulated the proposed offer to get approval signatures from operational

management and above.

86.     CS 1 stated that the Company had certain guidelines for the amount and number of

options that could be offered to a new hire. According to CS 1, in order to go "out of guidelines" on

an offer, various approvals had to be obtained. CS 1 described that normally, if the Recruitment

Department was negotiating a deal with a candidate, the Recruiters acted as intermediaries between

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1    the prospect and organization management.  It also was typically the Recruiters who made the first

2    actual agreement with prospects, asking them that if Brocade were to offer a certain amount of

3    money within a certain number of days along with benefits such as amounts of stock options, could

4    the Recruiter get a verbal commitment from the candidate.  After that, an offer letter was generated.

5    CS 1 stated that this was usually the way the process worked.

6          87.    However, according to CS 1, when the new hire was a candidate for a vice president,

7    manager, or an executive position, the terms for these men and women were negotiated directly by

8    Reyes, Canova and Jensen.  Further, according to CS 1, if any offer was "out of guidelines," then

9    additional approvals were required, and Jensen was typically the executive level manager who

10   signed off on these types of large commitments.  CS 1 also described the Company's "Evergreen

11   Plan" offered for high-level positions, which spelled out additional grants to be issued annually

12   during the person's employment.  The Evergreen Plan was usually only applicable to executive

13   level personnel.

14         88.    According to CS 1, Brocade's stock split three times during 2000.  CS 1 noted that

15   the Recruiters and new hires believed it was highly predictable during 2000 and 2001 that the stock

16   would continue to rise in price, making the earliest date that a new-hire could be granted options

17   very important in terms of both their ultimate gain and vesting dates.  That is, with the stock price

18   rising each day, and the exercise price being tied to the date of an option grant, the earlier the

19   options were granted, the lower the exercise price would be.

20         89.    CS 1 described several different methods used by Brocade to backdate option grants

21   and otherwise manipulate the option grant process from 2000 through 2002. Some new prospects

22   were identified through various lead sources and contacted by Recruiters. It was not uncommon for

23   managers who had worked at a previous company to recruit former co-workers, team members, and

24   executives to come aboard at Brocade.  Others had connections to managers of various disciplines

25   or upper-level management, including vice presidents and executives.  According to CS 1, while

26   negotiations for some upper-level management new hires were handled by the executives as

27   discussed above, once the decision was made to offer a new hire a job, the terms of any agreements

28   reached with new hires were transmitted to the Recruitment Department for purposes of generating

33

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

an offer letter.  CS 1 stated that the offer letters were a memorialization of the employment terms between Brocade and the new hire(s)— much like an employment agreement. However, CS 1 explained that offer letters were always generated in this manner regardless of how a prospect was introduced to the Company.

90.    CS 1 stated that Brocade's steady rise in stock price made the use of stock option grants a valuable incentive to both new hires and management because the new hires could be enticed into accepting an offer without the Company incurring the expense of a high salary.  CS 1 detailed Brocade's practice of backdating offer letters for desirable prospects—most of whom were generally well aware of, and compared rising stock prices among, tech companies in the Silicon Valley—as a way of evaluating a move to a new employer.

91.    According to CS 1, Brocade used a scheme of backdating option grants awarded to new hires.  As an example of the backdating practice, CS 1 indicated that an employee would first be contacted by Brocade on May 1, 2000, when employment was discussed.  A verbal offer would be given, and a start date of May 30, 2000, agreed upon.  A formal offer letter would be sent on May 15, 2000.  For purposes of this example, assume that Brocade's stock rose from $180 on May 1 to $230 by May 30.  During 2000 and 2001, the possibility then existed for a Board meeting to occur between May 1—the date a recruiter first began speaking with this employee and May 30— the date the employee actually was to begin work.  To further entice the employee to join Brocade, the Recruiter would tell the prospect that his or her start date would be backdated on the offer letter to a time before whenever the Board meeting actually occurred.

92.    CS 1 explained that this was done in order to take advantage of the lower price on the earlier date and to start the vesting process. The start date reflected on the offer letter, and even sometimes the date of the letter itself, were then backdated to a date prior to a Board meeting that followed those dates.  This scheme gave the false appearance that the employee had joined the Company prior to a date when he or she actually had started their employment and, thus, prior to the time their strike prices for their options were fixed.

93.    CS 1 also explained another method, whereby both the offer letter date and start date were backdated.  This method was used when a highly desirable candidate was communicating with

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1    Brocade about coming onboard at some point following a Board meeting. CS 1 said that once an

2    offer was fixed, in order to close the deal, Recruiters would include in their verbal negotiations an

3    offer that the employee's formal offer and start dates would be backdated to a date before a Board

4    meeting that had *already occurred*—and at these times, the employee prospect would, therefore,

5    already know the strike price. This scenario usually occurred when Recruiters were already in

6    touch with desirable candidates, and in the process of negotiating or processing an offer letter.

7    Meanwhile, a Board meeting would occur, or was about to occur, and the prospect would be

8    contacted and given an opportunity to accept the position with Brocade if they got their options

9    priced at the Board meeting—a meeting that occurred before they had even received a formal offer

10   letter or started work. In some cases, this practice was used to recruit extremely desirable

11   candidates, who were hired well after the Board had set a strike price for employees hired in a

12   previous period.

13          94.    CS 1 said that from 2000 to 2001, "Board meetings" were held *ad hoc*, and that there

14   seemed to be no regular schedule or even range of days in between such meetings. CS 1 recalled

15   that some of these *ad hoc* meetings noticeably occurred just after the stock had dipped in price. The

16   stock would begin to climb back, or would simply rebound and keep going up, and a Board meeting

17   would quickly follow. CS 1 stated that CS 1 is certain that it was "not unusual" that subsequent

18   offer letters were backdated along with start dates to take advantage of prices set at such Board

19   meetings that had already occurred during this two-year timeframe.

20          95.    CS 1 stated that at some point in 2002, Brocade migrated to a system of holding

21   *regular* Board meetings for option grants, usually meeting twice monthly around the fifteenth and

22   thirtieth of each month. At that time, offer letters generated before the fifteenth of the month would

23   be included in the strike price the Board issued on the fifteenth, and letters dated between the

24   fifteenth and thirtieth would be subject to the strike price decided on the thirtieth. Brocade's

25   Recruiters were not allowed to tell prospects when the date of the next Board meeting would be but,

26   instead, encouraged them to hurry up and join Brocade so that they could get the benefit of the

27   strike price that would be awarded at the next meeting.

28

96.     As described by Lead Plaintiff's other confidential sources, this new system led to the process of Brocade bringing in new hires to fill in paperwork before they actually started working at Brocade so they could be classed as an employee or placed on a leave of absence, and thus get options at the next Board meeting, even though the new hire still had not actually begun working at Brocade and, in many cases, was still working at another company.  CS 1 stated that offer letters were not backdated as frequently at this point, *but that start dates still* were if an employee had received an offer letter before the date of the next Board meeting, but the true start date occurred afterward.

97.     CS 1 stated that even after Brocade "tightened up" the offer letter practices by holding more regular Board meetings, CS 1 observed that strike prices had been set for batches of offer letters based on a market price that had occurred on a date between two Board meetings.  CS 1 knew about this practice because Recruiters were still in touch with new hires and HR about various issues pertaining to new employees until after the candidates had actually come to work and gone through official orientation.  Even then, there were sometimes still "loose ends" or questions raised by new hires with respect to their offer letters and benefits, and so, Recruiters often became aware of strike prices awarded by the Board for the grants in batches of offer letters that had been generated since the previous Board meeting.

98.     CS 1 explained that Reyes was necessarily involved in offers for high-level positions because Brocade was a small company.  According to CS 1, these offers represented significant commitments on behalf of the Company, and Brocade was competing with larger companies to recruit some of its key personnel.  One way to entice these higher-level candidates was to address the current stock price, but promise that they could get a lower price on their options based upon a price that was awarded to others at a prior Board meeting before this candidate had been recruited.

99.     CS 1 provided several specific examples of such offers.  CS 1 recalled the approvals process for an offer to Dan Cudgma ("Cudgma"), a Brocade Vice President, which was well beyond Company guidelines.  Offers to such high-level candidates, which were "out of guidelines," required involvement from Jensen, Reyes and the CFO.  CS 1 recalled there being quite a rush to

1  get approvals and the "t's crossed and i's dotted" so that Cudgma could take advantage of a lower

2  strike price.

3       100.    Lead Plaintiff's other Confidential Sources, including CS 4, have verified that

4  Cudgma was given a loan by Brocade in the amount of approximately $1 million. According to CS

5  4, at some point Cudgma had a disagreement with Reyes and threatened to expose the "whole

6  backdating thing." Cudgma was eventually terminated and, according to legal documents reviewed

7  by Lead Plaintiff, Brocade filed for foreclosure against Cudgma and foreclosed on his home. Lead

8  Plaintiff's Confidential Sources, including CS 4, have confirmed that Cudgma is the whistleblower

9  who threatened Brocade's General Counsel that he would tell governmental regulators about Reyes'

10  manipulation of Brocade's Stock Option Plans, which ultimately led to the SEC and DOJ

11  investigations against Reyes and Brocade.

12       101.    CS 1 also recalled the hiring of Evan Ellis ("Ellis"), a heavily-recruited sales Vice

13  President, to whom Brocade management *guaranteed a $5 million gain* on his initial stock option

14  grant in 2001. Ellis came to Brocade through Jack Cuthbert ("Cuthbert"), who was a Brocade Vice

15  President and spearheaded the recruiting of Ellis. Cuthbert and Ellis had worked together

16  previously at SGI, where Ellis was Cuthbert's boss. CS 1 said that Brocade included in the writing

17  of the offer letter generated to Ellis this guarantee of a $5 million gain without any conditions such

18  as whether the shares had even vested.

19       102.    CS 1 stated that Ellis started as either a Vice President or Director of Sales. Cuthbert

20  "pushed Ellis through" the process, according to CS 1, and ultimately, the offer to Ellis was "way

21  out of guidelines." This meant that a higher amount than Brocade's guidelines was ultimately

22  offered, and the number of stock options was also greater than Company policy authorized. As

23  discussed above, such "out of guidelines" grants required the involvement of Jensen, Reyes and the

24  CFO.

25       103.    According to CS 1, within approximately eighteen months to two years, Ellis was in

26  great conflict with management and decided to leave Brocade. The Company refused to pay Ellis

27  the $5 million guarantee and, according to CS 1, Ellis threatened suit to enforce his deal. CS 1

28  related, from information made available to CS 1, that Reyes invited Ellis to a hotel, and met one-

on-one with Ellis in a room, where Reyes told Ellis that if Ellis did not back off of his lawsuit—attempting to recover the $5 million guarantee—Ellis "would never work again in California." CS 1 suggested that the threats from Reyes went even deeper than Ellis' potential future employment. According to CS 1, after this meeting, the case was settled.

104.    CS 1 also recalled that Tim Duffy ("Duffy") was recruited with a backdated offer letter to take advantage of a lower strike price for a large stock option grant. Duffy was hired sometime in approximately early 2001. In addition, Duffy was paid a sign-on bonus of $70,000—a huge cash bonus by Brocade's standards. Again, this was another "out of guidelines" deal. CS 1 said that Duffy, like many of Brocade's highly desirable job candidates, was directly told that his offer letter and start date would be backdated to before the time he was actually able to begin work, as a recruiting tool to award him a lower strike price.

105.    CS 1 stated that when Brocade was trying to convince CS 1 to become an employee, part of the offer Brocade made to CS 1 involved backdating CS 1's start date.

106.    CS 1 stated that in 2000, Recruiter Christie Louie ("Louie") was hired after having been a contractor for over a month. The offer letter backdated Louie's start date by indicating that Louie had become an employee of Brocade at the time she had actually started as a contractor in order to provide her a strike price that had already been established in a prior Board meeting. However, after the fact, Brocade later demanded that Louie return all the money she was paid as a contractor—approximately $40,000 to $50,000.

107.    CS 1 also described another method used by the Company to carry out their scheme. CS 1 stated that the Company, upon negotiating severance agreements, in particular with upper-level managers being laid off, would allow those managers to remain technically employed for a period of time so that their options either could vest or could at least potentially appreciate to a higher price. CS 1 related CS 1's review of documents showing the process of Brocade awarding terminated employees leave of absence status, usually involving an employee who was terminated close to his or her vesting date. However, according to CS 1, this practice was very selective as to which employees were given this kind of special treatment. CS 1 related an email exchange with

1   Jensen over this very issue, with statements or acknowledgements by Jensen that certain terminated

2   employees were being categorized as "on leave of absence" in order to vest options.

3       108.    CS 1 stated that Recruiters often discussed the timing of how Brocade laid off

4   employees, and then would quickly fill their positions with new hires.  The layoffs often coincided

5   with dates close to vesting dates of options, where the options would not vest and the stock went

6   back to the Company.  From what CS 1 understood, this gave back to the Company stock that could

7   then be offered at lower prices at times when the market price had risen since the original grant.  As

8   described above, in other instances, employees were given severance packages that allowed them to

9   go on leave of absence until a date that their stock options vested.  CS 1 stated that this had to do

10  with Brocade's "playing favorites" and also avoiding disputes with the workers that caused concern.

11      109.    CS 1 further described that if stock prices were going down, it was beneficial to

12  Brocade to repatriate.  For example, if original options were granted to an employee at $130 per

13  share, but the stock price had declined to $10.00, there was usually not much dispute when

14  employees were laid off before vesting dates.  However, by initiating layoffs before vesting dates,

15  Brocade would get this stock back, which, according to CS 1, made the stock pool larger.  More

16  shares could then be offered at a lower price without being diluted to either one of the executives

17  being retained, or somebody new being hired.

18      110.    CS 1 stated that highly sought candidates like Ellis or Duffy were typically offered a

19  backdated offer letter and a strike price that had been awarded in prior periods. CS 1 recalled that

20  this use of older strike prices from prior periods sometimes involved about a thirty-day differential,

21  but could even be a price awarded to others months earlier.  CS 1 also stated that, for example, there

22  would be an actual hire date of October 1, but that the strike price would be September 2, and in

23  some cases, even months before.  CS 1 is certain that lower prices from prior periods were granted

24  for highly desirable candidates hired later.

25      111.    CS 1 recalled that Regan McGrath was recruited and then relocated to Brocade in

26  California, from his residence in Canada in approximately early 2001.  Included in the offer to

27  McGrath was an approximately $1 million loan.  McGrath was let go in 2003 or 2004, and the

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1  Company was forced to relocate him back to Canada. As discussed above, such "out of guidelines"

2  grants required the involvement of Jensen, Reyes and the CFO.

3  112.   CS 1 recalled that Steve Dehib was a senior product marketing manager heavily

4  recruited by Brocade in 2001. CS 1 handled the offer letter process with him, recalling that various

5  parts of the offer were "way out of guidelines," including an exceptionally high number of options

6  and backdating of his offer letter and/or start date. As discussed above, such "out of guidelines"

7  grants required the involvement of Jensen, Reyes and the CFO.

8  113.   CS 1 also recalled that Mark Koch was a sales executive hired by Brocade in New

9  York, with the terms of his offer being significantly out of guidelines, as well. CS recalled that

10  Koch's offer letter was backdated in order that he could take advantage of an earlier strike price as

11  well. As discussed above, such "out of guidelines" grants required the involvement of Jensen, Reyes

12  and the CFO.

13  114.   All of the methods, practices, and specific instances described by CS 1 directly relate

14  to the violations admitted by Brocade in the Restatement.

15  115.   **Confidential Source 2 ("CS 2"):**  CS 2 worked at Brocade from 2001 through mid-

16  2003. CS 2 worked in the HR Department. CS 2 was responsible for the process of "on boarding"

17  Brocade's new hires. The "on boarding" process included explaining the new hire's employee

18  benefits, including options grants, and distributing benefit packages to each such new hire.

19  According to CS 2, Brocade's recruiters made salary and stock option offers to new hires. The

20  Recruiting Department within the HR Department had a "Benefits Guide," which set forth the

21  number of stock options to be given to new hires depending upon their specific job category.

22  116.   CS 2 stated that the Benefits section of the HR Department was very small and

23  consisted of approximately 10 employees. CS 2 reported that CS 2 worked directly with Heidi

24  Rado, Manager of Employee Compensation and Benefits, and that Rado reported directly to Jensen,

25  Vice President of HR. According to CS 2, CS 2 attended weekly meetings with Jensen, who

26  verbally informed CS 2 that Jensen worked on the details of employee stock options with Brocade's

27  CFO, Defendant Canova. CS 2 also stated that Jensen worked directly with Defendant Canova with

28  regard to stock options for new hires, as such was a regular topic of discussion among CS 2 and the

40

1  employees of the HR Department.  CS 2 stated that Brocade's Stock Plan Administrator, Elizabeth

2  Moore, was also involved in the implementation of Brocade's benefits plans and options grants.

3  117.  After management had approved the terms of a new hire's offer and a new hire

4  accepted an offer of employment, the recruiter was required to inform the HR Recruitment

5  Department, which would then generate an "offer letter."  As part of CS 2's regular daily job duties,

6  CS 2 received copies of "offer letters" from Brocade's Recruiting Department.  According to CS 2,

7  when CS 2 prepared each new hire's "on boarding" package, CS 2 saw the new hire's offer letter

8  and such offer letters routinely showed the stock option exercise price to be fixed at the time the

9  new hire accepted an offer of employment, not at the time the new hire actually received a written

10  offer or after the new hire started working at Brocade.  That is, the exercise price in each such offer

11  letter was based upon the date the new hire accepted the offer, even if the offer letter itself was not

12  generated until several days later. This is one of the precise accounting violations admitted to by

13  Brocade in its Restatement.  *See* Brocade's SEC Form 10-K filed January 31, 2005.

14  118.  ***Confidential Source 3 ("CS 3"):***  CS 3 worked for Brocade from 2002 through

15  2003.  CS 3 was employed in the HR Department and was directly involved with the recruitment of

16  new employees.  CS 3 worked with three Recruiting Coordinators, and reported to Recruitment

17  Supervisor, Margie Lee.

18  119.  Pursuant to Lead Plaintiff's investigation, Lead Plaintiff has learned that Margie Lee

19  is represented by counsel as she has been interviewed by the SEC with respect to Brocade's

20  improper accounting for stock option grants during the Class Period.

21  120.  According to CS 3, Margie Lee reported to Greg Kayes, Manager of Recruitment,

22  who reported to HR Director, Uchida, who reported to Vice President of HR, Jensen.  Jensen

23  reported to Defendant Reyes.

24  121.  CS 3 was involved in the process of recruiting new hires.  According to CS 3, each

25  day CS 3 made "cold calls" over the telephone and searched computer databases to find prospects to

26  work for Brocade. CS 3 stated that due to the extremely competitive job market in the Bay Area

27  during the early part of the Class Period, recruiters for Brocade had to be very aggressive in trying

28  to obtain new hires.  CS 3 states that Brocade recruiting coordinators had access to a Brocade

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

"Benefits Guide" and database, which contained information regarding the benefits Brocade offered. This database contained a "stock guide," which set forth the range of options shares to be offered based upon the starting salary and job title for which the new hire was being considered. According to CS 3, most new hire candidates that CS 3 recruited were concerned about stock option exercise prices.

122.     CS 3 stated that when CS 3 contacted a qualified and interested new hire candidate, an interview was set up for the new hire prospect with a member of the HR Department and a management level person from the specific department or area for which the new hire was being considered. If the management person decided to extend an offer to the new hire, the management person instructed the Recruiting Department to generate an "offer letter." The recruiter who was in charge of contacting the new hire was required to inform the new hire that Brocade was extending a job offer and to give the new hire the details of that offer, including the number of options and their exercise price. According to CS 3, at this point, an offer letter itself was generated. CS 3's job duties included the preparation of such offer letters. CS 3 states that through this process, most new hires were made aware of the exercise price of their options at the time they were hired, before they actually began working for Brocade. This is one of the precise accounting violations admitted to by Brocade in its Restatement. *See* Brocade's SEC Form 10-K filed January 31, 2005.

123.     CS 3 also described a process whereby Brocade's management improperly used "leaves of absences" to manipulate a new hire's options grant. CS 3 described a frequent scenario involving employees who were not able to start working at Brocade right away (usually because they needed to provide notice and continue working for their prior employer for a given period of time). According to CS 3, Brocade would have such new hires come into work for a meeting (ostensibly for the purpose of meeting with HR to fill out some new employee paperwork), for the sole purpose of establishing a false start date.

124.     After the meeting, those employees left immediately and then returned later, usually within four weeks, to actually start working. According to CS 3, the new employees came in well before they could actually begin work, in order to create an illusory "start date," so that the employee and Brocade could report an earlier and more favorable exercise price (and date of grant)

rather than using the strike price from the date they actually commenced employment, which was usually weeks later. CS 3 stated that the time lag in between the candidate coming in for the initial "start date" set just for purposes of obtaining a lower strike price, and the date that the employee actually did come in to begin work at Brocade, was treated by the company as a "**leave of absence**."

125.    This is one of the precise accounting violations admitted to by Brocade in its Restatement. See Brocade's SEC Form 10-K filed January 31, 2005.

126.    ***Confidential Source 4 ("CS 4"):*** CS 4 worked at Brocade from 2002 through 2005 in the Recruiting Department. CS 4 reported to Uchida and later Kayes, each of whom reported to Vice President of HR, Jensen. According to CS 4, Jensen reported directly to Defendant Reyes.

127.    CS 4 states that the Brocade recruiters were trained to entice new job candidates to work for Brocade by offering them the opportunity to report to the Company for an "early start date" in order to take advantage of a potentially lower strike price on their initial option grants. CS 4 described that eliminating a two to four-week delay between the time of hire and the time of actually beginning work was potentially of substantial value to a new hire's stock option grant because of the steady increase in Brocade's share price, specifically during the 2000-2003 time period.

128.    CS 4 described the recruitment process as follows: recruiters would both cold-call a potential candidate either by seeking out those in certain positions at other companies, or finding out that individuals were potentially looking for new jobs with resumes posted on databases. The recruiters also responded to those who visited Brocade's website, and who either applied or expressed interest in knowing more about working for the Company. Once a recruiter contacted a prospect and the person was considered a "candidate" by the recruiter, a "phone screen process" was conducted, where the recruiter and often the designated manager screened a candidate through additional discussions, and sometimes questionnaires.

129.    Then, the candidate was subjected to interviews—first with a manager from the appropriate discipline, then members of a cross-functional team that would be working with that person, and sometimes members from the team that that person would be working with. There were usually two rounds of these interviews before Brocade management decided to present an offer

1    letter. There was no definitive procedure for this, each department manager did things a little

2    differently and the recruiting department would accommodate them.

3        130.    CS 4 learned upon beginning work in early 2002, that since at least 2000, Brocade's

4    recruiters were trained to tell prospects that strike prices would be determined at the very next

5    Board meeting after their start date.  Recruiters further explained that there was no regular schedule

6    for these meetings so that they could occur within one week to one quarter after the new-hire's

7    "start date."  Due to Brocade's rising stock price, this was a potential problem because the stock

8    price, and thus the exercise price, of any options granted to a new hire could and did rise

9    dramatically on a weekly, and often daily, basis.

10       131.    Consequently, CS 4 said that CS 4's supervisors, including Uchida, told CS 4 how

11   to pitch "early start dates" to new hires, in order to get them lower exercise prices, and that Brocade

12   always tried to get new employees the best option price when joining the company.  CS 4 states that

13   Brocade systematically brought new hires into the Company before they actually started to give

14   them a false "start date" so that the "Board" could set an award of options and fix an exercise price

15   and grant date of the options well-before the employee actually started working at Brocade, and

16   most of the time, the new employees were still actually working at other companies.  CS 4 states

17   that lower strike prices were the only reason why new hires were offered to come into Brocade on

18   an agreed "early start date," while not expected to report for actual work until a later, agreed "actual

19   start date" for orientation.  On these "early start dates," new hires met with the person who would

20   become the candidate's manager (or at least one of them).  Usually, the new hire was still required

21   to work out a notice period with their previous employer (from where they were often recruited).

22   Others had various other types of commitments that resulted in a necessary delay in reporting for

23   work before an agreed start date.

24       132.    By having recruits come into Brocade early, for just a short time on one day,

25   Brocade created "early start dates" according to CS 4, so that the new hires would lock in the

26   benefits of option strike prices set at the very next Board meeting.  This practice eliminated the risk

27   of waiting for a future meeting that would set the price after an actual start date.  In order to secure

28   the early start date, the new-hire did not have to go through "New Hire Orientation" – that would

1   wait until actually reporting for work on a later date. However, the candidates accepting a position

2   and appearing for an early start date were required to execute a Brocade "Non-Disclosure

3   Agreement" (NDA) for the company employees. CS 4 stated that Brocade began to wind down this

4   scheme in 2004 because the stock flattened and was trending downward, thus eliminating early start

5   dates as an incentive for new hires.

6          133.   CS 4 said that CS 4 and other recruiters, as well as many job candidates were

7   "uncomfortable" with the early start date practice. The form offer letters that Brocade sent to new

8   hires included two sentences that identified the employee's early start date (this would be filled in

9   by recruitment after agreement with the candidate) and the actual date the employee would begin

10  work (also filled in on this form). The recruiters necessarily discussed this practice with candidates

11  in order to ascertain which dates would be filled in on the offer letter. The language used in these

12  communications described "the early start dates" practice as a regular one that was applicable and

13  available to most new hires, and was especially accommodating to "hot" candidates (in demand and

14  uniquely desirable to Brocade).

15         134.   CS 4 also stated that from 2000 to 2002, the average time difference between the

16  false "start date" and actual start date was two to four weeks; from 2003 though 2004, the average

17  time difference was about two weeks. CS 4 described that this was also a time of great action for

18  other companies in Silicon Valley, whether established or start-up, causing talented workers to be in

19  high demand. Recruiting was so aggressive that many companies demanded extended notice for

20  people to leave and included a two-week to 30-day notice period as part of employment agreements.

21  Thus, according to CS 4, Brocade used this scheme to manipulate the process of offering option

22  grants to new hires.

23         135.   According to CS 4, strike prices were set pursuant to this scheme by using *ad hoc*

24  "Board Committee Meetings" – which consisted of two people: (1) Reyes and Jensen or (2) Reyes

25  and the acting CFO (Michael Byrd and later Defendant Canova). CS 4 states that it was widely

26  known within the recruitment department and throughout the Company that Jensen worked directly

27  for and with Reyes on stock option grants, especially when higher-level managers were the

28  grantees. CS 4 also states that CS 4's recruitment office was near a conference room often used by

                                                45

the executives, and CS 4 frequently saw Defendant Reyes meeting with these individuals. CS 4 explained that when starting out with Brocade, CS 4 quickly became familiar with Reyes' "Board meetings" that were held for option grant purposes, always after a time when Brocade's stock price had declined, bottomed, and then was starting to rise again. The meeting dates always tracked a period where the stock had dipped. CS 4 personally observed that the strike prices were regularly derived from the stock's low points between these Board meeting dates, and this observation was openly discussed as Defendant Reyes' practice within the recruitment and HR departments.

136. CS 4 said the occurrence of these meetings also was prompted by how many offers Brocade had out, whom they had offers out to, and whom Defendant Reyes "wanted to do something for." CS 4 described Defendant Reyes as having an internal reputation at the Company as a narcissist, who believed Brocade was his own company, and the type of person who truly believed he was self-entitled to do whatever he wanted there.

137. CS 4 said that the numbers of options granted to finance and engineering types, in general, were far lower than those recruited for the sales organization. CS 4 explained that Defendant Reyes was a "sales-oriented CEO," and that while Brocade was known for paying well, that the stock option grants were clearly in favor of sales people. CS 4 states that recruiters in the sales area, as well as upper-level managers and Vice Presidents in that area, pushed this early start date process very aggressively. CS 4 said that these were the categories of employees receiving the largest grants, and with salaries that were better than competitive. CS 4 explained that some prospects were more interested in a higher salary and accepted a lower number of options, but others – especially sales people – took lower base pay in order to get larger numbers of options. CS 4 states that many times, these awards were "exorbitant" and always tied to a nearly immediate "early start date."

138. CS 4 also stated that CS 4 recruited operations people, and workers for virtually all other positions at the San Jose Headquarters. On the other hand, sales persons could work anywhere in the country, according to CS 4, and not even see their manager until two to three months after their actual start date. For those persons working at the San Jose Headquarters, new employees went through orientation on their very first day of actual work. CS 4 explained it was

1   much easier for sales persons stationed across the country to seemingly begin work for Brocade,

2   while continuing to work out a notice period for their former employer and thus sales people

3   aggressively negotiated the soonest of early start dates.

4       139.   CS 4 stated that with employees coming in to secure their "early start date," the

5   recruiters were made aware of their arrival for a brief meeting with management.  Shortly thereafter,

6   these new-hires left, not to return until the date they actually began work.  CS 4 said that CS 4

7   recalled instances where the start date and actual beginning of employment with Brocade were

8   regularly two weeks to even a month apart, although some managers gave tasks to their new hires to

9   perform in the meanwhile, like reading up on Brocade materials.  CS 4 states this was an exercise to

10  appease the manager's anxiety over participating in the establishment of a sham start date.

11      140.   CS 4 further stated recruiters were not always involved in new-hires.  Sometimes

12  upper-level management made deals with "hot candidates"—and especially for particularly high-

13  level positions like Vice President and above. In many circumstances, Vice Presidents brought

14  others with them over from another company, and job positions were created within Brocade for

15  these migrant teams.  In this scenario, the recruiters became aware that "job requisitions" were

16  created for these new hires, and recruitment generated offer letters with information from upper-

17  level managers or even the executives.  According to CS 4, Defendant Reyes "micromanaged" this

18  process.

19      141.   CS 4 states that by 2004, when Brocade's stock had fallen below years of

20  performance, Defendant Reyes was losing a lot of key people and could not find any other ways to

21  motivate them to stay.  Reyes had relied heavily on option grants to entice people away from other

22  companies, but was personally disliked for having fired virtually the entire "V&C level" (Vice

23  President and CTO, COO, etc.) in short periods.

24      142.   ***Confidential Source 5 ("CS 5"):***  CS 5 was employed by Brocade in the Human

25  Resources Department during 2001. CS 5's job duties included the recruitment of new-hires.  CS 5

26  worked with several departments to assist in filling requisitions for new employee hires.  CS 5

27  reported to Director of HR, Uchida, who reported to Vice President of HR, Jensen.  According to

28  CS 5, Jensen reported directly to Defendant Reyes.  CS 5 worked directly with Defendant Canova

as well as Brocade's Chief Information Officer, James Cates, regarding new-hire candidates in their respective areas. CS 5 also stated that CS 5 worked on recruiting new hires for Brocade's international operations with Vice President of International Sales, James Lalonde, HR Coordinator, Lee Gagnon, and Recruitment Supervisor, Margie Lee.

143. CS 5's job duties included analyzing database and contact information to find potential new hires who may possess the qualifications and requirements for each position sought to be filled. After receiving a new hire requisition from a specific department or area, CS 5 worked directly with the management person in charge of that department or area throughout the recruiting and hiring process. CS 5 utilized Brocade's internal database information regarding the ranges of salary and stock option grants generally available for new hires based upon the specific job title being filled. CS 5 would then bring in suitable candidates to meet with management.

144. If the management-level person of the specific department decided to extend an offer to the new hire, CS 5 would then prepare a requisition to approve the hiring with the required information regarding options and salary ranges. According to CS 5, the new hire requisition approval was required to be signed by the management person in the department for which the person was being hired, a member of the finance department, and a HR Coordinator. CS 5 also stated that if a new hire was being offered a job with terms that differed from the ranges of salary and options for such a position as set forth in the Brocade database, then Defendant Canova was required to sign the requisition. Brocade then issued an "offer letter" based upon the approved requisition, which set forth the new hire's information regarding salary and options. CS 5 stated that there were repeated instances where CS 5's management-level persons, including Vice President of International Sales, James Lalonde, ordered CS 5 to offer salary and options beyond that set forth in the amounts approved for each specific job title in the Brocade database. CS 5 stated that in each instance, Lalonde informed CS 5 that Defendant Reyes was aware of and had personally approved the terms of the offer.

145. This is one of the precise accounting violations admitted to by Brocade in its Restatement. *See* Brocade's SEC Form 10-K filed January 31, 2005.

146. ***Confidential Source 6 ("CS 6"):*** CS 6 was employed by Brocade as a Senior Accountant from 2002 through 2004. CS 6 stated that CS 6 was recruited by the Company to work in the Company's Finance Department. CS 6 stated that CS 6 received stock option grants as part of CS 6's new hire compensation package. CS 6 also stated that CS 6 was given an exercise price for CS 6's options at the time CS 6 accepted the job offer and that such options were granted to CS 6 pursuant to a "Board Resolution." CS 6 also confirmed that Elizabeth Moore was directly involved with Brocade's stock option grant program during the period of CS 6's employment at Brocade.

147. ***Confidential Source 7 ("CS 7"):*** CS 7 worked for Brocade as an internal Sarbanes-Oxley auditor in 2004. CS 7 reported directly to Senior Accountant Jennifer Cebenoyan. CS 7 stated that Brocade originally hired Ernst & Young and later Deloitte & Touche, LLP to conduct the external audit of Brocade, but that neither outside auditor completed its work. Instead, Brocade conducted its audit internally and hired CS 7 and one other person to conduct this audit. According to CS 7, the other "auditor" was not familiar with GAAP and did not have an accounting background.

148. According to CS 7, Brocade did not have adequate procedures and controls in place to conduct an internal audit. For example, CS 7 stated that the personnel auditing the controls and procedures regarding option expenses did not have accounting backgrounds and were not familiar with how to apply GAAP to this process. CS 7 further stated that Brocade required CS 7 to compile narratives to describe Brocade's controls and procedures without first assembling flow charts to identify the points at which the internal control processes should be examined. CS 7 stated that the appropriate manner to conduct such an audit is to first compile and/or examine such flow charts and then prepare a narrative to explain the results. CS 7 also explained that it is appropriate to utilize certain operating software to conduct such a review and prepare the resulting report. However, according to CS 7, Brocade did not possess any such operating software and had no such operational control flow charts. CS 7 also stated that CS 7 had significant disagreements with Brocade regarding the manner in which Brocade accounted for credits and collections (specifically, CS 7 instructed Brocade that such auditing work must focus on the controls regarding the first

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1   opportunity for sale, but Brocade refused and instructed CS 7 to focus the audit after the point at

2   which a contract had already been executed).

3       149.    CS 7 stated that CS 7 voiced these disagreements to Cebenoyan, who voiced them to

4   management and that Brocade terminated CS 7's employment as a result.

5       150.    ***Confidential Source 8 ("CS 8"):*** CS 8 was employed by Brocade from early 2002

6   though the end of 2004.  CS 8 held different job titles while employed in Brocade's HR

7   Department.  One of CS 8's job duties was data entry for new hires, terminations and running

8   reports.  CS 8 also became responsible for forwarding offer letters and new employee information

9   packets to new-hires.

10      151.    CS 8 stated that the HR Department was divided into three parts:  Recruitment,

11  Compensation and Benefits, and HR Information Systems. During CS 8's employment at Brocade,

12  CS 8 reported to Kayes, Manager of Recruitment.  Kayes reported to Uchida, Director of Global

13  Talent.  Uchida reported to Jensen, Vice President of HR, until December 2003.  According to CS

14  8, Jensen reported to Reyes.

15      152.    According to CS 8, Brocade maintained a database, which tracked stock option

16  grants awarded to new hires by Brocade's competitors.  Uchida monitored this information to

17  determine whether the number of options granted to new hires compared to similar offers made by

18  those competitors.   CS 8 also stated that within this database, Brocade tracked the options given to

19  each Brocade employee through a classification system, which gave the following codes to each

20  type of employee:  AA (Senior Executives); A (Vice Presidents); B (Directors and Managers); and

21  every other employee was labeled as a "contributor" with either a "C" (for non-technical

22  employees) or a "T" (for technical employees).  C and T level employees were further sub-

23  classified by job level (for example, "C-6").  According to CS 8, Brocade's database used this

24  tracking system to monitor the number of options that could be awarded to each new hire by job

25  level code.  CS 8 also stated that Brocade began to implement a new, more generalized,

26  classification system at year-end 2004.

27      153.    This statement comports with Brocade's admission in its Restatement, contained in

28  its 2004 year-end Form 10-K, in which Brocade admitted that "there existed material weaknesses in

50

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1  our disclosure controls and procedures in fiscal year 2003 and prior years . . . [and] that those

2  control weaknesses were remedied by the fourth quarter of fiscal year 2003 and that as of October

3  30, 2004, our disclosure controls and procedures were operating effectively."

4      154.    According to CS 8, Mike Vescuso replaced Jensen as Vice President of Human

5  Resources in January 2004 after Jensen was removed from this position in December 2003. CS 8

6  became a Staffing Coordinator in May 2004 and held that position through December 2004.

7  Beginning in May 2004, CS 8 was responsible for forwarding new-hire packets to new-hires. As

8  explained by CS 2 and CS 8, new-hire packets included "offer letters," as well as other information

9  regarding the benefits being given to each new-hire. Although CS 2 confirmed that the "offer

10 letters" sent by Brocade to new-hires through mid-year 2003 contained the exercise price of any

11 options granted to each new-hire—and established the offer date as the date for determining the

12 price of such options—CS 8 states that as of May 2004, Brocade had terminated this process such

13 that the exercise price of the stock options granted to each new-hire was no longer stated in the

14 "offer letter."

15     155.    CS 8's explanation of this material change to Brocade's practice of setting the

16 exercise price of stock options awarded to new-hires, and the timing of this change (after, according

17 to CS 8, Vescuso took over as Vice President of HR, and dramatically changed the HR Department,

18 Brocade no longer included the exercise price in its "offer letters"), is directly in line with the fact

19 that, as announced in Brocade's Restatement, it had material weaknesses in its internal disclosure

20 controls and procedures from May 1999 until the fourth quarter of 2003 but that such weaknesses

21 were remedied as of October 30, 2004, and ultimately restated four years of its accounting

22 statements because it incorrectly accounted for stock options grants from May 1999 through August

23 2003.

24     156.    ***Confidential Source 9 ("CS 9"):***  CS 9 was a senior executive, officer-level person

25 in charge of information technology at Brocade from 2000 until early 2004. CS 9 worked with and

26 reported directly to Reyes and Canova throughout CS 9's employment with Brocade. According to

27 CS 9, Brocade's Senior Executives and the Board, specifically Reyes in 2000-2001, and thereafter

28 Reyes and Canova, determined the exercise price for stock option grants given to the Company's

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1    employees.  CS 9 stated that the specific amount and terms of stock options to be granted to existing

2    employees was within CS 9's department and were determined by the Board and Officer

3    Defendants in advance of the Board and Senior Executives authorizing CS 9 to distribute such

4    grants within CS 9's department.

5        157.    Therefore, according to CS 9, an individual who worked directly with each of the

6    Officer Defendants at their level of management throughout CS 9's entire employment at Brocade,

7    from 2000 through early 2004, Reyes (2000-2001) and Canova (2001-2004) were directly involved

8    in and had actual knowledge of the exercise price, number of shares, and other terms of stock option

9    grants given to employees.

10       **2.    *Additional Concrete Examples of Defendants' Scheme and Reyes', Canova's and Jensen's Role Therein***

11

12       158.    Brocade's Offer Letter to Canova demonstrates how this scheme was carried out.  A

13   copy of this Offer Letter is attached to Brocade's 2005 SEC Form 10-K as Exhibit 10.8.4.  In this

14   letter, Brocade offered Canova the position as CFO, with an option grant of 180,000 options, 1/8th

15   of which would vest after 6 months.  The letter set forth a full-time start date of December 12, 2000.

16   However, beneath that line, the letter set forth a date when Canova could start on a "part-time" basis

17   on November 13, 2000.  This is the method that Brocade used to get new hires to "on-board" weeks

18   before they actually became employees so they could get an early option grant date (and lower

19   price) and the options could start vesting earlier (here, one month of the required six month vesting

20   period would have expired before Canova ever started working).  Canova was a direct recipient of

21   options granted pursuant to this scheme.  Moreover, as discussed in greater detail below, on July 20,

22   2006, the WALL STREET JOURNAL reported that by the time Canova showed up for "full-time" work,

23   the stock price was up over 9% from the "part-time" start date.  However, less than two weeks later,

24   the price was much lower. So, Brocade backdated the grant date again and set the grant date at

25   December 21, 2000 when the price had dipped down again.  The result of this "re-pricing" was an

26   immediate paper gain for Canova of $16 million.  Thus, Canova was involved in Brocade's illicit

27   scheme as both a recipient and an executive who was a direct participant in the scheme.

28

159.     Further, Lead Plaintiff's review of documents regarding the employment of David Smith, former Brocade Vice President of SAN Integration, Applications and Support, demonstrates how Reyes (and in this instance, former CFO, Michael Byrd) carried out the scheme described by the Confidential Sources set forth above.  On January 6, 2000, Reyes sent an official Offer Letter to Smith offering Smith a Vice President Position.  Smith lived in Sugar Land, Texas at the time this letter was issued.  The Offer Letter was signed by Reyes.

160.     The Offer Letter offered Smith a base salary of $240,000.00, plus certain incentive bonuses.  The Offer Letter also offered a one-time relocation bonus of $1,000,000.00, structured as an interest-free loan to be forgiven over the next four years (Smith was required to pay back the loan on a pro-rata basis if he left the Company prior to the expiration of four years).  Reyes also stated that Smith would report directly to Reyes.

161.     The Offer Letter also offered Smith a stock option grant of 200,000 shares of Common Stock.  The Offer Letter expressly stated that the "exercise price of the option will be equal to the fair market value of Brocade's Common Stock on the grant date, which is your first date of your employment with Brocade."  In the very next sentence, however, the Offer Letter states Smith's start date is of the date of the Offer Letter, January 6, 2000, and therefore sets the exercise price at the price of the Common Stock that date, $149.063 per share.  And, in the sentence after that, the Offer Letter recognizes that the "vesting of this option will commence upon your start of employment . . . ."  The Offer Letter also instructs Smith to confer with Stephanie Jensen regarding the details of his employment benefits.  Additionally, on April 27, 2000, Byrd signed a letter to Smith formally offering Smith the $1,000,000.00 loan and setting forth the express terms of that loan.

162.     This Offer Letter signed by Reyes and the loan letter signed by Byrd show that Defendants' scheme operated exactly as described by Lead Plaintiff's Confidential Sources.  This was a high-level new employee, who was hired "out of guidelines" because he was given a larger salary, bonuses, and a $1 million loan.  The Offer Letter fixed the exercise price of the option grants as of the date of the Offer Letter, January 6, 2000, not the date the Smith actually began working for Brocade, which, according to a Brocade press release, did not occur until April 2000.  Smith also

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1   signed sworn pleadings in civil litigation against Brocade in which he stated that he began work at

2   Brocade in April 2000.  The Offer Letter and Loan Letter also show that Reyes and Jensen were

3   directly involved in stock option grants such as this one.

4          163.   Further, Lead Plaintiff has learned that Smith was terminated from his employment

5   at Brocade after he went to Reyes and Byrd and told them that Smith believed they were misleading

6   shareholders by misrepresenting the Company's financial projections (for reasons unrelated to this

7   case) and by committing patent infringement.  Just as Brocade did with Cudgma, it fired Smith

8   when he reported this unlawful conduct and filed suit against him to try to collect on the $1 *million*

9   loan.  When Brocade sued Smith, however, he initiated a whistleblower/wrongful termination suit

10  under California law.  That suit is styled *David Smith v. Brocade Communications Systems*, Case

11  No. CV 807447, Superior Court of California for the County of Santa Clara.

12       **3.**     *A* **WALL STREET JOURNAL** *report provides further details regarding Defendants'*

13           *fraudulent scheme*

14         164.   On July 20, 2006, the WALL STREET JOURNAL published a report titled "Setting the

15  Date:  How One Tech Company Played With the Timing of Stock Options."  This news report was

16  based, among other things, upon interviews with nine former employees and a review of relevant

17  company documents.  Steve Stecklow, *Setting the Date:  How One Tech Company Played With the*

18  *Timing of Stock Options*, WALL ST. J., July 20, 2006, at A1.

19         165.   The report states that in 2002, certain Brocade employees received a request from

20  their human resource managers "to alter the employment records of several executives to make it

21  seem like they joined the company later than they really did" in order to "give their stock options

22  more value."  *Id*.  The reason for this instruction was that Brocade's stock price had dropped since

23  these executives joined the Company causing their options to be underwater; thus, by changing their

24  start date, the options would be replaced or repriced so that they would carry a lower, in the money,

25  strike price.  *Id*.  Jensen inquired about how Brocade's computer systems stored employee records.

26  One former employee stated that he was "given folders, one at a time, containing revised offer

27  letters of jobs from these executives."  The new letters were dated several months after the original

28  one, so that options given when the executives came aboard could carry later dates, when the price

1   was lower." *Id.* When the former employee told Jensen he did not want to change any more

2   records, Jensen told him he did not have to and then a supervisor changed the remaining records.

3   *Id.*

4         166.    The report also cited several former employees as describing Brocade's scheme to

5   place employees on "part-time" status so that they could be given options at an earlier date—and

6   lower strike price—than the date and strike price that would be in effect when the employees

7   actually went to work for the Company.  According to one source, "This was not a secret.

8   Everybody knew about it."  The report states that one participant in this scheme was none other than

9   Canova.  Canova received an offer letter dated November 13, 2000, in which he was told he would

10  get options for 180,000 shares with a grant date of "the first date of your employment." *Id.*  The

11  same letter instructed Canova that he could work "up to four hours per week prior to joining full-

12  time" to "accelerate your on-boarding with Brocade." *Id.*  Canova was not to start as a full-time

13  employee until December 11, 2000.  This is the exact type of practice described by Lead Plaintiff's

14  confidential sources above.  By the time Canova actually started working at the Company the stock

15  had increased by approximately 9%.  That gain, however, was erased a few days later when the

16  stock sank.  Thus, Brocade ultimately made it appear that the option grant date was December 21,

17  2000 so that the strike price could be set as of that date, a move that on paper would equate to a

18  profit of nearly $16 million. *Id.*

19        167.    Further, according to the report, Brocade's "compensation committee" for granting

20  options "consisted solely of Mr. Reyes." *Id.*  One source stated that Jensen would take a list of new

21  hires to Reyes and then Jensen "would return with a printout, initialed by Mr. Reyes, listing closing

22  prices for every day since the previous grant date.  One date – often close to the lowest, and several

23  weeks in the past – would be highlighted in yellow and be used as the grant date for the group . . . ."

24  *Id.*

25        168.    The details provided by this WALL STREET JOURNAL report, which were based upon

26  interviews with former employees and a review of internal Company documents, further

27  corroborate the detailed information provided by Lead Plaintiff's confidential sources.

28

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          No.: 3:05-CV-02042-CRB

**4.      The Securities and Exchange Commission's and Department of Justice's findings and pleadings further evidence that Reyes and Canova, directly, and through their controlled person Jensen, knowingly engaged in a scheme to defraud investors**

169.      The WALL STREET JOURNAL report ran the morning of July 20, 2006.  That afternoon, the SEC and DOJ held a joint news conference announcing the filing of civil charges against Reyes, Jensen and Canova and criminal charges against Reyes and Jensen.  A federal grand jury handed down an indictment against Reyes and Jensen three weeks later on August 10, 2006.  These proceedings are discussed in greater detail below.  The documents filed pursuant to these federal proceedings contain the following factual allegations that further detail pervasive accounting fraud that occurred at Brocade from 1999-2004 and describe the direct involvement in this fraudulent scheme by Reyes, Canova and their controlled person, Jensen[5]:

- Reyes orchestrated a fraudulent scheme whereby he routinely executed backdated documents providing "in the money" option grants, evaded rules requiring Brocade to publicly report the associated expenses and materially understated Brocade's expenses and overstated its income.

- Reyes was given sole authority to grant options to employees (other than certain officers and directors) as the sole member of Brocade's Compensation Committee.

- From at least 2000 through 2004, Reyes used the authority delegated to him to choose when to grant options to non-officer employees, as well as how many to grant.  Reyes used the virtually unchecked authority given to him to grant "in-the-money" options by falsifying the date on which the grants were made, thereby granting the options with well below-market strike prices.

- Brocade's public filings for fiscal years 2000-2003 represented that Brocade accounted for its option grants in accordance with GAAP, including APB 25. Except in a few minor instances, Brocade did not disclose any compensation expenses in connection with its option grants in its SEC filings.

- Reyes and Jensen often waited until the end of the fiscal quarter before granting options. Jensen provided Reyes with a list (name of employee, number of options, hire date for new hires, and other information) of options granted at a purported "Compensation Committee Meeting" occurring on a given date. Jensen's staff would also print out the historical pricing information, highlight the lowest closing price during the period, and give it to Reyes with the Committee meeting minutes.  Reyes would then sign the minutes and date them as if the meetings occurred on the highlighted low dates and the stock options were priced at the market value of Brocade's stock on those dates.   Reyes and Jensen both knew that Reyes had not granted the options on the date set forth in the options grant.

---

[5] The SEC Civil Complaint, the DOJ Criminal Complaint, and the Indictment are incorporated herein by reference in their entirety.

- o The above-described practice for pricing option grants became so routine that by June 2003, an HR employee prepared a memorandum describing the practice in detail.

- Reyes and Jensen provided the minutes of the purported Committee meetings to Brocade employees responsible for recording the grant in Brocade's books and records and preparing its financial statements. As Reyes and Jensen further knew, because they supplied the false underlying documentation, the Company did not record an expense related to the grants in its financial statements.

- Reyes and Jensen backdated the following specific stock option grants:

  - o In January 2002, they backdated the Committee meeting minutes approving a grant to October 31, 2001 when Brocade's stock closed at $24.20 (the lowest price during 1Q 2002).

  - o They backdated the Committee meeting minutes approving a grant to November 28, 2001 so that employees hired between October 30, 2001 and November 28, 2001 could receive a stock option price of $28.82 (the lowest price between October 30 and November 28).

  - o They backdated the Committee meeting minutes approving a grant to January 22, 2002 so that employees hired between November 28, 2001 and January 22, 2002 could receive a stock option price of $31.76.

  - o They backdated the Committee meeting minutes approving a grant to February 28, 2002 when Brocade's stock closed at $21.97 (the lowest price during 2Q 2002).

- Jensen told HR employees who reported to her that they should not discuss stock option grants using e-mail.

- Jensen stated that she was personally involved with Reyes' stock pricing decisions approximately 90% of the time. Jensen stated that she cautioned Reyes not to always pick the low dates because it looked suspicious.

- Reyes backdated options grants on at least nine occasions between January 2, 2001 and July 2, 2002.

- During ten consecutive fiscal quarters (beginning with the third quarter ended July 31, 2000, through the fourth quarter ended October 26, 2002), Brocade granted stock options to employees at the quarterly low stock price in 8 out of 10 quarters, and with exercise prices near the quarterly low in the other two quarters.

- Reyes backdated options grants on at least six occasions between August 15, 2003 and October 20, 2004.

- During five consecutive fiscal quarters beginning with the quarter ended October 26, 2003, through the quarter ended October 30, 2004, Reyes made 32 options grants. Of those grants, 19 grants to over 1,000 employees (approximately 16 million shares), were priced at the weekly low closing price for Brocade's stock and for an additional three grants, within just $0.03 of the weekly low.

- Reyes and Jensen caused numerous employment offer letters and similar records to be backdated so that certain employees could receive earlier stock option grants that were purportedly made and priced when the market value of Brocade's stock was relatively low.

- When an HR employee questioned Jensen about the legality of Brocade's practice of backdating an employee offer letter, Jensen responded that she did not care and that HR did it because that is what Reyes wanted.

- Reyes knew the applicable accounting rules as he spoke frequently within the Company, with persons outside of Brocade, and publicly, about the rules requiring public companies to record an expense for "in-the-money" options grants. Reyes sought to evade the requirement by falsifying the dates, aware that the Company relied on the falsified options documentation to prepare its financial statements.

- Canova, a CPA well-versed in the proper accounting of "in-the-money" stock option grants, discussed these rules and their effect with Brocade's external auditors (KPMG) and others including Reyes.

- In April 2001, Canova received an email from Jensen in which a Brocade manager had stated that Brocade's option price was "usually the lowest closing price" experienced between meetings when options were granted. Canova instructed Jensen that she should caution the manager "not to make statements about the board granting shares at the lowest price."

- Also in April 2001, Canova and Brocade's controller discussed the controller's concerns about the delay between purported options grant dates and the dates when the finance department employees received documentation of the grants. Although the delay was the result of, and suggested the existence of, the options backdating scheme, other than speaking with Reyes, Canova did nothing to investigate.

- In early 2002, Canova learned of facts suggesting that options grants that included two executives, Richard Geruson and Daniel Cudgma, had been backdated and that Jensen had also used false dates on letters offering employment to them.

- In October 2002, Canova received an email describing option grants to Geruson as "forging option paperwork and offer letters so he could get better priced options." Although Canova was repeatedly confronted with information about falsified books and the backdating scheme, Canova did not investigate or review the impact of backdated or falsified options grants on Brocade's financial statements.

- After learning these facts, Canova facilitated the fraud by directing finance department employees to ensure that the dates used for option grants in the Compensation Committee meeting minutes were consistent with employee records reflecting their hiring dates. Where the two types of records were inconsistent, Canova instructed employees to ensure that the Compensation Committee meeting minute dates corresponded to the hire dates of the employees listed in the minutes.

- Canova knew, or was reckless in not knowing, that the option grant documentation used to prepare Brocade's financials was not reliable, the scheme resulted in the under reporting of compensation expenses, and the scheme rendered Brocade's public filings and disclosures materially false and misleading.

- Reyes knew that he and other officers received improperly backdated options, and was thus motivated, in part, to enrich himself and other officers.

- In a June 2003 resolution, a committee of the board of directors accepted a recommendation that Reyes be granted a total of 1.1 million options divided into two grants during two fiscal quarters. Reyes granted himself 600,000 options as of August 15, 2003 and 500,000 options as of December 10, 2003. Only after the grants were made and recorded in Brocade's books and records did the committee of Brocade's board approve the grants.

- On at least two occasions, Reyes received large options grants that were dated the same date on which he had granted other employees backdated options—April 17, 2001 and October 1, 2001.

- Reyes "granted" approximately 2 million options to over 260 employees on October 30, 2001, but he did not actually approve this option grant until January 2002, when Brocade's stock price was significantly higher. In January 2002, Reyes and Jensen backdated the grant to October 30, 2001, preparing false committee minutes to create the appearance that the options had been granted on the earlier date.

- On February 1, 2002, Reyes interviewed and decided to hire Daniel Cudgma. Reyes directed that Cudgma be included in an options grant that was backdated to November 28, 2001, when Brocade's stock price was approximately $8 per share lower than the February 1, 2002 closing price. Jensen prepared the committee meeting minutes, signed by Reyes, granting an option to purchase 285,000 shares, backdated to, and asserting a false hire date of, November 28, 2001.

- After Brocade's stock price declined, Reyes reacted by directing Jensen to change the option grant to Cudgma several times in March and April 2002. In approximately mid-April 2002, in an effort to retain Cudgma, Reyes signed Compensation Committee meeting minutes increasing Cudgma's option grant to 500,000 shares, backdated as of February 28, 2002 (a date on which Brocade's stock closed at approximately $4 per share below the then-current market price). At approximately the same time, Jensen directed persons in the HRD to prepare a new offer letter for Cudgma, this time backdated to January 28, 2002.

## G.  Defendants' Insider Trading

170.  As an additional part of their scheme, Brocade's executives participated in insider trading using the same simple mechanism devised to lure quality employees to Brocade. And, just like option grants to employees, Brocade executives received option grants backdated to hide their true cost. Reyes, Sonsini, Dempsey and Neiman facilitated this insider trading. Specifically, Director and Audit Committee member Sonsini urged Brocade's Board of Directors to make Reyes a "committee of one" to grant stock options to non-executive employees. Despite that specific delegation, however, Dempsey and Neiman retained the authority to grant option-based compensation to executives.

171.  Brocade's Charter for the Compensation Committee of the Board of Directors specifically stated that "grants and awards to executive officers of the Company" could not be

delegated to Reyes or any other officer of the company. As with many of Brocade's internal "prohibitions," Reyes, Dempsey and Neiman found a way to delegate this non-delegable duty. Indeed, the Compensation Committee, comprised of Dempsey and Neiman, took it one step further. Following Sonsini's lead, Dempsey and Neiman authorized Reyes to grant options to himself and other executives. Once Reyes exercised his additional authority, Brocade's Board thereafter approved those grants.

172. For example, in a June 2003 resolution, the Dempsey and Neiman Compensation Committee accepted a recommendation that Reyes be granted a total of 1.1 million options divided into two grants during two fiscal quarters. Relying solely on the resolution, Reyes included himself in two option grants that were otherwise made to employees of Brocade. Although nothing in the Committee's resolution specified the dates of the grants to Reyes or the strike price, Reyes granted himself 600,000 options as of August 15, 2003 and 500,000 options as of December 10, 2003. Only after the grants were made and recorded in Brocade's books and records did the Dempsey and Neiman Compensation Committee approve the grants.

173. Further, on at least two occasions, Reyes received large option grants that were dated the same date on which Reyes granted other Brocade employees backdated options. Those grants to Reyes were backdated as of April 17, 2001 and October 1, 2001. These grants also included grants to Canova and other Brocade executives.

174. Thus, in addition to their goal of hiring qualified employees while hiding the cost of that endeavor from shareholders, Defendants also sought to obtain the fruits of their fraud through participation in massive insider trading. The amount and percentage of shares acquired and sold by these insiders, the timing of those trades, a comparison of those trades to prior trades and Defendants' incentive to withhold material, non-public information, demonstrate that this insider trading was both unusual and suspicious.

    **1. *Option Grants to Brocade's Executives—Amount, Percentage & Comparison***

175. During Brocade's 1999 fiscal year, Dempsey and Neiman granted option awards to three Brocade executives—Kumar Malavalli, Victor Rinkle and Charles Smith. *See* Brocade's

Form 14A, dated March 15, 2000. In total, Brocade granted these three executives 434,000 options. *Id.*

176. During Brocade's 2000 fiscal year, once Defendants' fraud was rolling and Brocade's stock price continued to climb, Reyes, Dempsey and Neiman granted option awards to five Brocade executives—Gregory Reyes, Michael Byrd, Charles Smith, Jack Cuthbert and Paul Bonderson. *See* Brocade's Form 14A, dated February 26, 2001. In total, Brocade granted these five executives 2,088,656 options. *Id.* The total options granted in fiscal year 2000 constituted more than a 481% increase over the prior year:

**Fiscal Year 2000 Executive Option Grants**

| Source | Source Date | Executive | Grant | Exercise Price | Expiration Date | Grant Date (-1 Ex. Date) |
|---|---|---|---|---|---|---|
| DEF 14A | 2/26/01 | Gregory Reyes | 1,040,000 | $32.12 | 11/19/09 | 11/22/99 |
| | | Charles W. Smith | 288,328 | $32.12 | 11/19/09 | 11/22/99 |
| | | Jack Cuthbert | 143,328 | $32.12 | 11/19/09 | 11/22/99 |
| | | Michael Byrd | 85,000 | $32.12 | 11/19/09 | 11/22/99 |
| | | Paul Bonderson | 532,000 | $32.12 | 11/19/09 | 11/22/99 |

177. But Reyes, Dempsey and Neiman were not done; rather, they achieved another historic executive option grant milestone in fiscal year 2001. During Brocade's 2001 fiscal year, Reyes, Dempsey and Neiman granted option awards to six Brocade executives—Gregory Reyes, Antonio Canova, Michael Byrd, Jack Cuthbert, Paul Bonderson and David Smith. *See* Brocade's Form 14A, dated February 25, 2002. In total, Brocade granted these five executives 14,530,564 options. *Id.* The total options granted in fiscal year 2001 constituted more than a 695% increase over the prior year, and an increase of more than 3,300% over the fiscal year 1999 option grants:

**Fiscal Year 2001 Executive Option Grants**

| Source | Source Date | Executive | Grant | Exercise Price | Expiration Date | Grant Date (-1 Ex. Date) |
|---|---|---|---|---|---|---|
| DEF 14A | 2/25/02 | Gregory Reyes | 4,800,000 | $76.88 | 11/29/10 | 12/01/00 |
| | | | 3,970,020 | $20.70 | 04/17/11 | 04/17/01 |
| | | | 1,262,113 | $12.90 | 10/01/11 | 10/01/01 |
| | | Michael Byrd | 410,000 | $76.88 | 11/29/10 | 12/01/00 |
| | | | 1,139,050 | $20.70 | 04/17/11 | 04/17/01 |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT No.: 3:05-CV-02042-CRB

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 257,218 | $12.90 | 10/01/11 | 10/01/01 |
| | | Antonio Canova | 360,000 | $76.88 | 12/21/10 | 12/21/00 |
| | | | 377,750 | $20.70 | 04/17/11 | 04/17/01 |
| | | | 178,756 | $12.90 | 10/01/11 | 10/01/01 |
| | | Jack Cuthbert | 542,000 | $76.88 | 11/29/10 | 12/01/00 |
| | | | 541,760 | $20.70 | 04/17/11 | 04/17/01 |
| | | | 205,451 | $12.90 | 10/01/11 | 10/01/01 |
| | | Paul Bonderson | 220,000 | $76.88 | 11/29/10 | 12/01/00 |
| | | | 260,450 | $20.70 | 04/17/11 | 04/17/01 |
| | | | 5,996 | $12.90 | 10/01/11 | 10/01/01 |
| | | David Smith | 80,000 | $76.88 | 11/29/10 | 12/01/00 |
| | | | 207,810 | $20.70 | 04/17/11 | 04/17/01 |
| | | | 3,826 | $12.90 | 10/01/11 | 10/01/01 |

178.    During Brocade's 1999 fiscal year, Reyes, Dempsey and Neiman granted 434,000 option awards to only three Brocade executives.  In fiscal years 2000 and 2001, Reyes, Dempsey and Neiman granted 17,019,220 option awards to six Brocade executives, including Reyes, Canova and Byrd.

179.    The magnitude of the executive option grants in fiscal years 2000-01 is apparent not only when compared to prior executive option grants, but also when compared to the total shares of Brocade stock outstanding during the same time period.  During fiscal years 2000 and 2001, there were 222,559,000 and 229,762,000 shares of Brocade stock outstanding, respectively.[6]  In fiscal year 2000, five Brocade insiders, including Reyes and Byrd, were granted 2,088,656 options.  In fiscal year 2001, six Brocade insiders, including Reyes, Canova and Byrd, were granted 14,530,564 options.  *Id.*  Accordingly, in 2000 and 2001, six Brocade insiders received option grants equivalent to 1% and 6.32% of all outstanding shares of Brocade stock, respectively.  Within this two-year period, these six individuals were given ownership of 7.23% of Brocade.

180.    In the context of a publicly traded company with more than 225 million shares outstanding, these amounts are unusual, suspicious and dramatic.  At the end of fiscal year 2000, the largest owners of Brocade stock were: (1) FMR Corporation - 10.7% of shares owned; (2) Putnam Investment Management – 8.3%; (3) Morgan Stanley - 5.7% of shares owned; (4) Brocade's

---

[6]http://www2.barchart.com/prhistory.com/prhistory.asp?sym=BRCD.

Officers/Directors - 5.3% of shares owned; and (5) Oak Hill Associates, Ltd. – 5.2%.[7] Thus, as a result of these option grants, by 2001, Brocade insiders effectively constituted Brocade's fourth largest shareholder, inclusive of institutional traders.

181. An executive-by-executive comparison of these option grants to prior option grants makes clear that, in a short two-year period, Reyes, Sonsini, Dempsey and Neiman had turned a modest long-term incentive compensation program into an uncontrolled and unsupervised windfall machine:

**Comparison of Executive Option Grants**

| Executive | 1999 Grants | 2000 Grants | Percentage Increase 1999-2000 | 2001 Grants | Percentage Increase 2000-2001 |
|---|---|---|---|---|---|
| Gregory Reyes | 0 | 1,040,000 | N/A | 10,032,133 | **964%** |
| Antonio Canova | 0 | 74,630[8] | N/A | 916,506 | **1228%** |
| Michael Byrd | 0 | 85,000 | N/A | 1,806,268 | **2125%** |
| Kumar Malavalli | 134,000 | 0 | N/A | 0 | N/A |
| Victor Rinkle | 160,000 | 0 | N/A | 0 | N/A |
| Charles Smith | 140,000 | 288,328 | 206% | 0 | N/A |
| Jack Cuthbert | 0 | 543,328 | N/A | 1,289,211 | 237% |
| Paul Bonderson | 0 | 532,000 | N/A | 486,446 | (9%) |
| David Smith | 0 | 0 | N/A | 291,636 | N/A |

---

[7] Brocade's Form DEF 14A filed with the Securities and Exchange Commission on February 26, 2001.

[8] Canova did not receive option grants prior to fiscal year 2001, as he was not yet at Brocade. However, if Canova's pre-fiscal year 2001 grants are pro-rated based on Byrd's fiscal year 2001 grants, it can be assumed, for sake of comparison only, that Canova was granted 74,630 options in fiscal year 2001. The extrapolation performed is the most favorable to Canova. Specifically, for the fiscal year 2001 grants, Canova received 87.8%, 33.1% and 69.4% of the shares of Byrd, respectively. The extrapolation uses 87.8%, which provides Canova with the most favorable "before" trading possible.

182.     Although the amount of the rapid escalation of option grants, and astonishing percentage increase over prior grants, is compelling evidence of insider trading, the amount of money that Reyes and Canova stood to make from these options is beyond belief.  Indeed, when compared to Reyes', Canova's and Byrd's holdings prior to the fiscal year 2001 option grants, these grants leave no doubt that the amounts are not just unusual or suspicious – they are staggering. Inclusive of all grants prior to fiscal year 2001, Reyes, Byrd and Canova acquired the following option grants with the following projected values:

| Source | Source Date | Executive | Grant | Exercise Price | Potential Realizable Value at 5% annual rate of stock price apprec. for option term | Potential Realizable Value at 10% annual rate of stock price apprec. for option term |
|---|---|---|---|---|---|---|
| DEF 14A | 2/26/01 | Reyes | 1,040,000 | $32.13 | $21,014,640 | $53,255,223 |
| | | Byrd | 85,000 | $32.13 | $1,717,543 | $4,352,590 |
| | | Canova | 74,630 | $32.13 | $1,508,002 | $3,821,572 |

By comparison, Reyes', Byrd's and Canova's acquisitions through stock option grants in fiscal year 2001 dwarf their prior acquisitions:

| Source | Source Date | Executive | Grant | Exercise Price | Potential Realizable Value at 5% annual rate of stock price apprec. for option term | Potential Realizable Value at 10% annual rate of stock price apprec. for option term |
|---|---|---|---|---|---|---|
| DEF 14A | 2/25/02 | Reyes | 4,800,000 | $76.88 | $232,077,211 | $588,129,218 |
| | | | 3,970,000 | $20.70 | $51,682,192 | $130,972,821 |
| | | | 1,262,113 | $12.90 | $10,239,196 | $25,948,132 |
| | | Byrd | 410,000 | $76.88 | $19,823,262 | $50,236,037 |
| | | | 1,139,050 | $20.70 | $14,828,288 | $37,577,793 |
| | | | 257,218 | $12.90 | $2,086,743 | $5,288,216 |
| | | Canova | 360,000 | $64.88 | $15,494,985 | $39,267,265 |
| | | | 377,750 | $20.70 | $4,917,594 | $12,462,149 |
| | | | 178,756 | $12.90 | $1,450,201 | $3,675,095 |

183.     For all years prior to fiscal year 2001, Defendant Reyes was granted 1,040,000 options with a potential realizable value of between $21,014,640 and $53,255,223.  In fiscal year 2001, Reyes was granted 10,032,113 options with a potential realizable value of between $293,998,599 and $745,050,171.  Thus, in fiscal year 2001, Reyes increased his option grants by

7,457,113 shares over all prior years, or by 964%, and increased his potential realizable value by 1,397%.

184.    Prior to fiscal year 2001, Canova is projected to have received 74,630 options with a potential realizable value of between $1,508,002 and $3,821,572.  In fiscal year 2001, Canova was granted 916,506 options with a potential realizable value of between $21,862,780 and $55,404,509.  Thus, in fiscal year 2001, Canova increased his option grants by 841,876 shares over all prior years, or by 1,228%, and increased his potential realizable value by 1,449%.

185.    For all years prior to fiscal year 2001, Byrd was granted 85,000 options with a potential realizable value of between $1,717,543 and $4,352,590.  In fiscal year 2001, Byrd was granted 1,806,268 options with a potential realizable value of between $37,738,293 and $93,102,046.  Thus, in fiscal year 2001, Byrd increased his option grants by 1,721,268 shares over all prior years, or by 2,125%, and increased his potential realizable value by 2,197%.

186.    The number of shares, combined with the increase in the percentage of holdings and the percentage increase in potential realizable value of the shares obtained by these insiders through Defendants' backdating scheme are unusual and suspicious.

187.    Although the amount and percentages of options doled out to Brocade's executives by Reyes, Sonsini, Dempsey and Neiman alone are staggering, the timing of these trades demonstrates that the dates of the option grants were not picked randomly or by chance.  In fact, it is a mathematical certainty that Reyes, Dempsey and Neiman picked those dates with perfect hindsight.

   **2.    *Option Grants to Brocade's Executives—Timing***

188.    The most basic premise of stock trading is to buy low and sell high.  Thus, normal stock acquisition seeks to obtain stock at the lowest possible per-share price.  The timing of the five executive option grants dates in fiscal years 2000 and 2001 is not only unusual and suspicious; the likelihood that these five grant dates occurred by chance borders on the impossible.

189.    Of the 5 executive grant dates in fiscal years 2000 and 2001, 4 of the 5 grants occurred on the date of the lowest trading price for their respective calendar months:

| Options Grant (as of) Date | Executives Receiving Grant | Options Strike Price | Monthly Low Closing Price |
|---|---|---|---|
| November 22, 1999 | Gregory Reyes<br>Michael Byrd<br>Charles Smith<br>Jack Cuthbert<br>Paul Bonderson | $32.12 | $32.12 |
| December 1, 2000 | Gregory Reyes<br>Michael Byrd<br>Jack Cuthbert<br>Paul Bonderson<br>David Smith | $76.88 | $68.44 |
| December 21, 2000 | Antonio Canova | $68.44 | $68.44 |
| April 17, 2001 | Gregory Reyes<br>Antonio Canova<br>Michael Byrd<br>Jack Cuthbert<br>Paul Bonderson<br>David Smith | $20.70 | $20.70 |
| Oct. 1, 2001 | Gregory Reyes<br>Antonio Canova<br>Michael Byrd<br>Jack Cuthbert<br>Paul Bonderson<br>David Smith | $12.90 | $12.90 |

190.     Publicly available information demonstrates that each of these option grants occurred on a date when Brocade stock was trading at or near its lowest point of the calendar month (and in certain grants its lowest point in 6 months to two years) and just prior to the stock again rising in value.  As the charts below evidence, the dates on which these option grants occurred were not fortuitous.  Indeed, on each occasion, these executive option grants occurred on a date when Brocade's stock was at or near its lowest trading price for the period, and just prior to the stock's price rising again:

1

## Fiscal Year 2000 Executive Option Grants



[1] November 22, 1999—Backdated Grants to Reyes, Byrd, Smith, C., Cuthbert and Bonderson

## Fiscal Year 2001 Executive Option Grants



[1] November 13, 2000—Canova's Employment Offer, Option Grant and Start of "Part-Time" Employment
[2] December 1, 2000—Backdated Grants to Reyes, Byrd, Smith, D., Cuthbert and Bonderson
[3] December 21, 2000—Backdated/Redated Grants to Canova
[4] April 17, 2001—Backdated Grants to Reyes, Canova, Byrd, Smith, D., Cuthbert and Bonderson
[5] April 20, 2001—Brocade Announces Preliminary Financial Results for Q2 of 2001
[6] October 1, 2001—Backdated Grants to Reyes, Canova, Byrd, Smith, D., Cuthbert and Bonderson

191.    Brocade did not have a regularly timed schedule that specified when Reyes,

Dempsey and Neiman could award options to these executives.  Thus, common sense demands the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

conclusion that these dates were picked intentionally, leaving little chance that they occurred randomly.  Simple mathematics conclusively establishes that no random chance was involved.

192.    Employing a simple math equation, the probability that a particular option grant or population of option grants, occurred on a particular date by random chance can be established. The analysis is as follows:  (1) a population of grants is identified, *e.g.*, the five grant dates in fiscal years 2000 and 2001; (2) the effective date for each grant at issue is identified; (3) the probability of choosing the lowest price for a given period is then determined, *e.g.*, in a typical month there are 20 trading days, thus the probability of choosing the lowest price in a given month is 1/20 days = 5%; and (4) using the standard binomial probability formula, the odds of choosing that number of grant dates with the lowest price during the specified time period can be determined.

193.    Of the 5 executive option grant dates in fiscal years 2000 and 2001, 4 of the 5 grants occurred on the date of the lowest trading price for their respective calendar months.  There are 20 days in a typical trading month; thus there is a 5% chance of randomly selecting the date with the lowest price for the calendar month.  The exact probability of choosing the lowest trading date in 4 out of 5 calendar months can be determined using the following standard binomial probability formula:

$$P = \frac{n}{k(n-k)}(p^k)(q^{n-k})$$

n = number of opportunities to occur

k = the number opportunities that did occur

p = probability that the opportunity will occur

q = probability that the opportunity will not occur

Accordingly:

n = 5 (number of opportunities to pick monthly low)

k = 4 (number of grants made at monthly low)

p = .05 (probability of picking low from 20 trade dates)

q = .95 (probability of not picking low from 20 trade dates)

$$P = \underline{\quad 5 \quad} (.05^4)(.95^{5-4}) \;\; \rightarrow \;\; P = \underline{.0000297\%} \; \text{ or } \; \underline{1 \text{ in } 33,684} \; (1/.0000297)^9$$
$$4(5-4)$$

194.    Thus, the probability that these executive option grants were randomly awarded on the precise date when Brocade stock was trading at its lowest point each month is 1 in 33,648.  By comparison, over their lifetime, an individual's odds of dying in a car wreck is 1 in 82, dying in a motorcycle wreck is 1 in 1,159, dying from a fall down a flight of stairs is 1 in 2,331, and dying in an airplane accident is 1 in 5,704.  In fact, an individual only has a 1 in 56,439 chance of dying from a lightening strike during their lifetime.[10]  Clearly, lightening struck often and precisely at Brocade – not by random chance, but through the execution of Defendants' option-backdating scheme.  But the odds relating to the fiscal years 2000 and 2001 executive option grants only touch the surface.  Applying the same math equation to a larger population of grants, the results support only one conclusion – rampant insider trading.

195.    Appendix A to the SEC's Complaint contains two charts entitled "Ten Consecutive Quarters of Options Granted At or Near Quarterly Low Stock Price" and "Weeks of Options Granted At or Near Weekly Low Stock Price."  As is apparent from its title, the first chart sets forth ten consecutive Brocade fiscal quarters in which options were granted at or near the quarterly low stock price.

**Ten Consecutive Quarters of Options Granted At or Near Quarterly Low Stock Price**

| Quarter Ended | Options Grant (as of) Date | Number of Shares In Grant | Options Strike Price | Quarterly Low Closing Price* |
|---|---|---|---|---|
| July 30, 2000 | May 23, 2000 | 2,146,100 | $47.50 | $47.50 |
| Oct. 29, 2000 | Aug. 3, 2000 | 295,400 | $84.85 | $84.85 |
| Jan. 28, 2001 | Dec. 21, 2000 | 5,537,680 | $68.44 | $68.44 |
| April 29, 2001 | April 17, 2001 | 25,775,597 | $20.70 | $17.49 |
| July 29, 2001 | July 23, 2001 | 1,672,650 | $28.11 | $28.11 |
| Oct. 28, 2001 | Oct. 1, 2001 | 8,932,248 | $12.90 | $12.90 |
| Jan. 27, 2002 | Oct. 30, 2001 | 847,389 | $24.20 | $23.83 |

---

[9]A binomial calculator is available at http://faculty.vassar.edu/lowry/binomialX.html, or the calculations can be run in Microsoft Excel/Insert/Function/Statistical/BINOMDIST.

[10]http://realestate.msn.com/insurance/Article.aspx?cp-documentid=67278&GT1=7403.

| April 28, 2002 | Feb. 28, 2002 | 3,204,555 | $21.97 | $21.97 |
| July 30, 2002 | July 2, 2002 | 2,245,798 | $14.26 | $14.26 |
| Oct. 27, 2002 | Oct. 8, 2002 | 2,310,010 | $5.38 | $5.38 |

196.    Using the above-methodology, and the fact that in 8 out of 10 of the grants, the price on the grant date was the lowest for the respective calendar month, the odds of choosing 8 out of 10 grants with the lowest price based on calendar months is **1 in 630 million**:

$$P = \frac{n}{k(n-k)} (p^k)(q^{n-k})$$

n = number of opportunities to occur

k = the number opportunities that did occur

p = probability that the opportunity will occur

q = probability that the opportunity will not occur

Accordingly:          n = 10 (number of opportunities to pick monthly low)

k = 8 (number of grants made at monthly low)

p = .05 (probability of picking low from 20 trade dates)

q = .95 (probability of not picking low from 20 trade dates)

$$P = \frac{10}{8(10-8)} (.05^8)(.95^{10-8}) \ \Rightarrow \ P = 1.586^{-9}\% \ \text{or} \ \underline{1 \ in \ 630,517,023} \ (1/1.586^{-9})$$

197.    Using the above methodology, and the fact that in 8 out of 10 of the grants, the price on the grant date was the lowest for the respective quarter, the odds of choosing 8 out of 10 grants with the lowest price based on fiscal quarters is **1 in 3.8 trillion**:

$$P = \frac{n}{k(n-k)} (p^k)(q^{n-k})$$

n = number of opportunities to occur

k = the number opportunities that did occur

p = probability that the opportunity will occur

q = probability that the opportunity will not occur

Accordingly:          n = 10 (number of opportunities to pick quarterly low)

k = 8 (number of grants made at quarterly low)

p = .0167 (probability of picking low from 60 trade dates)

q = .9833 (probability of not picking low from 60 trade dates)

$$P = \frac{10}{8(10\text{-}8)} (.0167^8)(.9833^{10\text{-}8}) \quad \blacktriangleright \quad P = 2.632^{-13}\% \text{ or } \underline{1 \text{ in } 3,799,392,097,264} \ (1/2.632^{-13})$$

198.    The second chart sets forth five consecutive fiscal quarters beginning with the quarter ended October 26, 2003, through the quarter ended October 30, 2003, during which Reyes made 22 option grants.  SEC Complaint ¶ 30.  Of those grants, 19 grants to over 1,000 employees (granting options to purchase a total of approximately 16 million shares), were priced at the weekly low closing price for Brocade's stock and for the remaining three grants, within just $0.03 of the weekly low.  *Id.*

**Weeks of Options Granted At or Near Weekly Low Stock Price**

| Quarter Ended | Options Grant (as of) Date | Number of Shares In Grant | Options Strike Price | Weekly Low Closing Price* |
|---|---|---|---|---|
| October 26, 2003 | Sept. 2, 2003<br>Sept. 30, 2003<br>Oct. 6, 2003<br>Oct. 20, 2003 | 634,000<br>164,600<br>19, 310<br>133,944 | $5.85<br>$5.22<br>$6.01<br>$5.94 | $5.85<br>$5.22<br>$6.01<br>$5.94 |
| January 25, 2004 | Dec. 10, 2003<br>Jan. 22, 2004 | 2,006,750<br>270,550 | $5.52<br>$6.63 | $5.49<br>$6.61 |
| May 2, 2004 | Feb. 4, 2004<br>Feb. 19, 2004<br>Mar. 22, 2004<br>April 20, 2004<br>May 10, 2004 | 284,850<br>100,000<br>520,775<br>317,750<br>244,100 | $6.07<br>$6.26<br>$6.60<br>$6.18<br>$4.98 | $6.07<br>$6.26<br>$6.60<br>$6.15<br>$4.98 |
| August 1, 2004 | June 9, 2004<br>June 21, 2004<br>July 8, 2004<br>July 26, 2004 | 3,357,747<br>383,000<br>431,450<br>233,800 | $5.68<br>$5.64<br>$5.15<br>$4.41 | $5.68<br>$5.64<br>$5.15<br>$4.41 |
| October 30, 2004 | Aug. 12, 2004<br>Aug. 19, 2004<br>Aug. 31, 2004<br>Sept. 16, 2004<br>Sept. 28, 2004<br>Oct. 5, 2004<br>Oct. 20, 2004 | 1,079,800<br>74,000<br>70,780<br>315,047<br>141,750<br>69,250<br>297,800 | $4.04<br>$4.85<br>$4.93<br>$5.14<br>$5.45<br>$6.00<br>$6.03 | $4.04<br>$4.85<br>$4.93<br>$5.14<br>$5.45<br>$6.00<br>$6.03 |

199.   Using the above methodology, and the fact that in 19 out of 22 of the grants, the price on the grant date was the lowest for the respective week, the odds of choosing 19 out of 22 grants with the lowest price based on a trading week is **1 in 24 billion**:

$$P = \frac{n}{k(n-k)} (p^k)(q^{n-k})$$

n = number of opportunities to occur

k = the number opportunities that did occur

p = probability that the opportunity will occur

q = probability that the opportunity will not occur

Accordingly:          n = 22 (number of opportunities to pick weekly low)

k = 19 (number of grants made at weekly low)

p = .2 (probability of picking low from 5 trade dates)

q = .8 (probability of not picking low from 5 trade dates)

$$P = \frac{22}{19(22-19)} (.2^{19})(.8^{22-19}) \ \blacktriangleright \ P = 4.134^{-11}\% \ \text{or} \ \underline{\text{1 in 24,189,646,831}} \ (1/4.134^{-11})$$

It is a rare circumstance that a Defendant's wrongful conduct can be demonstrated to a mathematical certainty, but that is exactly what has occurred here.

200.   The SEC agrees that these dates were not chosen by random chance.  In its Complaint against Reyes, Canova and Jensen, the SEC alleged that, on at least nine occasions between January 2, 2001 through July 2, 2002, Reyes backdated option grants on: January 2, 2001, April 17, 2001, July 23, 2001, October 1, 2001, October 30, 2001, November 28, 2001, January 22, 2002, February 28, 2002 and July 2, 2002.  *See* SEC Cmpl. ¶ 26.  Not surprisingly, the April 17, 2001 and October 1, 2001 dates are two of the three dates on which Reyes, Dempsey and Neiman granted millions of options to Brocade's executives, including Reyes and Canova.  *Id.* at ¶ 47.

201.   The circumstances surrounding the April 17, 2001 and October 1, 2001 option grants make these instances of backdating particularly egregious.  Beginning on March 26, 2001 and continuing through April 18, 2001, Brocade stock traded in the high teens and low twenties.  This was the lowest trading price of Brocade stock in at least 16 months.  Then, on April 20, 2001,

1   Brocade announced its preliminary financial results for the second quarter of 2001.  The market

2   reacted favorably to this announcement, sending Brocade's stock into the thirties, forties and fifties

3   almost immediately.  Having determined that the price floor had occurred on or about April 17,

4   2001, Reyes, Dempsey and Neiman thereafter granted and/or repriced 6,496,840 executive options,

5   including 3,970,020 options to Reyes and 377,750 options to Canova.

6          202.    Further, as this Court is aware, after the attacks on September 11, 2001, the markets

7   closed to trading for a short period of time.  Thereafter, on October 1, 2001, Brocade stock traded at

8   $12.90/share, which was its lowest point since July 12, 1999.  This low value resulted, in part, from

9   the tragedy of September 11th.  Being the opportunists that they are, Reyes, Dempsey and Neiman

10  took the opportunity to backdate 1,913,360 executive option grants, including 1,262,113 options to

11  Reyes and 178,756 options to Canova.

12         203.    The SEC further has alleged that, on at least six occasions between August 15, 2003

13  through October 20, 2004, Reyes backdated option grants: August 15, 2003, October 20, 2003,

14  January 22, 2004, February 26, 2004, March 22, 2004 and June 21, 2004.  *Id*. at ¶ 29.  Although not

15  set forth in the charts above, Reyes, Dempsey and Neiman granted 1,400,000 options to five

16  Brocade executives, including Reyes and Canova, on August 15, 2003.  *See* Brocade's DEF 14-A,

17  filed with the SEC on February 23, 2004.

18         204.    Interestingly, although Canova's grant of 360,000 options from Reyes, Dempsey and

19  Neiman on December 21, 2000 is not listed by the SEC as a known backdated grant, that grant

20  likewise is an instance of insider trading.  As set forth in Section IV.(F)(2), in a letter dated

21  November 13, 2000, Canova was offered an option for 180,000 shares with a grant date of the first

22  date of his employment.  Canova further was invited to begin his employment on a part-time basis

23  of up to four hours a week. Canova agreed to become a part-time employee on November 13, 2000,

24  and a full-time employee on December 11, 2000.

25         205.    However, Brocade's public filings do not contain a grant of options to Canova on

26  November 13, 2000, December 11, 2000 or even December 1, 2000, when Reyes and Byrd received

27  their grants.  The reason for this omission is simple.  Publicly available information demonstrates

28  that Brocade's stock closed at $103.62/share on November 13, 2000, which was the lowest trading

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                            No.: 3:05-CV-02042-CRB

1    price in almost three months.  However, by December 1, 2000, when Reyes, Dempsey and Neiman

2    granted 6,052,000 options to five executives, Brocade's stock had dropped to $83.94/share.  Thus,

3    Canova's "original" option grant was "out-of-the-money" even prior to his employment with

4    Brocade.  By December 11, 2000, when Canova actually began his employment, Brocade stock had

5    recovered to $112.57/share.  But, not satisfied with an increase of $8.95/share, Reyes, Dempsey and

6    Neiman waited to remedy the situation.

7         206.    After Brocade's stock had suffered a sharp drop, and had closed at its lowest point in

8    the second half of the year on December 21, 2000, Reyes, Dempsey and Neiman granted Canova

9    360,000 options backdated to December 21, 2000.  The difference between an option grant date of

10   December 11, 2000 and the grant on December 21, 2000 would have meant $15.6 million more in

11   profit had Brocade's stock recovered and the options vested.

12        207.    Based on the amount and percentage of options acquired by these insiders, the timing

13   of these trades, a comparison of those trades to prior trades and Defendants' incentive to withhold

14   material, non-public information, it is beyond dispute that Defendants Reyes and Canova, with

15   direct assistance from Defendants Sonsini, Dempsey and Neiman, participated in massive insider

16   trading.

17        ***3.    Insider Sales***

18        208.    Collectively, Defendants' executives and directors enriched themselves by hundreds

19   of millions of dollars in insider trading proceeds during the Class Period.  Specifically, these

20   executives and directors profited as follows:

21              Reyes                          $167,600,948

22              Neiman                         $125,571,454

23              Dempsey                        $10,615,948

24              Sonsini                        $2,058,289

25              Canova                         $31,526

26        209.    These insider sales are unusual and suspicious for several reasons.  First, these

27   executives and directors made multi-million dollar stock sales at a time when the price of Brocade

28   stock was substantially inflated due to the materially misleading statements contained in its

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                        No.: 3:05-CV-02042-CRB

1   Financial Statements.  The enormous proceeds obtained from these transactions evidence not only

2   the knowledge and participation of Defendants Reyes, Sonsini, Neiman, Dempsey and Canova in

3   the pervasive scheme at Brocade during the Class Period, but further demonstrate why they did it.

4   Indeed, had the true information regarding Brocade's financial condition been released at the time

5   of the transactions, the executives and directors clearly would not had obtained such massive

6   proceeds.  When the truth finally was revealed, Brocade stock dropped 46%.  Had these executives

7   and directors told the truth during the Class Period, it would have cut their profits by at least this

8   amount, if not eliminated them all together.

9        210.    Second, a portion of the stock comprising these sales was obtained through the

10   fraudulent option-backdating scheme.  Thus, some of this profit was the poisoned fruit of a prior

11   fraud.  For example, assume that an insider properly was granted 100,000 shares of stock at an

12   exercise price of $20, for a total cost basis of  $2,000,000.  Assume further that upon vesting the

13   insider sold the stock for $4,000,000 ($40/share) for a profit of $2,000,000.  Now assume that this

14   insider received the same 100,000 shares through the option-backdating scheme described in the

15   Complaint so that the exercise price was $18.00, for a total cost basis of $1,800,000.00.  Now, if

16   upon vesting the insider sells the same shares for the same $4,000,000, he would increase his profit

17   by 20% ($2,200,000) merely by lowering the cost basis of each share by $2.  This is precisely what

18   occurred here every time a Defendant sold shares obtained through a backdated option grant.  When

19   this simple analysis is extrapolated to the millions of shares and the hundreds of millions of dollars

20   in potential profit made available to Reyes, Canova, Neiman, Dempsey and Sonsini, a strong

21   inference of scienter is readily apparent.

22        211.    Third, the amount, percentage, comparison and timing of Reyes' insider sales

23   demonstrate precisely how Defendants took advantage of Brocade's inflated share price.  All of

24   Reyes' significant Class Period sales were confined to a 20-month period from May 18, 2000 to

25   January 24, 2002.  Reyes sold 9,299,970 shares (or 58% of his holdings) during this 20-month

26   period, generating $265,525,483 in proceeds.  By comparison, in the 8 months prior to the Class

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT         No.: 3:05-CV-02042-CRB

Period, Reyes sold 4,488,000 shares, but generated only $54,206,051 in proceeds.[11] Thus, Reyes' Class Period sales generated 5 times more than that generated prior to the Class Period. The unusual and suspicious nature of Reyes' trading becomes even clearer when placed in the context and timing of the fraud and the comparative trading price of Brocade's stock.

212.    From May 18, 2000 through January 24, 2002, Brocade stock traded between $12.90[12] and $130.00, while from January 25, 2002 through May 15, 2005, Brocade stock traded between $3.97 and $37.05,[13] with the stock trading well below $10 from September 26, 2002 through May 15, 2005. The fact that Reyes' significant Class Period sales, producing a profit of $167,600,948, occurred at a time when Defendants' fraud was producing its best results is both unusual and suspicious, and supports a strong inference of scienter.

213.    Reyes' late Class Period transactions also support a strong inference of scienter. On February 28th and March 3rd of 2003, the Reyes Family Trust, whose investment and voting is controlled by Reyes and his wife, purchased 1,478,000 shares of Brocade at a cost basis of $5,935,648 ($4.016/share). On the same dates, the Reyes Foundation purchased 1,000,000 shares of Brocade at a cost basis of $3,985,282. *Id*.

214.    Fortunately for Reyes' trust and foundation, Reyes kept the fraud going just long enough to turn a profit on these purchases as well. The shares acquired in the spring of 2003, and more, were sold just after the January 24, 2005 partial disclosure, but prior to the full disclosure of this massive fraud. On February 22-24, 2005, Reyes sold 3,920,270 trust shares and all of the remaining 900,000 foundation shares. The trust shares produced $23,592,415 ($6.02/share) in proceeds and the foundation shares produced $5,490,000 in proceeds. The estimated in-and-out profit on the equivalent trust shares alone is $2,961,912.

---

[11] Of course, the entirety of Reyes' sales should be considered in the insider trading analysis. Indeed, all of Reyes' sales occurred during the concealment of the fraud and inflation of Brocade's stock price, and, but for the five-year limitations period, would constitute a part of the Class Period.

[12] This low occurred on October 1, 2001, in the wake of the September 11th tragedy.

[13] The $37.05 high trading price occurred on February 1, 2002, just 6 days into Reyes' period of no trading. *Id*.

215.    Significantly, had Reyes waited until any point in the five-day trading period after Brocade's May 16, 2005 restatement to sell those shares, he would have lost money or made significantly less profit.  During that period of time, Brocade traded between $3.77 and $4.55/share. Depending on which date and time Reyes sold his shares, his monetary return would have been between a loss of $363,588 and a profit of $789,252 on the trust shares.

216.    Indeed, Reyes' insider sales in late February and early March of 2005 are very unusual and suspicious.  In January of 2005, Brocade had only revealed the tip of the fraud iceberg. At that time, Reyes knew that the SEC was well into its investigation of Brocade's fraud, knew that the magnitude of Brocade's restatements would ultimately shock the market, and knew that things would only get worse.  With that insider knowledge, Reyes dumped 4,820,270 shares on the market, and collected his $2,961,912 in profits from selling on inside information.  These sales were calculated to and did maximize Reyes' personal benefit from undisclosed inside information.

### 4.    The Context of Defendants' Incentive To Withhold Material, Non-Public Information

217.    As set forth extensively throughout this Complaint, Defendants had every incentive to withhold material, non-public information.  Specifically, if Brocade's improper and illegal option backdating scheme were kept from the public, then Brocade could:  (1) hire and retain employees without having to incur large cash compensation expenses for high salaries; (2) unilaterally grant themselves absurdly large numbers of lucrative options at the lowest possible price; and (3) increase the stock's price by hiding the true impact that the cost of these option grants had on Brocade's public financials. The proof is in the pudding.  The ultimate exposure of this illegal option-backdating scheme, and its corresponding effect on Brocade's financials, caused Brocade's stock to drop by 46%.

## H.    Sonsini Deliberately Chose to Allow Reyes and Canova to Commit Accounting Fraud

218.    In his capacity as Brocade's attorney, a member of Brocade's Board of Directors and Audit Committee, personal friend and advisor to Reyes, and delegator of Reyes's "Committee of One" powers, Sonsini had direct access to—and thus knowledge of—the requirements of Brocade's

Stock Option Plan and the requirements imposed upon Brocade by GAAP and the Exchange Act regarding options granted under that plan.  In his capacity as a member of Brocade's Board of Directors and Audit Committee, Sonsini had a duty to observe, monitor and know the actions taken by Reyes as CEO.  And, perhaps most specifically, as the person who gave Reyes the power to grant options as a "Committee of One," Sonsini knew that Reyes was able to exercise almost unfettered control over Brocade's Stock Option Plan with little oversight—a bright red flag that required Sonsini, as the Board member who gave Reyes these powers in the first place, to keep a close eye on Reyes.

219.    However, as the person who gave Reyes this extreme degree of power—a gift that, as SEC Commissioner Campos stated, in and of itself signals that an outside director is not doing his job—Sonsini stood to lose significant credibility, business, and potentially monetary gains, if he exposed Reyes for breaking the law as a result of abusing this power.  Indeed, Sonsini not only gave Reyes this power, but also served as the named partner of the law firm that served as Brocade's outside counsel, which filed an opinion letter of approval every time Brocade filed a Registration Statement with the SEC for stock registered pursuant to the Company's Stock Option Plans. Moreover, Sonsini and his firm made millions of dollars off of Brocade as its outside counsel, were shareholders of Brocade, did legal work for over 30 companies that were also manipulating their options programs, served as a director on the boards of half a dozen such companies, and received at least one conspicuously timed option grant from one such company.  Sonsini thus knew that if he watched Reyes closely or intervened to stop his unlawful conduct, both Sonsini and his law firm could lose millions in fees from and investments in Brocade, and, that Sonsini would be exposed for his involvement with numerous other companies alleged to have participated in illicit option backdating schemes.  As a result, Sonsini chose to stand by and do nothing to stop Reyes or warn Brocade's investors about the true nature and consequences of Brocade's fraudulent scheme.

220.    Defendant Sonsini is a named partner at the law firm of WSGR.  As a named partner in WSGR, Sonsini has a duty of loyalty to his partners.  However, as a member of Brocade's Board of Directors and Audit Committee, Sonsini also owed certain non-waivable duties to Brocade's investors, which were expressly identified under Brocade's Code of Ethics, Audit Committee

1    Charter, Proxy Statements, and Sarbanes-Oxley. Among other things, Sonsini's duties as a Board

2    member required him to provide independent review and oversight of Reyes, Brocade's financial

3    reporting processes, internal controls, and independent auditors, and to ensure that management not

4    only carried out its duties lawfully, but also filed complete and accurate disclosures with the SEC.

5            221.    Unfortunately for Brocade's investors, throughout the Class Period, Sonsini had

6    severe and irreparable conflicts of interest between his obligations to himself, WSGR, and

7    Brocade's investors, including the fact that: (1) Sonsini was the person responsible for directly

8    handing Reyes unfettered authority to hand out stock options as a committee of one; (2) Sonsini

9    appears to have received at least one illicit option grant from a company while he was a member of

10   its board; (3) Sonsini was a partner entitled to his share of millions of dollars earned by WSGR as

11   outside counsel to Brocade; (4) Sonsini was a partner entitled to receive distributions from WSGR's

12   private investment entity (WS Investments), which was a shareholder in Brocade; (5) WSGR wrote

13   and filed opinion letters for Brocade's Registration Statements for stock issued under the Stock

14   Option Plan;[14] (6) Sonsini had a personal relationship with Reyes and key members of Reyes'

15   family; (7) Sonsini served as a member of the board of six different companies under investigation

16   for illegal stock option grants made while Sonsini was a board member; and (8) Sonsini's law firm

17   earned millions in fees for serving as outside counsel to over 30 companies under investigation for

18   illegal stock option grants.

19           222.    As a member of Brocade's Board and Audit Committee, Sonsini had a duty to

20   Brocade's shareholders to ensure that Brocade's public disclosures were accurate and honest. As

21   outside counsel for Brocade, however, Sonsini and his law firm had one of the most important

22   duties lawyers can have: the duty of keeping information learned from a client confidential under

23   the attorney-client communication privilege. Thus, at all times throughout the Class Period, while

24   Sonsini acted as both a Board member and a partner at WSGR, he had an irreconcilable conflict

25   _____

26   [14] Lead Plaintiff has compared the language of Brocade's Stock Option Plans to the language of
     numerous stock option plans for other companies where WSGR participated in drafting such plans.
27   Based upon this comparison, and upon information and belief, Lead Plaintiff believes that WSGR
     either participated in the drafting of Brocade's stock option plan or brought this plan to Brocade.
28

1   between these dual roles:  If Sonsini became aware of improper conduct he owed a duty to

2   Brocade's shareholders to inform them of this conduct; however, as a partner at Brocade's outside

3   counsel, WSGR, Sonsini was not allowed to disclose such information without his client's

4   permisssion.  While conflicts of interest like this may be waived from the perspective of the

5   attorney/client relationship, the duties imposed upon a Board member by the Company, Sarbanes-

6   Oxley, GAAP and the federal securities laws can never be waived.  Thus, as one publication put it:

7   "Sonsini is a symptom of an incestuous governance culture, everybody is in bed with each other.  It

8   clashes very much with the Sarbanes-Oxley environment."  Peter Burrows, *Sonsini Under Scrutiny*,

9   BUSINESSWEEK, Oct. 2, 2006 (quoting Ralph D. Ward, Editor, BOARDROOM INSIDER).

10          223.    Sonsini's law firm, WSGR, earned millions in fees working as Brocade's outside

11   counsel throughout the Class Period.  WSGR performed legal work on a multitude of SEC filings

12   regarding Brocade's stock option plans.  For example, WSGR filed an Opinion Statement for

13   Brocade's Registration Statement of Securities (securities to be offered to employees pursuant to

14   employee benefit plans) on: June 13, 2000 (SEC Form S-8 Exhibit 5-1); January 16, 2001 (SEC

15   Form S-8 Exhibit 5-1); June 29, 2001 (SEC Form S-8 Exhibit 5-1); October 30, 2001 (SEC Form S-

16   8 Exhibit 5-1); October 28, 2002 (SEC Form S-8 Exhibit 5-1); March 3, 2003 (SEC Form S-8

17   Exhibit 5-1); August 3, 2004 (SEC Form S-8 Exhibit 5-1); and November 23, 2005 (SEC Form S-8

18   Exhibit 5-1). WSGR also filed an Opinion Statement for Brocade's Registration of Securities-

19   Prospectus filed on March 21, 2002 (Form S-3 Exhibit 5.1, Form S-3/A (Amendment) filed May 21,

20   2002.

21          224.    Each Registration Statement listed above contained one of the following two

22   Opinions from WSGR:

23                  It is our opinion that, upon completion of the actions being taken, or
                    contemplated by us as your counsel to be taken by you prior to the
24                  issuance of the Shares pursuant to the Registration Statement and the
                    Plan and upon completion of the actions being taken in order to
25                  permit such transactions to be carried out in accordance with the
                    securities laws of the various states where required, the Shares will be
26                  legally and validly issued, fully-paid, and non-assessable.

27                  [Or]

28

> It is our opinion that, when issued and sold in the manner described in the Plan and pursuant to the agreements which accompany each grant or purchase under the Plan, the Shares will be legally and validly issued, fully paid and non-assessable.

225. As disclosed by Brocade, WSGR billed the following fees to Brocade for legal work during the Class Period: fiscal year ending October 28, 2000, <u>0.3 million</u>; fiscal year ending October 27, 2001, <u>0.6 million</u>; fiscal year ending October 26, 2002, <u>4.9 million</u>; fiscal year ending October 25, 2003, <u>1.2 million</u>; and fiscal year ending October 30, 2004, <u>0.6 million</u>. Therefore, Brocade paid WSGR over $7.6 million in legal fees for legal work from 2000 though 2004. Further, WSGR's private investment entity, WS Investments  (WS Investments 98B) has been listed a "Significant Shareholder" of Brocade and in February 2000, Sonsini filed an amended SEC Form 4 regarding an August 1999 distribution to Sonsini by WS Investments 98B from sales of shares of Brocade stock.

226. WS Investments is an investment entity owned by certain WSGR partners.  From time to time, WSGR's legal fees for services rendered to Silicon Valley companies have been paid in the form of stock to WS Investments.  According to a FORTUNE article, WSGR takes mandatory deductions from each WSGR partner's pay and deposits the money in WS Investments. *See* Roger Parloff, *Scandals Rock Silicon Valley's Top Legal Ace*, FORTUNE, Nov. 17, 2006.  Additionally, WSGR has taken legal fees in the form of stock or options in startup or small companies. FORTUNE quotes Sonsini as stating "it's an opportunity for a return … and many times it's how we get paid [by startups that] don't have any money.  So if I invest $25,000, you know what he does?  Over a period of 12 months he pays us $25,000 back in the way of legal fees." *Id*.  According to FORTUNE, WS Investments distributed over $175 million to WSGR partners in 2000 alone. *Id.*

227. When a lawyer serves on a board of a company that pays him legal fees, or in which he has an investment, there is an inherent conflict of interest between the lawyer as a board member and investors.  Indeed, if the lawyer discovers fraud or an error that needs to be disclosed to investors, his duty as a director is to disclose the truth to the company's investors.  However, if the lawyer discloses the truth to investors, he not only will run afoul of his duty to his client to keep such information confidential, but also risks losing his client (and thus the legal fees paid by that

1   client) and/or he risks a loss on his investment in the company if the disclosure of the truth causes

2   the company's stock price to drop.

3       228.    Moreover, according to BUSINESSWEEK, Sonsini was one of Reyes' closest personal

4   advisors.   Peter Burrows, *Sonsini Under Scrutiny*, BUSINESS WEEK, Sept. 21, 2006.  Sonsini also

5   was a personal friend of Reyes' father, a Silicon Valley executive.  *Id*.  And, Sonsini and WSGR

6   acted as outside counsel for Google, where Reyes' uncle served as Chief Financial Officer.

7   According to FORTUNE, WS Investments' investment in Google rose to almost $20 million after

8   Google went public in 2004.  Roger Parloff, *Scandals Rock Silicon Valley's Top Legal Ace*,

9   FORTUNE, Nov. 17, 2006.

10      229.    Sonsini and his partners at WSGR were paid over $7.6 million in legal fees by

11  Brocade at the same time Sonsini was supposed to be an independent outside director for Brocade.

12  All of this money was paid to WSGR, and shared by Sonsini as a partner, while Sonsini was

13  supposed to be simultaneously carrying out a duty of loyalty to his partners at WSGR and a duty of

14  honesty to Brocade's shareholders.  And all of this money was paid over the same period of time in

15  which Sonsini allowed Reyes to commit widespread, systematic and pervasive accounting fraud.  It

16  was Sonsini's job as a member of Brocade's Board of Directors to watch out for and stop

17  accounting fraud.  Yet it was Sonsini's job as a WSGR named partner to generate profits for his

18  partners by expanding the firm's client-based business.  Sonsini's dilemma was exacerbated by the

19  fact that it was he who originally armed Reyes with the power to run rampant over the Company's

20  Stock Option Plan, a decision that SEC Commissioner Campos stated indicates that such a board

21  member chose not to take his duties as a board member seriously. Sonsini knew that if he

22  intervened to stop Reyes, Reyes could remove WSGR as Brocade's outside counsel, and that

23  Sonsini and his firm could lose millions in fees from Brocade.

24      230.    The problems with Sonsini's multi-faceted roles at Brocade were exemplified by his

25  inolvement in Brocade's attempted sale to Cisco Systems, Inc.  Throughout this transaction, Sonsini

26  acted not only as a member of Brocade's Board but also as a partner for WSGR, which acted as

27  Brocade's outside counsel in attempting to complete the sale.  Moreover, "according to two sources

28  familiar with the talks, he [Sonsini] acted like an investment banker by seeking a **success fee** if the

1   deal went through." Peter Burrows, *Sonsini Under Scrutiny*, BUSINESSWEEK, Oct. 2, 2006

2   (emphasis added). "You couldn't tell if he was the lawyer for the Company, a board member, or the

3   investment banker . . . ." *Id.* Ultimately, Cisco backed out of the deal due to the discovery of

4   Reyes' and Brocade's unlawful options backdating scheme. According to one news report, "inside

5   sources say that Cisco got cold feet after finding the accounting irregularities on its own but confirm

6   that Reyes' departure two months later further diminished its interest." Peter Burrows, *Stung by*

7   *Stock Options*, BUSINESSWEEK, Feb. 14, 2006. If Cisco in fact discovered these irregularities on its

8   own, an alarming question arises: why did Sonsini not immediately disclose this fact to Brocade's

9   shareholders. The answers are even more alarming: if Sonsini disclosed this development to the

10   public, at a minimum, he would risk violating the attorney/client privilege and risk blowing up the

11   deal, thus precluding him from getting a success fee.

12        231. Further, Sonsini knew that dozens of other WSGR corporate clients – many engaging

13   in similar forms of options manipulation - would be reluctant to retain WSGR if it earned the

14   reputation as Silicon Valley's whistleblower firm. Thus, for five years, while Sonsini and his firm

15   made millions off Brocade in legal fees, Sonsini stood by and did nothing whatsoever to intervene

16   or stop Reyes' and Brocade's widespread accounting fraud. Indeed, it was not until the attorney for

17   whistleblower Daniel Cudgma called Brocade's General Counsel and threatened to turn Brocade in

18   to federal authorities, and Brocade's General Counsel in turn called WSGR, that Sonsini, WSGR or

19   anyone affiliated with Brocade chose to do anything at all to rein in Reyes. Amazingly, even after

20   Brocade's rampant accounting fraud was uncovered, Sonsini and his partners at WSGR still

21   managed to charge an additional $6.7 million for legal work in 2005 (which likely was for WSGR's

22   multi-faceted role as counsel in Brocade's Audit Committee investigation and in defending Brocade

23   in the ensuing governmental matters and civil litigation). The evidence that was uncovered in the

24   ensuing internal investigation was not new; this evidence was there all along. Indeed, as the papers

25   filed by Brocade in the derivative litigation against it prove, Brocade's internal investigation

26   involved questioning Brocade employees and reviewing Brocade's internal documents.

27        232. Sonsini was also incentivized to turn a blind eye toward the fraudulent conduct in

28   light of his own involvement as counsel to many other companies within the Silicon Valley

engaging in illegal option manipulation practices. If someone exposed Reyes' and Brocade's stock options scheme, it was likely that the lid would be blown off of Sonsini's direct involvement with these other companies. Ultimately, that is exactly what happened. Indeed, according to one study, WSGR was legal counsel for at least forty percent of the companies currently under investigation for this conduct. Roger Parloff, *Scandals Rock Silicon Valley's Top Legal Ace*, Fortune, Nov. 17, 2006. APERS' own investigation has determined that, in addition to Sonsini's direct involvement with Brocade's Stock Option Plan and Registration Statement Opinions related to the Plan, WSGR also either wrote the stock option plans or provided Registration Statement Opinions for the following companies, all of which are under investigation for stock option backdating and/or mispricing:

| | |
|---|---|
| Altera Corporation | McAfee Inc. |
| Symmetricom | Mercury Interactive[15] |
| Amkor Technology | Microtune |
| Apple Computer | Novell, Inc. |
| Arthrocare | Novellus Systems |
| Atmel Corporation | Pixar |
| Autodesk | PMC Sierra |
| Maxim Integrated[16] | Quick Logic |

---

[15] Prior to becoming Mercury Interactive's (MERQ) General Counsel, Susan Skaer, from at least 1996 to 1997, was employed with WSGR (MERQ's outside legal counsel). Skaer was apparently assigned to work the MERQ engagement. Skaer, along with WSGR attorney Henry P. Massey Jr., is copied as "Agent for Service" on the MERQ Share Registration filed August 9, 1996, regarding the 1989 Stock Option Plan, (as amended through January 1996) and the 1996 Supplemental Stock Plan. Additionally, Skaer, along with MERQ executives Areyh Finegold and Susan Abrams, was appointed and authorized to sign as "attorneys-in-fact," for MERQ Executives and Directors. WSGR, as "legal counsel for Mercury Interactive Corporation," provided the opinion, and related consent to the filing of its opinion, as to the legality of Securities being Registered.

[16] Brocade's outside counsel for the Audit Committee Investigation, Morrison & Foerster, has served as outside counsel to Maxim Integrated. For Maxim's share registrations filed since March 2006, WSGR has provided the legality opinion. Additionally, on other Maxim 2006 filings, copies are sent to Matthew Sonsini of WSGR. Brocade's former CFO, Michael J. Byrd, was CFO of Maxim before coming to Brocade.

| | |
|---|---|
| Epigram, Inc.[17] | Rambus, Inc. |
| Cirrus Logic | Redback Network, Inc. |
| Cyberonics | SanMina-SCI |
| Integrated Silicon Solutions, Inc. | Sigma Designs |
| Jabil Circuit | Vitesse Seminconductors |
| Juniper Networks | Wind River |
| KLA Tencor | Xilinx |
| Linear Technology Corporation | |

233.    Additionally, Sonsini served as a member of the board of directors for the following companies under investigation for stock options backdating and/or mispricing,:

| | |
|---|---|
| KLA Tencor | Novell, Inc.[18] |
| Pixar | LSI Logic |
| Lattice Semiconductor Corporation | Echelon Corporation |

234.    According to a news report first published on October 2, 2006, Sonsini received a grant of 50,000 options from Novell, Inc. while he was on Novell's board, which was a deviation from the company's normal compensation plan. ***This grant was made on October 26, 1999, at a time when Novell's stock was at a 17-month low.***  Later, Novell announced exceedingly positive financial results for the previous year, which resulted in the stock rising from $16.69 on the "date" of the grant to $39.94 less than a month after the announcement.  The result was a gain of over $1 million on paper for Sonsini as a result of this option grant.  According to Boalt Hall School of Law Professor Jess Fried, "It doesn't smell good.  This was at the annual low and was an off-cycle grant, and it's highly likely that this was spring loaded."  Justin Scheck, THE RECORDER, October 2, 2006.

235.    According to a recent study by THE CORPORATE LIBRARY, Larry Sonsini's ties to companies involved in backdated stock option grants is undeniable.  THE CORPORATE LIBRARY, *The*

---

[17] WSGR acted as escrow agent for restricted stock option purchases.

[18] WSGR's private investment entity, WS Investment Company, has been a shareholder of Novell, Inc.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

*Spread of Options Backdating: A Closer Look at the Boards and Direction Involved*, Oct. 2006. Under a separate section labeled "The Wilson Sonsini Connection," the study states that a special analysis was done to examine the connections between the partners and principals of WSGR and companies under investigation, which resulted in a finding that the ties between WSGR and these companies are substantial. The study reached the following conclusions regarding WSGR's and Sonsini's involvement with these companies:

> A number of WSGR senior partners, including Mr. Sonsini, knowingly involved themselves in multiple roles with these companies, each of which involved some form of compensation. They were paid for the provision of legal services, and they were paid to serve as company directors, both in cash and in company stock. At the same time, they also made money as investors in many of these companies. They embraced a series of relationships that were inherently conflicted, and while they may not have led in any way to the current crisis facing so many of these companies, the very existence of these multiple relationships, and what they say about the boards involved, could have an effect on the potential for damage now faced by these companies and the individuals involved.

> In the Corporate Library's experience, genuinely bad corporate governance generally involves a wide spectrum of director actions and intentions, with outright fraud at one extreme and base incompetence at the other. But the vast majority of governance-related problems that put shareholder value at risk lives somewhere in the middle. More often than not they involve an ethical rather than a legal dimension and the Wilson Sonsini Goodrich & Rosati web of connections among its many Silicon Valley clients presents a prime example.

236. Unfortunately for APERS and the Class, with respect to Brocade, Sonsini's involvement and genuinely bad corporate governance involved both outright fraud and base incompetence. The fact that Sonsini served on the board of six companies—in addition to Brocade—under investigation for stock option backdating and/or mispricing and WSGR was outside counsel for at least 37 such companies, further evidences that Sonsini's involvement in the fraud at issue here was not the result of a mere accident or mistake but, quite the contrary, was knowing and/or the result of deliberate recklessness.

237. Sonsini's direct involvement in Hewlett-Packard's ("HP") attempt to cover up the real reasons why one of its key directors resigned in the wake of HP's illegal pretexting scandal provides further evidence that Sonsini will stop at nothing, including violating federal securities laws, to help his clients. On September 6, 2006, the WALL STREET JOURNAL broke news of a

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

"pretexting" scandal at computer company HP, a company for which Sonsini and his firm have long-served as outside general counsel.[19]  Not surprisingly, it was revealed that Sonsini played a vital role in yet another corporate scandal.  As was later detailed in a derivative complaint filed against HP and its executives on November 8, 2006, Sonsini not only advised HP that what it had done was legal (when in fact, it was not), he also assisted in a scheme to file a defective SEC filing regarding the scandal, and ignored repeated requests to correct the defective filing.

238.   At a meeting of HP's board of directors on May 18, 2006, the results of an extensive investigation into press leaks regarding HP board deliberations were the center of attention.  At that meeting, the board was presented with a report that pointed the finger at George Keyworth, a longtime HP director, as the source of the leaks.  A "boardroom showdown" ensued, and a divided board, by secret written vote, demanded that Keyworth resign.  Outraged at this demand, Tom Perkins, a close friend of Keyworth and fellow board member, picked up his papers, grabbed his briefcase, and walked out, announcing his resignation on his way out the door.

239.   While Sonsini was not present at the now-infamous May 18 board meeting, he later testified before Congress that he was immediately called in to talk to Perkins, whom he knew from decades of Valley deals.  The following discussion reportedly ensued:

| | |
|---|---|
| Sonsini: | "How can you characterize this, Tom? May I say you're resigning for personal reasons?" |
| Perkins: | "No, Larry, you cannot." |
| Sonsini: | "May I say it's a disagreement with Pattie?" |
| Perkins: | "Sure, but don't you dare say I resigned to spend more time with my children." |

240.   At this point, Sonsini had a clear opportunity to identify the pretexting that had taken place at HP as a privacy invasion that would offend regulators and the public.  Instead of doing so, he helped HP circle the wagons.  Sonsini possessed a clear motive to cast Perkins' resignation in an inaccurate light:  As Sonsini knew, when a director resigns from a public corporation, federal law,

---

[19] HP's general counsel, Ann Baskins, is married to one of Sonsini's partners at WSGR.  WSGR justifies this apparent conflict of interest by saying that this fact "was well-known within HP."

1  and the duty of candor owed to shareholders under state law, require that company to disclose the

2  reason if the resignation resulted from a disagreement.  Despite this knowledge, and in blatant

3  violation of the law, Sonsini advised HP to file its Form 8-K announcing Perkins' resignation from

4  the board, offering **no explanation** for what caused his departure after nearly 50 years with the

5  company.  Indeed, on May 22, 2006, HP filed its Form 8-K—disclosing that Perkins had resigned,

6  but not disclosing why—leading investors to believe that Perkins simply stepped down for personal

7  reasons.

8  241.    In mid-June 2006, Perkins contacted Sonsini, asking him to look into the press leak

9  investigation that had been the subject of the controversial May board meeting.  In an email to

10  Perkins, Sonsini acknowledged that HP's security consultants "did obtain information regarding

11  phone calls made and received by the cell or home numbers of directors" and that it was "done

12  through a third party that made pretext calls to phone-service providers."  Sonsini also reportedly

13  warned Perkins about the dangers of violating a director's duty of confidentiality: "Tom, be careful

14  of your discussions about the inquiry."  Peter Burrows, *Sonsini Under Scrutiny*, BUSINESSWEEK,

15  Oct. 2, 2006.

16  242.    WSGR previously had been called upon to review the legality of pretexting.  Sonsini

17  had advised HP that pretexting was "not generally unlawful."  Sonsini's defense of pretexting was

18  that it is "apparently a common investigatory method."  In reliance on this legal advice, HP took the

19  position that "pretexting is legal in California."

20  243.    When Perkins' counsel (one of the nation's legal experts on surveillance tactics)

21  informed Perkins that pretexting was in fact illegal, Perkins sent Sonsini an email asking for an

22  explanation.  Sonsini wrote back assuring Perkins that the leaks investigation, including the use of

23  pretexting, appeared to be "well done and within legal limits."  Sonsini also stated that that he had

24  consulted with an unnamed outside counsel regarding the issue.

25  244.    When pressed about this email during the House hearings, Sonsini said he had never

26  heard of pretexting and was relying upon two reports from HP's legal department.  It turns out,

27  Sonsini was relying upon the precise person at HP who was directing the illegal pretexting.  He

28  chose not to seek an outside opinion from a law firm he knew, or to have Wilson Sonsini lawyers do

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                              No.: 3:05-CV-02042-CRB

1    research until much later.

2         245.    Throughout the summer of 2006, Perkins and his counsel urged HP's general counsel

3    and lawyers at Wilson Sonsini to correct HP's false Form 8-K.  Perkins also wrote to Sonsini and

4    HP directors in August 2006, demanding a correction to the Form 8-K.  This letter put the HP board

5    and Sonsini on notice that he considered the May 22, 2006 8-K that announced his resignation to be

6    defective.  Because the company had refused to disclose the truth about the reasons for Perkins'

7    resignation, he warned, he was legally obligated to go public.

8         246.    Perkins and his counsel knew that this letter would create a problem for HP.  If a

9    director sends a letter to the board detailing his reasons for resigning, as Perkins' letter did, the

10   company must file the letter with the SEC within two business days.  Instead of doing so, HP wrote

11   back to Perkins, copying Sonsini, saying that it would be "inappropriate" to change the 8-K because

12   it was accurate when it was filed.  Sonsini later testified before Congress that he agreed that the

13   company did not need to revise the disclosure until it did an internal investigation: "It was not

14   material at that point in time since the investigation was not done."  HP's letter also stated that

15   WSGR had been assigned to conduct this investigation.

16        247.    At this point, after HP and Sonsini refused Perkins' repeated requests to take action,

17   Perkins and his attorney decided to get the power of the government behind them.  Perkins turned

18   over the emails and letters that had been exchanged regarding the dispute to the SEC.  He also

19   contacted the U.S. attorney's office and the California attorney general.  Perkins' counsel also

20   objected to HP's choice of WSGR to do the internal investigation.  In an August 23, 2006 letter to

21   Sonsini's partner, Perkins' attorney accused Wilson Sonsini of having a conflict of interest, in part

22   because of *"Mr. Sonsini's key participation in the events at issue."*  Perkins' counsel questioned

23   how the firm could legitimately investigate events that involved the "key participation" of its

24   chairman: "My personal respect for your and Mr. Sonsini's legal ability and professional integrity

25   does not mitigate the conflicts of interest arising from your firm's longstanding relationship as

26   counsel to [HP]."  Perhaps Yale School of Management Professor Jeffrey A. Sonnenfeld summed

27   up the apparent conflict of interest best when he said that Sonsini "could not have been a worse

28   choice" to advise the board.

248.    So, despite the fact that: (1) WSGR was HP's outside general counsel; (2) HP general counsel Anne Baskins was married to a WSGR partner; and (3) Sonsini told Perkins that pretexting was lawful, Sonsini and WSGR remarkably maintain that the firm's involvement in the leaks probe was an "independent investigation."  WSGR's written statement said: "Our firm investigation was independent in that we were not involved or aware of the [pretexting] investigations…It was not, nor was it intended to be, 'independent' in the same sense as certain investigations conducted by counsel who have no connection to the company under investigation; in these situations, counsel's work is generally understood to be destined for regulatory and other government agencies."

249.    Not surprisingly, WSGR issued a report (authored by two WSGR partners with close ties to Sonsini) regarding the HP leaks probe on August 30—*clearing everyone at HP*.  While saying that everyone at HP acted with the "best of intentions" and that "the use of pretexting…was not generally unlawful," WSGR also recommend that HP stop the practice.  A week later, the story broke in the WALL STREET JOURNAL.  It was not until later that day, September 6, 2006—almost four months after Perkins' resignation on May 18, 2006—that HP *finally* amended its previous Form 8-K to provide the legally required details (albeit convoluted) of the director's resignation.  Of course, WSGR and Sonsini argue that HP, not the firm, is ultimately responsible for the securities filings.  Two days later, federal prosecutors contacted HP about the pretexting, and the House Energy and Commerce committee also contacted HP and WSGR regarding the matter.  It was after these developments that HP decided to reexamine its relationship with Sonsini—he is no longer serving as the lead adviser to HP's board and HP has brought in another law firm to replace Sonsini as the face of HP's legal team.

250.    On September 28, 2006, Sonsini testified for five hours before Congress regarding his role in the HP scandal.  There, Sonsini received scathing criticism from Congressmen in utter disbelief of Sonsini's complete lack of judgment:

> "How, after all was said and done, could the board's outside counsel, Mr. Larry Sonsini, review the investigation and say that pretexting for phone records of board members, employees, and journalists was aboveboard and legitimate?" (Kentucky representative Ed Whitfield).

"We have a fine display of arrogance, cover-up, and probably gross stupidity. Where were the lawyers? There were red flags waving all over the place . . . But none of the lawyers stepped up to their responsibilities." (Michigan representative John Dingell).

251. U.S. Representatives are not the only ones with questions. In an October 2, 2006 BUSINESSWEEK article, Peter Burrows asks the following: "Why didn't he sound alarms when he first found out about pretexting? Why didn't he recuse himself from the board's deliberations about the scandal? Shouldn't his firm's lawyers have noticed the widespread sloppiness, if not fraud…?" Peter Burrows, *Sonsini Under Scrutiny*, BUSINESSWEEK, Oct. 2, 2006. Sonsini has yet to provide adequate answers to any of these valid questions.

252. During questioning by Wisconsin congresswoman Tammy Baldwin, Sonsini admitted that he thought the entire effort was "somewhat over the top," but he didn't see it as his job to raise concerns. Instead, he shifted the blame to HP's in-house lawyers:

> Baldwin: *Mr. Sonsini, when you reviewed [the report], what did you think?*
>
> Sonsini: *Yes, when I got the report, [it was]* **with the view of, what do we do with the result, [now that we have] discovered the person who has leaked the information?** *What do we do in terms of a corporate governance point of view going forward? And I did not focus, other than on the words and footnotes saying that it was lawfully done, on the sub rosa investigation. It certainly seemed to me to be somewhat over the top. But my focus at the time, because I'm not an expert in such matters, and they would not send this report to me to comment upon those kinds of issues, my focus was, I was dealing with a serious corporate governance issue.*
>
> Baldwin: *I, of course, am focusing on what you didn't focus on. . . . Who was in charge of making sure the tactics used were legal?*
>
> Sonsini: *I think the record has become quite clear that who was in charge was the HP internal legal department. They took the responsibility on, rightly or wrongly- that's what happened. I came in after the fact and learned that. That's who was in charge.*

253. Of course, it is quite clear what Sonsini did with the information he learned regarding the leaks investigation results—he continued his efforts to cover up the truth about Perkins' resignation, despite his knowledge that his conduct was in blatant violation of federal law. Sonsini also made it abundantly clear at the hearing that he now disapproves of pretexting: "Pretexting is clearly wrong, unethical and improper." However, he could not escape the fact that he had not raised any alarms when it mattered most:

> Rep. Marsha Blackburn (Tenn.): *You were told people at HP were lying about their identity. You did not raise questions or say that this is unacceptable. I don't understand.*

91

Sonsini: *That's a fair question. I didn't know what pretexting was.*
But that didn't stop him from telling HP that it was legal at the time.

254.     Sonsini's role in the HP scandal is directly relevant here because, once again, this conduct goes to show that Sonsini is no stranger to violations of the Exchange Act. Sonsini's involvement in such conduct further shows that his conduct in the present case was not the result of a mere accident or mistake but, quite the contrary, was knowing and/or the result of deliberate recklessness. When given the choice between performing his duties to shareholders and investors versus safeguarding the interests of his friends on corporate boards, Sonsini once again chose the latter in violation of federal securities laws.

I.     **Reyes and Canova Certified That They Were Aware of All Material Accounting Information and Internal Controls and, Therefore, Had Actual Awareness of How Brocade Accounted for Stock Option Grants**

255.     Reyes and Canova signed Brocade's Financial Statements, which contained certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") for each quarter (Form 10-Q) and each Annual Report (Form 10-K) for fiscal years 2002 through 2004. By signing these certifications, Reyes and Canova swore—subject to criminal penalty—that they: (1) had reviewed each Financial Statement; (2) designed or caused to be designed Brocade's internal disclosure controls and procedures upon which Brocade's accounting for stock option grants was based; (3) that such disclosures and procedures were adequate; (4) **that all material information relating to Brocade was made known to Reyes and Canova as certifying officers**; and (5) that the Financial Statements were accurate. Specifically, Reyes and Canova certified that:

(1)     The Financial Statements listed below (all of which have been restated) and certified under SOX:

•     Full compliance with Section 13(a) or 15(d) of the Securities Exchange Act of 1934.

•     That information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of Brocade

*See* 2002 Form 10-K (Reyes and Canova); 2003 Form 10-K (Reyes and Canova); 2004 Form 10-K (Canova); Forms 10-Q for quarters ending July 27, 2002, January 25, 2003, April 26, 2003, July 26, 2003, January 24, 2004, May 1, 2004, July 31, 2004 and October 30, 2004.

(2)    Reyes and Canova signed the Financial Statements listed below (all of which have been restated) and certified under SOX:

•    Brocade maintained disclosure controls and procedures and internal control over financial reporting

•    Disclosure controls and procedures are controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. This includes, but is not limited to, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.  *See* SEC Rule 13(a)-15(e), 17 C.F.R. §240.13a-15(e); 17 C.F.R. §240.15d-15(e).

*See* Exhibit 99.1 to SEC Form 10-K for Fiscal Year 2002; Exhibit 32.1 to SEC Form 10-K for Fiscal Year 2003; Exhibit 32.1 to SEC Form 10-K for Fiscal Year 2004; Exhibit 32.1 to SEC for 10-Q for each listed 10-Q.

(3)    Reyes and Canova signed the Financial Statements listed below (all of which have been restated) and certified under SOX:

•    The certifying officers are responsible for establishing and maintaining disclosure controls and procedures for the registrant, and have:

•    Designed, or supervised design, of disclosure controls and procedures to ensure that material information relating to Brocade was made known to the certifying officers, particularly during the period in which the report was being prepared;

•    Had evaluated the effectiveness of Brocade's disclosure controls and procedures and presented in the filing the certifying officer's conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by the report; and

•    Had disclosed in the reports any change in Brocade's internal control over financial reporting that occurred during Brocade's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, Brocade's internal control over financial reporting.

•    The certifying officers have disclosed, based on their most recent evaluation of internal control over financial reporting, to Brocade's auditors and the audit committee of Brocade's board of directors:

1  • All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

4  • Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

6  *See* Exhibits 31.1 and 31.2 to SEC Form 10-Q for: September 8, 2003, January 20, 2004, March 8, 2004, June 14, 2004, September 13, 2004, January 31, 2005 (Canova only), and March 31, 2005 (Canova only).

8  256. By signing these certifications, Reyes and Canova swore, subject to criminal penalty, that they had actual contemporaneous knowledge of (1) all data regarding the granting, recording and disclosure of stock option grants, (2) the way such data was used in creating each Financial Statement, and (3) the specific internal controls (of which Brocade's Restatement admits there were few, if any) that Brocade used to ensure that stock options were properly granted, recorded and disclosed.

14  **J.** **A Former Brocade Employee Who Personally Received A Backdated Option Grant From Reyes and Canova Blows the Whistle on Defendants' Fraud**

16  257. As detailed above, CS 1 stated that Reyes, Canova and Jensen were personally involved in an "out of guidelines" options grant to a former employee, Daniel Cudgma. As further detailed above, the governmental actions corroborate CS 1's information that Reyes, Canova and Jensen were directly involved in granting backdated options to Cudgma. CS 1 recalled the approval process for an offer to Dan Cudgma ("Cudgma"), a Brocade Vice President, which was well beyond Company guidelines. Offers to such high-level candidates, which were "out of guidelines," required involvement from Jensen, Reyes and the CFO. CS 1 recalled there being quite a rush to get approvals and the "t's crossed and i's dotted" so that Cudgma could take advantage of a lower strike price.

25  258. Lead Plaintiff's Confidential Sources, including CS 4, have verified that Cudgma was given a loan by Brocade in the amount of approximately $1 million. According to CS 4, at some point Cudgma had a disagreement with Reyes and threatened to expose Defendants' use of backdated options grants. Cudgma was eventually terminated and, according to legal documents

94

reviewed by Lead Plaintiff from Court filings in Massachusets state court, Brocade filed for foreclosure against Cudgma in April 2004. According to sources cited in a *Wall Street Journal* article dated July 20, 2006, which corroborates the information provided by CS 4, Cudgma contacted an attorney regarding Defendants' use of backdated options. Cudgma's attorney then contacted Brocade's General Counsel, Mark Cochran, and informed him that Cudgma was planning to contact the SEC regarding Brocade's use of backdated option grants. Thereafter, according to the *Wall Street Journal*, Cochran contacted Defendant Sonsini's law firm, WSGR, which in turn contacted Brocade's Audit Committee. Incredibly, now that Cudgma had threatened to turn Brocade in to federal regulators, Sonsini, Dempsey, Neiman and the rest of Brocade's Audit Committee, all of whom had deliberately disregarded the fact that a pervasive, systematic fraudulent scheme had taken place right in front of them for five years, finally decided to do something about it.

## V.   THE INVESTIGATION BY BROCADE'S NEW AND INDEPENDENT OUTSIDE COUNSEL AND OUTSIDE AUDITOR CONCLUDED WITH A DETERMINATION THAT THE COMPANY IMPROPERLY ISSUED, ACCOUNTED FOR AND DISCLOSED STOCK OPTION GRANTS FROM 1999-2004 AND THAT THERE WAS "OVERWHELMING AND CONCLUSIVE EVIDENCE" AGAINST REYES

259.    The Audit Committee decided to begin an internal investigation into the very accounting scheme that had taken place right in front of them. However, to conduct this investigation, the Audit Committee brought in new—and independent—legal counsel, Morrison & Foerster, to head the investigation. Morrison & Foerster in turn engaged a new accounting team, PricewaterhouseCoopers ("PWC"), to conduct a forensic accounting investigation into the matter. In essence, Brocade had to bring in new, independent outsiders to do the job that Brocade, its legal counsel, and its Audit Committee Members failed to do in the first place.

260.    According to documents filed by Brocade in the derivative litigation pending in this Court, the internal investigation began on November 1, 2004 and continued through the end of January 2005. The internal investigators interviewed thirty current and former employees and reviewed approximately 850,000 pages of documents obtained from twenty-five former employees

1   and the Company's central repository.  According to Brocade, these employees and documents

2   came from "numerous relevant departments" including the human resources department.

3       261.    At the conclusion of this three-month internal investigation, the Company

4   determined that the way in which Brocade accounted for stock option grants in publicly filed

5   statements during the Class Period was incorrect and required restatement.  In a BUSINESSWEEK

6   article, the author cites Reyes as stating that, upon completion of Brocade's first internal

7   investigation, he was informed by Defendant Sonsini, that the Audit Committee had determined that

8   the evidence regarding Reyes' involvement in the accounting violations was overwhelming and

9   conclusive.  Peter Burrows, *Brocade Stung by Stock Options,* BUSINESSWEEK, Feb. 13, 2006.

10  Although Reyes disputed this conclusion, he stepped down as CEO shortly after this conversation.

11      262.    Unfortunately, Brocade had to initiate a second internal investigation.  This second

12  investigation lasted  six months and focused more directly on Brocade's accounting for stock-based

13  compensation to employees on leaves of absences and in transition roles prior to leaving Brocade—

14  conduct that Lead Plaintiff's confidential sources depicted above as a direct part of Brocade's

15  overall fraudulent scheme.  The second investigation resulted in more employee interviews and

16  review of over two million pages of internal documents.  The conclusions reached as a result of this

17  second investigation resulted in yet another restatement of Brocade's Financial Statements.

18      263.    That Morrison & Foerster and PWC found massive accounting violations after an

19  initial investigation of only three months and thirty employee interviews, provides a shocking

20  illustration of just how recklessly Sonsini, Dempsey and Neiman disregarded the accounting

21  violations that were going on right before their very eyes.  Indeed, these three Defendants signed off

22  on every Financial Statement at issue even though it was their job to ensure that those statements

23  were accurate and even though they had given Reyes unfettered power to act as a committee of one

24  when they knew the Company did not have sufficient internal controls, safeguards and procedures

25  in place to ensure that stock options would be properly granted, accounted for and disclosed.  Yet,

26  while it only took Morrison & Foerster and PWC three months to conclude that these violations

27  occurred, these three Defendants failed to stop this fraud for over five years.

28

## VI. BROCADE'S RESTATEMENTS

264. Unfortunately for Lead Plaintiff and Brocade's other investors, the unraveling of Defendants' misconduct would come back to haunt the Company, when, on January 6, 2005, the Company began to make a series of admissions regarding massive, systematic and widespread accounting violations that occurred over a five-year period as a result of Defendants' scheme. That day, Brocade announced that it would restate its Financial Statements for fiscal years ending 2002 and 2003 to record additional stock-based compensation expenses as a result of an Audit Committee internal review that was later completed on January 24, 2005.

265. As a result of this investigation and audit, Brocade restated its Financial Statements for 1999 through 2004. *See* Brocade Form 10-K filed January 31, 2005. On November 14, 2005, in its amended SEC Form 10-K filed for the fiscal year-ended 2004, Brocade further admitted that its accounting practices had failed in three major regards and, thus, that all of the Financial Statements issued since its inception as a public company were materially false and misleading:

> In January 2005, following an internal review by our Audit Committee, we determined that we had not correctly accounted for: (A) stock option grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000; (B) stock option grants that were made to persons engaged on a part-time basis prior to their new hire full-time employment during the period August 2000 to October 2002; and (C) stock option grants where there was insufficient basis to rely on our internal process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003. As a result, we restated our financial statements to record additional stock-based compensation charges relating to many stock option grants from the periods 1999 though the third quarter of fiscal 2003 as well as a valuation allowance associated with deferred tax assets related to previously recorded stock option tax benefits (the "January 2005 Restatement"). In addition, it was concluded that there were improprieties in connection with the documentation of stock option grants and related employment records of a small number of employees prior to mid-2002, which resulted in immaterial adjustments included in this restatement.

*See also* Brocade Form 10-K filed January 31, 2005, p. 56 n.3.

266. The Restatement was the result of the investigation conducted by Brocade's own Audit Committee. Remarkably, although the Audit Committee signed off on every single Financial Statement at issue, it found that the Company, under the direction of Defendant Reyes, as CEO and

97

Chairman of the Board, Canova as CFO, Sonsini as a Board Member, and Dempsey and Neiman as Board Members and the Compensation Committee, had materially misled investors for virtually the entire existence of the Company.  Moreover, as a direct result of the Audit Committee's findings, Brocade relieved Defendant Reyes from his positions as CEO and Chairman.  And, as detailed above, Brocade further admitted that its internal controls and disclosure procedures regarding Brocade's stock option granting process were not only flawed during the Class Period but were, for the most part, utterly non-existent.  *Id.* at pp. 83-84, Item 9A.

267.    Brocade's Restatements are a public admission that all of the Financial Statements and related press releases issued during the Class Period were materially false and misleading because they omitted material facts when made.  The specific Financial Statements at issue are all of Brocade's SEC Form 10-K's and 10-Q's filed for fiscal years 2000-2004, as well as numerous press releases issued by the Company during these years, which incorporated the same financial information set forth therein.  Due to the length of these Financial Statements, the relevant portions are set forth in detail in Section VIII, *infra*.  In addition to their specific statements in these press releases, the following were signatories to the following public statements, all of which were restated:

| Date of Filing | Name of Filing | Signed by |
|---|---|---|
| June 13, 2000 | 10-Q | Byrd |
| September 12, 2000 | 10-Q | Byrd |
| January 26, 2001 | 10-K | Reyes, Neiman, Dempsey, Sonsini |
| June 12, 2001 | 2Q 2001 10-Q | Canova |
| September 11, 2001 | 3Q 2001 10-Q | Canova |
| June 24, 2002 | 2001 10-K | Reyes, Canova, Dempsey, Neiman, Sonsini |
| March 12, 2002 | 1Q 2002 10-Q | Canova |
| May 30, 2002 | 2Q 2002 10-Q | Canova |
| August 27, 2002 | 3Q 2002 10-Q | Canova, Reyes |
| January 22, 2003 | 2002 10-K | Reyes, Canova, Dempsey, Neiman , Sonsini |
| March 7, 2003 | 1Q 2003 10-Q | Canova, Reyes |
| June 9, 2003 | 2Q 2003 10-Q | Canova, Reyes |
| September 8, 2003 | 3Q 2003 10-Q | Canova, Reyes |
| January 20, 2004 | 2003 10-K | Reyes, Canova, Dempsey, Neiman, Sonsini |
| March 8, 2004 | 1Q 2004 10-Q | Canova, Reyes |
| June 14, 2004 | 2Q 2004 10-Q | Canova, Reyes |
| January 31, 2004 | 3Q 2004 10-Q | Canova, Dempsey, Neiman, Sonsini |
| March 9, 2005 | 1Q 2005 10-K | Canova |

268.    On January 6, 2005, the Company issued a press release entitled "Brocade

1  Communications to Restate Financial Statements; Company Currently Expects Adjustments to

2  Relate to Stock Compensation; Company Plans to Delay the Filing of its Form 10-K for Fiscal Year

3  Ending October 30, 2004." The press release stated in part:

4        Brocade Communications Systems, Inc., the world's leading provider
       of infrastructure solutions for Storage Area Networks (SANs),
5        announced today that it currently expects to restate its financial
       statements for fiscal years ending 2002 and 2003 to record additional
6        stock-based compensation expense as a result of an internal review.
       During the course of the review, which is still ongoing, the Company
7        determined that the way in which it accounted for stock option grants
       was incorrect and requires restatement. The Company currently
8        expects the restatement to relate to stock compensation. The
       Company does not currently anticipate any material adjustments to its
9        historical revenues, non-stock option related operating expenses or
       cash positions. The Company expects related adjustments will be
10       made to the Company's financial statements for fiscal years prior to
       2002, as necessary. Specifically, the Company has determined it
11       incorrectly accounted for, and will record historical stock-based
       compensation charges relating to, (i) grants that were made to new
12       hires on their offer acceptance date, rather than the date of their
       commencement of employment, during the period May 1999 to July
13       2000, and (ii) grants that were made to persons engaged on a part-
       time basis prior to their new hire full-time employment during the
14       period August 2000 to October 2002.

15       Brocade's audit committee is conducting the internal review with the
       assistance of outside counsel and accountants, both of whom were
16       retained for this purpose. The review is ongoing. There can be no
       assurance that additional adjustments will not be required. The Audit
17       Committee expects to complete the review process in the next few
       weeks. The Company intends to provide more information as soon as
18       it is available.

19       "Our core business remains strong and the restatement does not affect
       the underlying fundamentals of our business. We continue to
20       successfully execute on our strategies and plans and to further
       strengthen the overall position of the Company, " said Greg Reyes,
21       Brocade Chairman and Chief Executive Officer.

22       269.    On January 24, 2005, the Company issued a press release entitled "Brocade

23  Announces the Completion of Audit Committee Internal Review; All Adjustments Are Non Cash

24  and Relate to Stock-Based Compensation and Associated Tax Adjustments." The press release

25  stated in part:

26       Brocade Communications Systems, Inc., the world's leading provider
       of infrastructure solutions for Storage Area Networks (SANs),
27       announced today that its Audit Committee has completed its
       previously announced internal review. As a result of the findings of
28       the review, the Company expects to record additional stock-based

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

compensation charges, which are non-cash. In addition the Company expects to record a valuation allowance associated with deferred tax assets related to previously recorded stock option tax benefits.

The Company affirmed that none of the adjustments impact historical revenues, cash positions, or non-stock option related operating expenses. The Company emphasized that its core business remains strong and the financial restatement does not affect the underlying fundamentals of the business. Brocade is working to prepare revised financial statements to reflect the net stock compensation expenses and associated income tax effect. Brocade will provide more information as soon as it is available.

The table below reflects the Company's expectations of the approximate impact to the Company's Pre-tax Income (Loss) and Net Income (Loss):

| (Amounts in Millions (1) | FY02 (1) | FY03 (1) | FY04 (1) |
|---|---|---|---|
| Pre tax income (loss) as reported | $84 | $(134) | $(16) |
| Adjustments to pre tax income (loss): | | | |
| Stock based compensation | 47 | (1) | (2) |
| Adjusted pre tax income (loss) | $131 | $(135) | $(18) |
| Income tax provision (benefit) as reported | 24 | 2 | (14) |
| Adjustment to tax provision (benefit): | | | |
| Changes in effective tax rate | (19) | 10 | 28 |
| Adjusted tax provision (benefit) | $5 | $12 | $14 |
| Net income (loss) as restated | $126 | $(147) | $(32) |
| Net income (loss) as reported | $60 | $(136) | $(2) |
| Change in reported net income | $66 | $(11 ) | $(30) |

(1) The amounts provided are estimates and subject to audit. The Company has not yet filed its Form 10-K report for the Year Ended October 30, 2004, and there can be no assurance that these amounts may not change.

As announced on January 6, the Company determined it incorrectly accounted for, and would record historical stock-based compensation charges relating to, (i) grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000, and (ii) grants that were made to persons engaged on a part-time basis prior to their

new hire full-time employment during the period August 2000 to October 2002.

Upon completion of the internal review, the Audit Committee further determined that there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003. As a result, the Company will record additional stock-based compensation charges relating to many of its stock option grants from the periods 1999 though the third quarter of fiscal 2003. In addition, it was concluded that there were improprieties in connection with the documentation of stock option grants and related employment records of a small number of employees prior to mid 2002, which resulted in immaterial adjustments included in this restatement.

These charges will affect the previously filed financial statements for fiscal years 2002 and 2003. The Company also expects to make stock based compensation and associated income tax adjustments to previously reported fiscal year 2004 financial results. These adjustments relate solely to matters pertaining to stock options granted prior to August 2003. For years prior to 2002, the Company will reduce previously reported net income by approximately $304 million (consisting of a reduction to net income in years 1999 and 2000 of $15 million and $1,019 million, respectively, and an increase to net income in 2001 of $730 million) relating solely to stock based compensation and associated income tax adjustments. The Company will calculate the additional historical stock based compensation charges using the variable method of accounting under APB 25. The stock compensation and related tax adjustments are all non-cash.

As a result of the stock compensation adjustments, the Company's deferred tax assets previously recognized have now been fully reserved. The Company expects to realize a tax benefit in future reporting periods when it is able to utilize its Net Operating Losses to offset future Income. This will result in a lower future effective income tax rate than previously expected.

Brocade also announced today that Michael Klayko, previously Vice President of Worldwide Sales, has been named Chief Executive Officer, and that David House, who previously served as lead outside director of the Company, has been named Executive Chairman of Brocade, effective immediately. Greg Reyes, who served in these positions for six years, will remain active as an employee advisor to Brocade. For more information, please see the press release entitled, "Brocade Announces Executive Appointments" issued today.

Brocade does not expect these developments to impact the timing of its release of financial results for the first quarter fiscal year 2005, ending January 29, 2005, expected to occur on February 16, 2005.

270. On April 28, 2005, the first indication that Brocade had not corrected all of its fraudulent accounting and put the governmental investigations behind it began to enter the market. On that date, Merrill Lynch cut its rating on shares of Brocade to "sell" from "buy." Shelby

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1    Seyrafi, an analyst for Merrill Lynch, stated in a research note to clients that investors could become

2    increasingly concerned about the dilutive impact on earnings of expensing employee stock options

3    over the next few months, leading shares to "behave weakly." Seyrafi also disclosed that additional

4    problems were yet to come pursuant to the ongoing SEC investigation. The disclosure of the

5    additional information caused Brocade's stock price to drop heavily. Just as the leakage of the

6    relevant truth predicted, more bad news was still to come. Indeed, unknown to investors, Brocade's

7    Audit Committee was about to announce that it had discovered additional accounting violations

8    pursuant to its second internal investigation.

9         271.    On May 16, 2005, the bases for the April 28, 2005, Merrill Lynch research note was

10   finally and fully admitted by Brocade. On that date, the Company filed an 8-K that revealed that

11   the Financial Statements in question still did not accurately portray Brocade's financial results for

12   the relevant period and, therefore, should not be relied upon. Specifically, the 8-K stated as

13   follows:

14             On May 11, 2005, on management's recommendation, Brocade
               Communications Systems, Inc., in consultation with KPMG LLP, the
15             Company's independent registered accounting firm, **determined that
               the Company's financial statements for the fiscal years ending
16             2001, 2002, 2003 and 2004, and the interim periods contained
               therein, should no longer be relied upon** because of an error in such
17             financial statements as addressed in Accounting Principles Board
               Opinion No. 20. The Company will restate its financial statements for
18             those periods and expects related adjustments will be made to the
               Company's financial information for fiscal 2001, as
19             necessary.(emphasis added).

20        272.    On that same day, Brocade issued a press release (expressly incorporated into its

21   May 16, 2005 8-K) that further expounded on this Restatement:

22             **…the Company will restate its financial statements for the fiscal
               years ending 2002 through 2004 to record additional charges for
23             stock-based compensation expense…**Following the completion of
               an Audit Committee review announced on January 24, 2005,
24             additional information came to the Company's attention that indicated
               **that its guidelines regarding stock option granting practices were
25             not followed during the period from August 2003 through
               November 2004.** After further review, the Company concluded that it
26             could not rely on the documentation used to support the recorded
               measurement dates for stock options granted in that period. As a
27             result, the Company will restate its financial statements to account for
               additional stock-based compensation for stock options granted from
28             August 2003 through November 2004. The additional charges are

expected to result in a cumulative increase in non-cash stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.

After discovering the additional information regarding non-compliance of its guidelines, the Company commenced a review of certain other practices that could impact stock option accounting. **This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees** on leaves of absences (LOA) and in transition roles prior to ceasing employment with Brocade…After discovering the additional information regarding non-compliance of its guidelines, the Company commenced a review of certain other practices that could impact stock option accounting. This review determined that from 2001 through 2004, the Company had not appropriately accounted for the cost of stock based compensation for certain employees…Management estimates the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 2001 through 2004.

The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

| year | additional non-cash expense | reduction in EPS |
|---|---|---|
| 2001 | $12.0 - $26.0 million | $0.05 - $0.11 |
| 2002 | $19.0 - $23.0 million | $0.08 - $0.09 |
| 2003 | $0.2 - $0.8 million | $0.00 - $0.01 |
| 2004 | $0.8 - $2.8 million | $0.00 - $0.01 |

273.     Further, on May 16, 2005, and consistent with the April 28, 2005, Merrill Lynch research note, Brocade disclosed that the Department of Justice was working with the SEC "in a joint investigation regarding the Company's stock option granting process."  Ultimately, the accounting improprieties first announced on May 16, 2005 were included in a further restatement on November 14, 2005:

As previously disclosed on Form 8-K filed with the Securities and Exchange Commission on May 16, 2005, Brocade Communications Systems, Inc. (the "Company") determined that the Company's financial statements for the fiscal years ended October 30, 2004, October 25, 2003, and October 26, 2002, and the interim periods contained therein, should no longer be relied upon because of errors in such financial statements. The Company has restated those

financial statements, which appear in the Company's Annual Report
on Form 10-K/A for the fiscal year ended October 30, 2004 (the
"Form 10-K/A"). As a result of such restatements, on November 10,
2005, the Company, on management's recommendation and in
consultation with the Company's Audit Committee and KPMG, LLP,
the Company's independent registered public accounting firm,
concluded that the financial statements for the first fiscal quarter of
2005 ended January 29, 2005, should no longer be relied upon
because of an error in such financial statements.

Specifically, the Company concluded that the Company's balance
sheet for the first quarter of fiscal 2005 ended January 29, 2005 needs
to be restated to reflect the cumulative effect of the restatements
previously announced on additional paid-in capital and retained
earnings. The restatement of the financial statements for the quarter
ended January 29, 2005 relates exclusively to reclassifications within
shareholders equity related to the cumulative effect of the foregoing
restatements.

274. The Restatements serve as an express admission by Defendants that Brocade's previously issued Financial Statements and its public statements regarding those results were false and misleading for the entire Class Period because, due to Brocade's improper accounting for its stock-based compensation expenses, Brocade's Financial Statements failed to disclose material facts necessary to make such statements not materially false and misleading and in violation of GAAP.

275. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. §210A-0l(a)(I), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. Brocade's Restatements of earnings were clearly material. The decision as to whether to expense the grant of stock options to employees directly affects a company's earnings per share. Or, better put, what outside shareholders' share of earnings are.

276. Furthermore, pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of Restatement and revisions announced by Brocade were to

correct for material errors in previously issued Financial Statements. APB No. 20, ¶¶ 7-13. Specifically, Brocade's Restatement was not due to a change in reporting entity or a change in accounting principle, but rather to correct material errors in previously issued Financial Statements: in particular, improper accounting regarding its stock-based compensation program that, when corrected, dramatically lowered Brocade's previously stated earnings and net income, and increased its compensation expenses and related tax expenses.

277.   Further evidence of the materiality of the Restatement is the fact that there was a restatement at all.   GAAP notes that the restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. APB No. 20, ¶ 14. Moreover, immaterial corrections are not required to be restated. APB No. 20, ¶ 38.

278.   Thus, GAAP provides that financial statements should only be restated under limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Brocade's Restatements were not due to a change in reporting entity or a change in accounting principle, but rather to material errors in previously issued Financial Statements.   The Restatements are, therefore, material as the applicable accounting principles and federal securities laws define that term.

279.   As a result of these materially false and misleading statements and failures to disclose, Brocade's publicly traded securities traded at inflated prices during the Class Period. APERS and other members of the Class purchased or otherwise acquired Brocade's publicly traded securities relying upon the integrity of the market price of such securities and market information relating to Brocade, and have been damaged thereby.

280.   Further, as discussed in greater detail above, as stated in its January 24, 2005 press release, Brocade also was required to restate its earnings because of fundamental problems with its stock compensation plan and an utter lack of internal controls:

> Upon completion of the internal review, the Audit Committee further determined that there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003. As a result, the Company will record additional stock-based compensation charges relating to many of its stock option grants from the periods 1999 though the third quarter of fiscal 2003. In addition, it was concluded that there were improprieties in connection with the documentation of stock option grants and related employment records of a small number of employees prior to mid 2002, which resulted in immaterial adjustments included in this restatement.

281. Since there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options, Brocade should have accounted for its stock-based compensation planning by using the variable method under APB 25. The variable method outlined in APB 25 requires an actual compensation expense to be recognized in the income statement itself (with the corresponding impact to earnings per share), rather than in the footnotes (with no earnings per share impact) based upon a formula at the end of each quarter.

282. Brocade materially misstated its financial condition, including its earnings per share, for every quarter from 1999 through 2004, despite the fact that the Company, Reyes, Canova, Sonsini, Dempsey and Neiman knew or were deliberately reckless in not knowing that: (1) the Company did not have adequate internal controls in place to ensure that it was receiving the documentation necessary to account for its stock-based compensation and/or (2) that the Company, in fact, could not document the grant dates or vesting periods necessary to use the more favorable APB 25 intrinsic value treatment.

283. Thus, the Restatement concedes that all of the Company's Financial Statements issued during the Class Period were materially false and misleading because they omitted such material facts. The Restatement revealed that pervasive, massive, and systematic accounting violations occurred for five straight years.

## VII. REYES' AND CANOVA'S WELL-TIMED RESIGNATIONS

284. Buried in Brocade's January 24, 2005 Restatement was the fact that Reyes resigned from his position as CEO and Chairman, remaining at the Company as a director and a consultant. Glaringly absent was the fact that Reyes had in fact resigned after Defendant Sonsini told him that

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT  No.: 3:05-CV-02042-CRB

1   the evidence gathered against him by the Audit Committee was "overwhelming and conclusive."

2   The WALL STREET JOURNAL quoted Reyes on July 20, 2006, as declaring that "They never asked

3   me to do a single thing [as a consultant]." The Company ultimately terminated Reyes in July 2005.

4   Reyes' departure from the Company was a direct result of the determination by Brocade's outside

5   investigators that he was personally responsible for the accounting violations that led to Brocade's

6   massive restatement. In fact, as BUSINESS WEEK reported on February 13, 2006, when Reyes later

7   tried to rescind his resignation, Larry Sonsini informed Reyes that Brocade's outside auditor,

8   KPMG, "had refused to certify Brocade's financials with Reyes as CEO." Peter Burrows, *Brocade*

9   *Stung by Stock Options*, BUSINESSWEEK, Feb. 13, 2006.

10      285.    Reyes did not leave without taking additional profits from the Company. Indeed, as

11   detailed above, Reyes sold off a considerable amount of stock, generating proceeds of

12   approximately $29,082,415 after the Company's January 24, 2005 Restatement but before its

13   announcement in May 2005 that it would issue further restatements—an announcement that Reyes,

14   as former CEO, knew was coming. By selling his stock at this opportune time, Reyes saved himself

15   tens of millions of dollars.

16      286.    Reyes' resignation also coincided with the collapse of a potential buyout of Brocade

17   by Cisco Systems Inc. ("Cisco"). As a February 13, 2006 BUSINESSWEEK article explains, in

18   November 2004, Reyes claims that he wanted to sell Brocade to Cisco, but was pressured to resign

19   before the deal could close. Peter Burrows, *Brocade Stung by Stock Options*, BUSINESSWEEK, Feb.

20   13, 2006. The article states that Reyes "was in the final stages of selling Brocade to Cisco Systems

21   Inc. for $9 a share," but that talks with Cisco stalled after Brocade's board disclosed the

22   investigation into its fraudulent stock option backdating. *Id.* The article goes on to state that

23   "Cisco got cold feet after finding the accounting irregularities on its own but confirm that Reyes'

24   departure two months later further diminished its interest." *Id.*

25      287.    Canova resigned from his position as CFO and principal accounting officer of the

26   Company on December 15, 2005.

27      288.    The timing of Reyes' and Canova's departures suspiciously coincided with the

28   revelation of Brocade's mass stock option backdating scandal, Reyes' stock sales, the joint

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1  investigation by federal regulators, Brocade's Restatement, and the findings of Brocade's internal

2  investigation.

3          **VIII.  THE GOVERNMENT'S INVESTIGATIONS AGAINST BROCADE**

4  **A.  The SEC and DOJ Announce Formal Investigations Into Brocade's Accounting**
        **Violations**

5

6         289.  On or about May 16, 2005, Brocade announced that the SEC began investigating

   Brocade's accounting and disclosure of stock option grants.  Brocade also acknowledged that same
7
   day that the Department of Justice was working with the SEC in a joint investigation regarding
8
   these issues.  Brocade announced on or about June 1, 2005, that the SEC had upgraded its
9
   investigation into a formal investigation.
10

11  **B.  Brocade Rushes to Settle with the SEC**

          290.  Brocade publicly commented on the status of the SEC's formal investigation into the
12
   accounting violations that precipitated Brocade's Restatement during Brocade's Analyst Conference
13
   Call on February 17, 2006.  During that call, acting CEO and President, Michael Klayko, informed
14
   analysts that:
15
               During the [first] quarter [of 2006], **we began active settlement**
16              **discussions with the staff of the SEC regarding the Company's**
               **restatements related to stock option accounting.  As a result of**
17              **these discussions, in Q1 [2006] we booked a $5 million provision**
               **for an estimated settlement expense.**  This settlement amount is our
18              best estimate at the time and is subject to change as our discussions
               with the staff of the SEC continue. (emphasis added).
19
          291.  Brocade filed its Form 10-Q for the First Quarter of 2006 on or about March 8, 2006.
20
   In this filing, Brocade admitted that the $5 million it had previously reserved for settlement of the
21
   SEC's charges against the Company, as announced during the February 17, 2006 Conference Call,
22
   was not sufficient.  Therefore, Brocade announced that it had reserved an additional $2 million, for
23
   a total of $7 million, for a settlement with the SEC and had, in fact, reached an agreement to settle
24
   the SEC's claims against the Company, pending final approval by the SEC.  The details of the
25
   Company's announcement as stated in this 10-Q are as follows:
26
         Internal review and SEC investigation costs.
27
            On January 24, 2005, we announced that our Audit Committee
28           completed an internal review regarding historical stock option

granting practices. Following the January 2005 Audit Committee internal review, on May 16, 2005, we announced that additional information had come to our attention that indicated that certain guidelines regarding stock option granting practices were not followed and our Audit Committee had commenced an internal review of our stock option accounting focusing on leaves of absence and transition and advisory roles. Our Audit Committee review was completed in November 2005. In addition, we are undergoing an SEC and Department of Justice ("DOJ") joint investigation regarding our historical stock option granting practices. As a result, for the three months ended January 28, 2006, and January 29, 2005 we recorded $4.0 million and $3.7 million, respectively for professional service fees related to the completed internal reviews and ongoing SEC investigation.

Provision for SEC settlement.

During the three months ended January 28, 2006 we began active settlement discussions with the Staff of the SEC's Division of Enforcement (the "Staff") regarding our financial restatements related to stock option accounting. As a result of these discussions, for the three months ended January 28, 2006 we recorded a $7.0 million provision for an estimated settlement expense. **This is an increase of $2.0 million over the $5.0 million previously disclosed on February 16, 2006 as a result of further discussions with the Staff. The $7.0 million estimated settlement expense is based on an offer of settlement that the Company made to the Staff and for which the Staff intends on recommending to the SEC's Commissioners.** The offer of settlement is contingent upon final approval by the SEC's Commissioners. (emphasis added).

**C.** **The SEC Files A Civil Action Against Reyes, Canova and Jensen; The DOJ Files A Criminal Action Against Reyes and Jensen; and a Federal Grand Jury Indicts Reyes and Jensen**

292. On July 20, 2006, the SEC filed a civil complaint against Reyes and Canova, as well as Jensen. The SEC complaint charged Reyes with backdating options he doled out as a "committee of one" to hundreds of employees, boosting the potential value of the options and concealing millions of dollars of compensation expenses from shareholders. The complaint further alleged that Canova enabled the backdating scheme to continue undetected by ignoring facts that called into question the integrity of Brocade's Financial Statements based on its options grants. On the same date, the U.S. Attorney for the Northern District of California filed a criminal complaint against Reyes and Jensen alleging a single count of securities fraud, which carries a maximum

1   penalty of 20 years in prison and a $5 million fine.  The criminal complaint was supported by the

2   affidavit of FBI Agent Joseph Schadler.

3       293.    In a joint press conference with the SEC and DOJ, SEC Chairman Cox warned that

4   backdating "deceives investors and the market as a whole about the financial health of companies

5   that cheat in this way." He added, "It is poisonous to an efficient marketplace."  Furthermore, when

6   asked about the argument that the government had not alleged a motive for personal gain against

7   Reyes, U.S. Attorney Kevin V. Ryan countered, "We don't have to show personal gain [to bring

8   criminal securities-fraud charges].  Different people have different reasons for what they do and

9   why they do it."

10      294.    On August 9, 2006, United States Magistrate Judge Chen denied Reyes' motion to

11  dismiss the criminal complaint against him.

12      295.    On August 10, 2006, Reyes was charged with 12 additional counts of securities fraud

13  in a federal Indictment.  These charges included conspiracy, securities fraud, mail fraud, falsifying

14  books and making false statements to accountants.  Jensen also was indicted on eight counts of

15  conspiracy, securities fraud, mail fraud and falsifying books.

16  **IX.    DEFENDANTS' QUICK SETTLEMENT OF THE DERIVATIVE CLAIMS
           AGAINST THEM**

17

18      296.    On August 10, 2006, Brocade, Canova, Sonsini, Dempsey and Neiman announced

19  that a settlement agreement with plaintiffs in the derivative shareholder lawsuit in which Brocade

20  agreed to strengthen corporate governance and pay $525,000 in attorneys' fees.   That fact that these

21  Defendants entered into such a quick settlement in the derivative case on the same day that the

22  Indictment was handed down against Reyes, when no monetary relief was afforded to the Company,

23  and after the Court had granted the defendants' motion to dismiss, evidences that Defendants rushed

24  into the settlement to prevent further inspection of the Company's internal records.  The

25  conspicuously quick nature of this settlement is exacerbated by the fact that pursuant to the

26  settlement, the Company—which was the only party in the derivative litigation to have access to

27  and review the documents used by Morrison & Foerster and PWC—refused to release any claims it

28  has against Reyes.

1
2
3

### X.   AS MEMBERS OF BROCADE'S AUDIT COMMITTEE AND/OR COMPENSATION COMMITTEE, SONSINI, DEMPSEY AND NEIMAN KNEW OR WERE DELIBERATELY RECKLESS IN NOT KNOWING OF BROCADE'S SYSTEMATIC, WIDESPREAD AND PERVASIVE ACCOUNTING FRAUD

4
5
6
7
8
9

297.   The detailed allegations set forth above establish that Sonsini, Dempsey and Neiman acted with scienter in their individual capacity because of their direct involvement in Brocade's unlawful scheme.  Additionally, in their capacity as members of Brocade's Board and Audit Committee, Sonsini, Dempsey and Neiman acted recklessly in the performance of their duties and, as a direct result, facilitated the rampant accounting fraud and utter lack of internal controls at Brocade described herein.

10
11
12

298.   The vital importance of audit committees to the integrity of a company's financial reporting was emphasized by the SEC in the rules promulgated pursuant to the Sarbanes-Oxley Act of 2002:

13
14
15
16
17
18
19

> The audit committee, composed of members of the board of directors, plays a critical role in providing oversight over and serving as a check and balance on a company's financial reporting system. The audit committee provides independent review and oversight of a company's financial reporting processes, internal controls and independent auditors. It provides a forum separate from management in which auditors and other interested parties can candidly discuss concerns. By effectively carrying out its functions and responsibilities, the audit committee helps to ensure that management properly develops and adheres to a sound system of internal controls, that procedures are in place to objectively assess management's practices and internal controls, and that the outside auditors, through their own review, objectively assess the company's financial reporting practices.

20
21
22

299.   Even prior to the enactment of Sarbanes-Oxley, Brocade described the important rules and responsibilities of the Audit Committee in its 2001 Schedule 14A Proxy Statement filed with the SEC:

23
24
25
26

> The audit committee makes recommendations to the Company's Board of Directors regarding the selection of independent auditors, reviews the results and scope of audit and other services provided by the Company's independent auditors **and reviews the accounting principles and auditing practices and procedures to be used for the Company's financial statements**.  (emphasis added).

27
28

---

111

300.     Of all the Board's committees, the Audit Committee had the greatest responsibility for the oversight of Brocade's accounting for and disclosure of stock option grants and for the presence of internal processes, controls and procedures regarding those grants.  Indeed, it was fundamental that the Audit Committee Defendants have a detailed understanding of the Company, and particularly the adequacy of its financial systems and internal controls.

301.     Moreover, Brocade's Stock Option Plans specifically charged Brocade's Board of Directors with the responsibility of carrying out the Company's Stock Option Plans according to the requirements of the Plans and in compliance with the federal securities laws.  Clearly, as evidenced by Brocade's own Restatement, the Audit Committee Defendants failed this task miserably.

302.     In this regard, the Audit Committee Defendants knew, or were deliberately reckless in not knowing, that Brocade improperly accounted for and disclosed stock option grants. Moreover, the Audit Committee Defendants knew or were deliberately reckless in disregarding that the Company's financial systems and internal controls were grossly inadequate.

303.     The Audit Committee Defendants acted recklessly in allowing Brocade to make the statements identified in Section VIII., *infra*, without ensuring that the necessary internal controls existed to guarantee that those statements were free from material error.  Indeed, according to the Proxy Statement referenced above, it was the stated responsibility of the Audit Committee to discuss those controls with Brocade's management and with the Company's outside auditor, KPMG.

304.     Brocade admitted in its Restatement that its internal controls and disclosure procedures regarding Brocade's stock option granting process were flawed during the Class Period. *See* Brocade's SEC Form 10-K filed January 31, 2005, pp. 83-84, Item 9A.  Brocade admitted that these controls were so fundamentally flawed that the Company's Financial Statements could not be relied upon for the entire Class Period and that these flaws were not remedied until the end of Brocade's fiscal year 2004. *Id*.  Brocade further announced that significant changes were made to its Disclosure Controls and Internal Controls over Financial Reporting and the stock option grant process, which were not in place during all or part of the Class Period. *Id*.  These changes and additions, which are set forth in detail above, are significant because they establish that such

1  internal controls, processes and procedures **were not** in place during the relevant parts of the Class

2  Period.

3      305.    The Company's own Restatement clearly admits that Brocade's internal controls and

4  processes for the accounting for, and disclosure of, option grants not only were not good during the

5  Class Period but, in fact—by the Company's own admission—were simply non-existent.  The fact

6  that the Company has made these concessions that these internal controls were non-existent is

7  conclusive proof as to Sonsini, Dempsey and Neiman's *scienter*.  Indeed, these members of the

8  Audit Committee were charged with knowing these controls, making sure they were appropriate,

9  and remedying any related problems.  Had they conducted any investigation of those controls, or

10  engaged in any substantive discussion of the adequacy of those controls with management or with

11  outside auditor Arthur Anderson or later KPMG, they would have necessarily discovered the

12  inadequacy of those controls and implemented controls sufficient to have prevented the perpetration

13  of the misconduct alleged herein.  The fact that they either were aware of these failures and chose to

14  ignore them, or simply failed to conduct the necessary, and required, investigation, is

15  incontrovertible evidence of their knowledge or reckless disregard of the wrongdoing at Brocade.

16      306.    Further, Brocade's Stock Option Plans filed with the SEC, which are discussed in

17  detail above, specifically mandated that Brocade's Board of Directors be in charge of stock option

18  grants for the entire Class Period.  The Plans expressly require that the Board, in its entirety, or

19  through a specifically appointed Committee thereof, control granting of stock option grants and

20  ensure that such grants are awarded, accounted for, and disclosed in compliance with the Plans and

21  federal law.  However, Defendant Reyes' own comments that Audit Committee member Sonsini

22  granted Reyes complete authority to "dole out" stock option grants as Reyes deemed appropriate is,

23  in and of itself, evidence that the Audit Committee in general, and Defendants Sonsini, Dempsey

24  and Neiman (as the Compensation Committee) in particular, violated the Company's own Stock

25  Option Plans and acted with actual awareness and/or deliberate recklessness.  Moreover, the

26  Restatement admits there was no written guideline setting forth the appropriate procedures to be

27  used for granting options from 1999-2004.  The evidence provided by Lead Plaintiff's Confidential

28

1  Sources, which also is set forth above, further supports that these Defendants allowed Reyes and

2  Canova to grant stock options with little or no oversight by the Board or the Audit Committee.

3      307.    As set forth in great detail above, Brocade engaged in a number of improper stock

4  option grants during the Class Period, which caused five years of Brocade's Financial Statements to

5  be materially false and misleading.  Had these Audit Committee members undertaken to investigate

6  any of these transactions, as they did once they became aware of the SEC's and Department of

7  Justice's joint investigation into these issues, they would have uncovered the wrongdoing that, in

8  2005, caused Brocade to dismiss Reyes as CEO and Chairman and restate Brocade's Financial

9  Statements.  That these Defendants were readily able to uncover the fraud when they finally decided

10  to perform their proper function in late 2004 and early 2005 under threat of a governmental

11  investigation, demonstrates that they knowingly and/or willfully failed to perform their duty for

12  more than four years so as to permit Brocade to falsify its Financial Statements over that extended

13  period.

14  **A.    Numerous Red Flags Alerted Sonsini, Dempsey and Neiman to Brocade's Fraud**

15      308.    In addition to their direct, individual participation in Brocade's massive stock option

16  scheme, Sonsini, Dempsey and Neiman knew of or deliberately disregarded this scheme in their

17  capacity as members of Brocade's Board, Audit Committee and/or Compensation Committee

18  (Dempsey and Neiman).  As detailed above, Brocade's Code of Ethics, Audit Committee Charter,

19  Compensation Committee Charter and Proxy Statements filed with the SEC imposed specific duties

20  upon Sonsini, Dempsey and Neiman to ensure that adequate controls, procedures and safeguards

21  were in place to ensure that management complied with all applicable rules under GAAP and

22  federal securities laws for accounting for and disclosing stock option grants.

23      309.    From the very beginning of the Class Period, these three individuals were directly

24  aware of numerous red flags—the two most obvious and important of which they were directly

25  responsible for creating—yet did nothing to stop this scheme.  These red flags were so patently

26  obvious that either Sonsini, Dempsey and Neiman were directly aware of this scheme or

27  disregarded it with deliberate recklessness.  Either way, their conduct renders them liable for the

28  losses suffered by APERS and the Class.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

**1. Reyes' Role as Committee of One Was a Red Flag to Sonsini, Dempsey and Neiman**

310.    Three people granted Reyes the unfettered power to act as a "Committee of One" for awarding stock options: Sonsini and the Compensation Committee (which consisted solely of Neiman and Demsey). In fact, Sonsini urged the Board to grant Reyes such power, a fact that was later confirmed by Reyes and his attorneys.

311.    SEC Commissioner Roel C. Campos gave a speech directed to this very issue—and directly related to Brocade—on August 15, 2006. In his speech, Mr. Campos stated that one of the two biggest "don'ts" for directors is "don't assign critical board functions to 'committees of one,' unless you're extremely careful to adopt procedures to ensure that there are appropriate checks and balances in place." *See* "How to Be An Effective Board Member," Speech by SEC Commissioner Roel C. Campos, Boston, Mass., August 15, 2006. Mr. Campos went on to say that even if such committees of one are not *per se* unlawful, "it's a signal to the company's officers that directors are not taking their obligations as a director seriously and are willing to let expediency guide their decision-making."

312.    Thus, Sonsini, Dempsey and Neiman either knew, or were deliberately reckless in failing to know that Brocade's stock options program was an extremely high-risk area. In fact, they were the ones who gave Reyes the power to act in this unusual capacity in the first place. To simply sit back and ignore Reyes for five years while he exercised this unfettered authority is deliberately reckless conduct. This red flag strongly supports Sonsini's, Dempsey's and Neiman's scienter regarding Brocade's illegal options scheme.

**2. The Lack of Internal Controls From 1999 Through 2001 Was a Red Flag to Sonsini, Dempsey and Neiman**

313.    The complete lack of internal controls at Brocade during the years 1999, 2000 and 2001 was an additional red flag to Sonsini, Dempsey and Neiman. To fulfill their responsibilities, it was fundamental that these members of the Audit Committee have a detailed understanding of Brocade's inner workings, and in particular, the adequacy and effectiveness of its financial systems and internal controls.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                    No.: 3:05-CV-02042-CRB

314.    Brocade's publicly filed Stock Option Plans specifically charged Brocade's Board of Directors with the responsibility to carry out those Plans in compliance with the language of the Plans themselves and with federal securities laws.  These duties included ensuring that the Company had a Compensation Committee and that any and all stock option grants were approved by that Committee, made in compliance with the Stock Option Plans, and recorded and disclosed as required by GAAP and federal securities laws.  Thus, the Audit Committee had the specific duty to ensure (1) that any option grants were handed out in strict compliance with Brocade's Stock Option Plans and (2) that all such grants were properly recorded, accounted for and disclosed.

315.    However, Brocade's restatements make clear that Sonsini, Dempsey and Neiman were deliberately reckless in failing to carry out these duties.  The sheer magnitude, pervasiveness and materiality of these violations should have been a warning or "red flag" that an investigation was needed.  That flag was especially bright for Sonsini, a lawyer who <u>knew</u> what the law was, yet gave unfettered control to Reyes.  Sonsini and his brethren let Reyes go unchecked during a time when "there existed material weaknesses in [Brocade's] disclosure controls."  These internal controls were clearly the Audit Committee's responsibility.

316.    The fact that neither these nor any other internal controls, procedures or safeguards were in place before 2002, and then only minimal controls were implemented between 2002-2004, creates a strong inference that Sonsini, Dempsey and Neiman deliberately stood by and did absolutely nothing to ensure that the Company complied with either the Stock Option Plans, GAAP or federal securities laws.  It was the lack of these specific controls and procedures that led to the GAAP violations at issue.  Even worse is the fact that the Restatements admit that the Company was aware of the inadequacies in 2003, yet made no real improvements thereafter, and continued to let Reyes go unchecked.

**3.      *Sonsini's Multi-Faced Role as Brocade's Outside Counsel, Participant in the WS Investments, Brocade Board Member, and Delegator of Reyes' Committee of One Powers was a Significant Red Flag***

317.    In his capacity as Brocade's attorney, a member of Brocade's Board of Directors and Audit Committee, personal friend and advisor to Reyes, and delegator of Reyes's "Committee of One" powers, Sonsini had direct access to—and thus knowledge of—the requirements of Brocade's

Stock Option Plan, the requirements imposed upon Brocade by GAAP and the Exchange Act regarding options granted under that plan. In his capacity as a member of Brocade's Board of Directors and Audit Committee, Sonsini had a duty to observe, monitor and know the actions taken by Reyes as CEO. And, perhaps most specifically, as the person who gave Sonsini the power to grant options as a "Committee of One," Sonsini knew that Reyes was able to exercise almost unfettered control over Brocade's Stock Option Plan with little oversight—a bright red flag that required Sonsini, as the Board member who gave Reyes these powers in the first place, to keep a close eye on Reyes.

### 4. *Arthur Andersen's Indictment Was a Red Flag to Sonsini, Dempsey and Neiman*

318. In March 2002, Brocade's then-current auditor, Arthur Andersen, LLP, was indicted by a federal grand jury for obstruction of justice in the Enron scandal. The auditing company was alleged to have destroyed millions of documents in connection with the investigation of Enron. Following this indictment, on June 18, 2002, Brocade dismissed Arthur Andersen as its independent accountants, and on the same day, engaged the services of KPMG as its new independent accountants. Sonsini, Dempsey and Neiman were all members of the Audit Committee at this time.

319. The fact that the Company's existing auditor had to be replaced due to a criminal indictment was a significant red flag—which they ignored—that required Sonsini, Dempsey and Neiman to take a careful look at all of Brocade's accounting treatment and internal controls.

### 5. *Defendants' Ongoing Measures to Bring Their Internal Controls Into Compliance with Sarbanes-Oxley Were a Red Flag to Sonsini, Dempsey and Neiman*

320. Beginning in December 2002, Brocade undertook significant remedial measures designed specifically to fix severe flaws in its internal controls in order to make them compliant with Sarbanes-Oxley. These measures were obvious red flags to the Audit Committee that the Company's options program was experiencing severe internal controls problems. Indeed, according to the admissions in the Company's restatement, Brocade's management began to undertake the following changes to its options program starting in December of 2002:

- It implemented "cross functional teams composed of members of Brocade's legal, accounting and human resources departments to develop improvements in the stock option granting process;"

- It made "personnel changes in areas associated with the stock option granting process to increase the levels of experience of the personnel involved;"

- It formalized "guidelines relating to the size and vesting schedule of stock option grants for all new employee and on-going employee grants;"

- It improved "the documentation of the actions of the Compensation Committee and Subcommittee regarding stock option granting;" and

- It increased "the frequency of stock option grants, moving to grants on a two to three week routine cycle, and significantly reduced the processing time between grant dates and the delivery of option paperwork to employees."

321.    The subject of these changes makes clear that the option practices existing at Brocade at the time these changes were contemplated, and thereafter implemented, demanded close scrutiny by the Company's Audit Committee.  This is especially true given that the Audit Committee knew or recklessly disregarded that Brocade was undertaking this overhaul of its current program without public disclosure of the process taking place or the planned revisions.  In light of the extensive changes that Brocade acknowledges now occurred during this time period, the Audit Committee clearly knew about and/or discussed this topic frequently.  Thus, the Audit Committee either knew, or was deliberately reckless in failing to know, that Brocade's stock options program was an extremely high-risk audit area.   This red flag strongly supports these members of the Audit Committee's scienter regarding Brocade's illegal options scheme.

### 6.    Defendants' Heavy Reliance On Stock Options To Attract Candidates And Pay Employees Was A Red Flag

322.    Brocade's heavy reliance on its massive stock options program to attract job candidates and pay employees also should have alerted the Audit Committee to the fact that Brocade's stock options program constituted a high audit risk area.  APERS' Confidential Source 4 ("CS 4"), who worked at Brocade from 2002 through 2005 in Brocade's Recruiting Department, stated that Brocade "systematically brought new hires into the Company before they actually started to give them a false start date."  CS 4 also described a pervasive scheme, lasting until 2004, which allowed Brocade to entice new employees by granting them options prior to dramatic rises in the Company's stock price.  CS 4 further stated that this scheme was carried out not merely by recruiters, but by upper level management.  In fact, Defendant Reyes himself "micromanaged" this process.

**7.    The Importance of Stock Options Relative to Total Compensation Expense and Other Financial Metrics Was a Red Flag**

323.    Brocade reported its stock options using the "intrinsic value" method of accounting under Accounting Principles Board ("APB") Opinion No. 25.  Under APB 25, Brocade was required to record as an expense the difference between the exercise price of its options and the price of its stock on the grant date.  But SEC rules also required Brocade to disclose the fair value of the options it granted, and the *pro forma* effect such expense would have on its financial statements.

324.    Brocade disclosed, pursuant to FAS 123, the *pro forma* effect on its financial results were it to record the fair value of its options grants.  But these *pro forma* disclosures further highlight how these Audit Committee Defendants either were aware of or should have been aware of and had a full grasp of how significant options were to Brocade's overall financial health.  For example, in Brocade's 2003 Annual Report, filed with the SEC on Form 10-K on January 2004 (the "2003 10-K"), the Company reported a net loss for fiscal 2003 of $136.24 million.  *See* 2003 10-K, KPMG Appx. Exh. C., p. 57.  Calculating the *pro forma* effect of its options under the fair value method, however, the Company would have deducted stock-based compensation expenses of $138.739 million, and its net loss would have <u>more than doubled</u> to $274.59 million.  *Id.*  For fiscal year 2002, the first audit year for KPMG, Brocade reported net income of $59.746 million.  *Id.*  But under the fair value method, it would have deducted stock-based compensation expenses of a staggering magnitude - <u>$471.573</u> million – and reported a *pro forma* <u>loss</u> of $411.139 million.  These dramatic numbers were a red flag to the Audit Committee highlighting the importance of the stock options program to any audit of Brocade's financials.   This red flag, both separately and in conjunction with other red flags discussed herein, strongly supports the Audit Committee's scienter regarding Brocade's illegal options scheme.

**8.    Brocade's Frequent Use of "Out-of-Guideline" Stock Option Grants Was a Red Flag**

325.    Brocade's frequent use of "out-of-guideline" stock option grants to attract job candidates constituted another conspicuous red flag that the Company was manipulating its options program.  After 1999, Brocade's stock option program was to be governed according to its Non-Statutory Stock Option Plan ("NSO Plan").  The NSO Plan states that it "shall be administered by

the Board or (ii) a Committee, which Committee shall be constituted to satisfy Applicable laws." The NSO Plan further gives the Board or Committee the sole authority to, among other things, determine: (1) who could receive option grants; (2) the number of shares granted by such options; and (3) the exercise price for such options.

326. According to several of APERS' confidential sources, Defendants would often go "out of guidelines" to award hefty options grants to sought-after job candidates. Due to the exceptional nature of these out-of-guideline grants, the Company was required to obtain certain approvals, including that of Jensen, Reyes and the sitting Brocade CFO. APERS' confidential sources further describe how, in violation of Company guidelines, Brocade management improperly used sham "leaves of absence" for new hires. This practice permitted Brocade to accelerate the date on which a new hire would receive his or her options grant.

327. The Company admitted it failed to follow its own policies, stating on January 24, 2005:

> Upon completion of its internal review, the Audit Committee further determined that there was insufficient basis to rely on the Company's process and related documentation to support recorded measurement dates used to account for certain stock options granted prior to August 2003.

And on May 16, 2005, Brocade again admitted that the guidelines for its stock options program were not followed during the Class Period, in this case relating to sham leaves of absence and part-time employment arrangements.

328. A company's failure to follow its own internal policies is evidence of recklessness. This red flag, both separately and together with the other red flags discussed herein, further supports these Audit Committee members' scienter regarding Brocade's illegal options scheme.

### 9. *Ad Hoc Committee*

329. Similarly, frequent *ad hoc* Board committee meetings to approve stock option strike prices was a red flag that the Company was manipulating its options program. To facilitate the manipulation of options grant prices, Reyes and Jensen frequently convened *ad hoc* "Board Committee Meetings" to set options strike prices. These sham meetings, according to APERS' CS 4, frequently took place when Brocade's stock had reached a "bottom" point. As explained, *supra*,

1    among the remedial actions undertaken by Brocade as early as December 2002, was to "improve the

2    documentation of the actions of the Compensation Committee and Subcommittee regarding stock

3    option granting."

4         330.    Regardless of whether *ad hoc* meetings were illegal or even improper on their face,

5    their informality and frequency should have done more than merely raise the eyebrows of these

6    Audit Committee members; the Audit Committee should have obtained sufficient evidential matter

7    to test the integrity of the Compensation Committee and Subcommittee's minutes.  With the

8    Company contemporaneously undertaking specific changes to improve (1) documentation of its

9    compensation committee and subcommittee meetings, (2) formalized guidelines relating to the size

10   and vesting schedule of stock option grants for new and current employees, and (3) extended

11   processing time between grant dates and delivery of option paperwork, these *ad hoc* meetings,

12   together with the other red flags discussed herein, further support these Audit Committee members'

13   scienter.

14        **10.    *The Brocade Defendants Awarded Themselves and Their Employees
               Disproportionately Large Options Grants and High-Risk Loans***

15

16        331.    Defendants' abuse of Brocade's options program to enrich themselves and their

17   employees was a red flag to these Audit Committee members.  For example, in 2000-01, Brocade

18   executed at least four option grants to its officers when, in the previous year, the Company had

19   executed a single grant.  The unique amount and timing of such grants should have alerted the Audit

20   Committee that Brocade officers had made grants to themselves under the assumption of generating

21   near-term and/or "guaranteed" returns.  In its 2002 Definitive Proxy Statement, filed with the SEC

22   on form DEF 14A on February 25, 2002 (the "2002 Proxy"), the Company explained the function

23   of Stock-Options incentives, in pertinent part, as follows:

24        The Board provides our executive officers with long-term incentive compensation
          through grants of options to purchase our Common Stock…  The Board considers
25        the grant of each option subjectively, reviewing factors such as the individual
          performance, the anticipated future contribution toward the attainment of our
26        long-term strategic performance goals and the number of unvested options held
          by each individual at the time of the new grant.

27   2002 Proxy at 26.

28

---

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

332.   That Brocade management granted itself "performance based" options at the very moments when the Company's stock was bottoming out should have heightened the Audit Committee's suspicions.  Moreover, these Audit Committee Defendants failed to scrutinize the circumstances surrounding Defendant Reyes' extraordinary, unfettered discretion in administering Brocade's options program.  Reyes was a "committee of one" in determining which employees would receive options and at what date and price.[20]

333.   These Audit Committee Defendants also should have discovered that Brocade was abusing its option plans by collateralizing loans to key individuals with high-risk, unvested or out-of-the-money options.  Reyes even used the options plan to secure massive loans to himself.  These improper loans were a further red flag, indicating how obvious and rampant the abuse of Brocade's stock option plan was.

## XI.   LOSS CAUSATION

334.   As detailed herein, throughout the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Brocade common stock.  Defendants achieved this facade of success and expected continued growth in part by misrepresenting the Company's Financial Statements and reported earnings, as well as issuing misleading statements concerning Brocade's ability to lure new hires in the competitive computing industry.  When Defendants' prior misrepresentations and fraudulent conduct were revealed and digested by the market, the price of Brocade common stock fell significantly, as the artificial inflation was removed from the Company's stock price. As a result of their purchases of Brocade common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

335.   As set forth in detail above, Defendants continuously misrepresented the Company's results of operations throughout the Class Period.  On the day prior to the start of the Class Period,

---

[20] Similarly, insider trading by several of the Brocade Defendants, generating hundreds of millions of dollars in profits, should have alerted the Audit Committee to the ongoing options fraud.

1    on May 18, 2000, Brocade common stock traded at a price of $58.81[21] per share.  During the Class

2    Period, due in part to Defendants' false and misleading misrepresentations and omissions, Brocade

3    common stock reached as high as the artificially inflated price of $128.25 per share.

4            336.    Defendants' scheme began to unravel on or about January 6, 2005.  After the close of

5    the market on that date, Brocade publicly disclosed for the first time that "the way in which it

6    accounted for stock option grants was incorrect and requires restatement."  Specifically, Brocade

7    admitted that it incorrectly accounted for, and would record historical stock-based compensation

8    charges relating to, (i) grants that were made to new hires on their offer acceptance date, rather than

9    the date of their commencement of employment, during the period of May 1999 to July 2000, and

10   (ii) grants that were made to persons engaged on a part-time basis prior to their new hire full-time

11   employment during the period of August 2000 to October 2002.  In light of these events, Brocade

12   stated that it expected to restate its financial statements for fiscal years ending 2002 and 2003 to

13   record additional stock-based compensation expense.

14           337.    The shocking January 6, 2005 disclosure immediately removed part of the artificial

15   inflation from the price of Brocade common stock.  In reaction to the announcement, Brocade

16   common stock fell from $6.92 per share to $6.40 per share in one trading day, representing a 7.5

17   percent drop.  Volume in Brocade common stock exceeded 24 million shares on January 7, 2005,

18   compared to volumes of 8.8 million shares, 6.2 million shares, 7.6 million shares, 5.8 million

19   shares, and 2.3 million shares during the five previous trading days, respectively.

20           338.    In a press release dated January 24, 2005, the Company announced the results of the

21   Audit Committee's internal review, stating "that there was insufficient basis to rely on the

22   Company's process and related documentation to support recorded measurement dates used" in

23   accounting for Brocade's stock option grants from 1999 through the third quarter of 2003 and that

24   "the Company expects to record additional stock-based compensation charges."  As a result of these

_____

26   [21] On May 18, 2000, Brocade common stock traded at a price of $117.62 per share.  However, the
     stock price does not take into account the 2:1 stock split that occurred on December 22, 2000.
27   Thus, the adjusted stock price is $58.81 per share.  All references to stock prices will refer to the
     adjusted price taking into account the December 22, 2000 2:1 stock split.

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

statements, Brocade common stock fell from $6.14 a share on January 24, 2005 to as low as $5.62, closing at $5.83 per share on January 25, 2005 – a 5% drop on a high volume of more than 19,500,000 shares. The January statements both were materially false and misleading because they omitted the true extent of Brocade's options related misstatements. Brocade would not reveal the complete truth about these problems or these financial results for several months. Indeed, the January statements were only the tip of the iceberg.

339. On April 28, 2005, amidst the SEC's investigation of Brocade, analysts began to downgrade shares of Brocade from "buy" to "sell" and warn the public regarding the additional potential dilutive impact on earnings of expensing employee stock options and problems facing Brocade as a result of the investigations by federal regulators and the additional harmful impact of problems with Brocade's option plan. In reaction to analysts lowering their guidance, Brocade common stock fell from $5.04 per share on April 27, 2005 to as low as $4.26 to close at $4.57 per share on April 28, 2005, representing a 9 percent drop on unusually high trading volume. The next day, April 29, 2005, Brocade stock continued its drop, closing at $4.35 on unusually high trading volume.

340. The artificial inflation contained in Brocade's common stock price continued to dissipate through Defendants' further disclosure of wrongdoing at Brocade on May 16, 2005. In addition to the improper accounting practices revealed on January 6, 2005, Brocade admitted that, "from 2001 through 2004, the Company had not properly accounted for the cost of stock based compensation for certain employees on leaves of absences (LOA) and in transition roles prior to ceasing employment with Brocade." Defendants disclosed that in addition to the January announcements, these new revelations of prior accounting manipulations would force Brocade to restate its results of operations for fiscal years 2001 through 2004 for additional amounts as follows:

| Fiscal Year Ending | Additional Non-Cash Expense | Reduction in EPS |
|---|---|---|
| 2001 | $12.0 to $26.0 million | $0.05 to $0.11 |
| 2002 | $19.0 to $23.0 million | $0.08 to $0.09 |
| 2003 | $0.2 to $0.8 million | $0.00 to $0.01 |
| 2004 | $0.8 to $2.8 million | $0.00 to $0.01 |

341. In addition to the details concerning the Restatement and accounting improprieties, Brocade disclosed on May 16, 2005, that the Department of Justice was working with the SEC in a "joint investigation regarding the Company's stock option granting practices."

342. As a direct result of Defendants' admissions and the public revelations regarding the truth about Brocade's previous representations and its actual business prospects going forward, Brocade's stock price plummeted 46%. This drop removed the inflation from Brocade's stock price causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and Brocade's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of over 46% as evidenced by the drop in price of over $3.00 per share.

343. The 46% decline in Brocade's stock price by the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Brocade's stock price declines negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. During the same period in which Brocade's stock price fell 46% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, *i.e.,* damages, suffered by plaintiff and other members of the Class was a direct result of: (1) Defendants' fraudulent scheme to artificially inflate Brocade's stock price; and (2) the subsequent significant decline in the value of Brocade's stock when Defendants' prior misrepresentations and other fraudulent conduct were belatedly revealed.

## XII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

344. In light of the detailed facts set forth above, Defendants' regular press releases, made by Brocade and Reyes, and Financial Statements filed with the SEC, which were made by Brocade and signed by the Officer Defendants and Sonsini, Dempsey and Neiman, were materially false and misleading statements during the Class Period. Set forth chronologically below, these statements misrepresented Brocade's financial results because they omitted information which would have

shown that the Company's earnings per share, net income, net stock compensation expenses and associated income tax consequences were far worse than what the Company claimed in each of these statements. Additionally, these statements provided wholly false explanations to support the Company's improperly reported results, and failed to disclose that Brocade was engaging in a pervasive scheme and set of fraudulent accounting practices that rendered its financial reporting wholly unreliable. Moreover, as the Class Period progressed, Brocade was forced to live with the consequences of its earlier lies, the same accounting tricks on which Brocade relied to boost its early Class Period results unwound and caused its later Class Period results to suffer. The signatories to each such Financial Statement are set forth in the chart of restated financial results in Section VI., *supra*.

**A.   2000-2001**

345.   On June 13, 2000, the Company filed its SEC Form 10-Q for the second quarter of the year 2000.

346.   On September 12, 2000, the Company filed is SEC Form 10-Q for the third quarter of the year 2000.

347.   On January 26, 2001, the Company filed its SEC Form 10-K for the year ended 2000.

348.   On February 21, 2001, the Company issued a press release entitled "Brocade Announces Record Revenue and Earnings for First Quarter of Fiscal 2001." The press release stated in part:

> Brocade Communications Systems, Inc., the leading provider of Storage Area Networking infrastructure, reported today record revenue and earnings for the first quarter of fiscal 2001 (Ql 01). For Ql 01, net revenues were $165.0 million, as compared to the $42.7 million reported in the first quarter of fiscal 2000 (Ql 00) and the $132.1 million reported in the fourth quarter of fiscal 2000 (Q4 00). During Ql 01, deferred revenue increased by $7.1 million to $9.1 million.
>
> Net income for Ql 01 was $32.5 million as compared to the $7.3 million reported in Ql 00 and the $27.2 million reported in Q4 00. Diluted net income per share for Q 1 01 was $0.13 as compared to the $0.03 reported in Q 1 00 and the $0.11 reported in Q4 00.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

Operating income as a percentage of net revenues in Q 1 01 increased to 26.9 percent of revenues, up from 26.6 percent in Q4 00. This is the seventh consecutive quarter that operating income, as a percentage of revenues, has increased.

*     *     *

Greg Reyes, Brocade President and CEO, commented on the quarter: "We are very pleased with our financial results for the quarter, which demonstrate our continued focus and execution in providing the world's leading networking infrastructure for storage area networks. In every industry, in every sector across the globe, companies are relying on Brocade SAN infrastructure to network their servers and storage, keep pace with exponential growth in data storage requirements, and deliver a platform to reduce the cost of managing, administering, and moving business-critical data."

349.   On April 20, 2001, the Company issued a press release entitled "Brocade Announces Preliminary Q2 01 Financial Results." The press release stated in part:

Brocade Communications Systems, Inc. announced today preliminary results for the second quarter of fiscal 2001. Brocade expects to report total net revenue for the second quarter of fiscal 2001 (Q2 01) that will be approximately 30 percent less than the net revenue reported in the first quarter of fiscal 2001 (Ql 01). Diluted net income per share for Q2 01 is expected to be in the range of $0.05-$0.06 per share. During the second quarter, Brocade expects that gross margins will remain in the 60 percent range and will continue at those levels for the next several quarters. Additionally, Brocade expects that DSOs will be within the target range of 50 to 60 days.

"As enterprise capital spending continues to thaw, we are well positioned for growth in the latter part of fiscal 2001 and we expect our year-over- year revenue growth will be approximately 58 percent," said Greg Reyes, Brocade President and CEO.

350.   On May 15, 2001, the Company issued a press release entitled "Brocade Announces Second Quarter Fiscal 2001 Financial Results." The press release stated in part:

Brocade Communications Systems, Inc. reported today financial results for the second quarter of fiscal 2001 (Q201). For Q2 01, net revenues were $115.2 million as compared to the $62.1 million reported in the second quarter of fiscal 2000 (Q200).

Net income for Q2 01 was $12.0 million as compared to the $13.3 million reported in Q2 00. Diluted net income per share for Q2 01 was $0.05 as compared to the $0.06 reported in Q2 00. During the second quarter, gross margins remained at 60 percent.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1   In Q2 01, Brocade generated $6.1 million in cash after purchasing $16.9 million in capital equipment and making $10.6

2  million in minority investments. Total cash at the end of Q2 01 was $217.1 million. Brocade exited the quarter with$5.7 million in

3  deferred revenue. The majority of the deferred revenue was related to inventory held by Brocade master resellers that has not sold through

4  to the end customer.

5  Greg Reyes, Brocade Chairman and CEO, commented on the quarter:

6   Considering the current difficult economic environment for technology companies, the second quarter was a period of significant

7  achievement for Brocade. We are pleased that we met the expectations that we set out in April, and we believe that the second

8  quarter was the low water mark for our business.

9  351. On August 15, 2001, the Company issued a press release entitled "Brocade Exceeds

10 Revenue Estimates for the Third Quarter of Fiscal 2001." The press release stated in part:

11   Brocade Communications Systems, Inc. reported today financial results for the third quarter of fiscal 2001 (Q3 01). ForQ3

12  01, net revenues were $116.3 million, a $24.2 million increase from the $92.1 million reported in the third quarter of fiscal 2000(Q3 00)

13  and a $1.1 million increase from the second quarter of fiscal 2001 (Q201). Brocade exited the quarter with $13.4 million in deferred

14  revenue, an increase of$7.7 million over the $5.7 million reported in Q2 01.

15

16   Net income for Q3 01 was $12.0 million as compared to the $20.1 million reported in Q3 00 and the $12.0 million reported in Q2

17  01. Diluted net income per share for Q3 01 was $0.05 as compared to the $0.08 reported in Q3 00 and the $0.05 reported in Q2 01. During

18  the third quarter, gross margins remained at 60 percent, an improvement over the 58.6 percent reported in Q3 00 and consistent

19  with Q2 01.  In Q3 01, Brocade generated $23.8 million in cash after investing $20.6 million in capital equipment. Total cash at the end

20  ofQ3 01 was $241.0 million.

21   Greg Reyes, Brocade Chairman and CEO, commented on the quarter: "We are pleased with our results for the third quarter, which

22  demonstrate our ability to manage well through a challenging economic environment.

23

24  352. On November 28, 2001, the Company issued a press release entitled "Brocade

25 Announces Record Revenue for Fiscal Year 2001; Storage Networking Leader Reports Annual

26 Revenue Growth of 56 Percent." The press release stated in part:

27   Brocade Communications Systems, Inc. reported today financial results for the fourth quarter ended October 27,2001 (Q401).

28  In Q4 01, net revenue was $116.5 million, as compared to the $116.3

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT   No.: 3:05-CV-02042-CRB

1    million reported in the third quarter of fiscal 2001 (Q301). For fiscal
     year 2001 (FY 01), revenue was a record $513.0 million, an increase
2    of $184.0 million, or 56 percent, from fiscal year 2000 (FY 00).
     Brocade exited Q401 with $12.6 million in deferred revenue.
3
           Diluted pro forma net income per share for Q4 01 was $0.05,
4    consistent with the diluted net income per share reported in Q3 01.
     Pro forma net income for Q4 01 was $10.9 million as compared to net
5    income of $12.0 million reported in Q3 01. For FY 01, pro forma net
     income was $67.4 million and pro forma diluted net income per share
6    was $0.28, as compared to net income of $67.9 million and diluted net
     income per share of $0.28, respectively, reported in FY 00. These pro
7    forma results exclude charges of $77.1 million related to purchase
     commitments, facilities lease losses and asset impairments, and the
8    write-down of private minority equity investments.

9
           These results compare to net revenue of $132.1 million
10   reported in the fourth quarter of fiscal 2000 (Q4 00) and net income
     and diluted net income per share of $27.2 million and $0.11,
11   respectively.

12
           During the fourth quarter, pro forma gross margins remained
13   at 60.0 percent, a slight improvement over the 59.8 percent gross
     margins reported in Q4 00 and consistent with Q3 01 gross margins.
14   Gross margins on a pro forma basis for FY 01 were 60.0 percent, as
     compared to 58.2 percent gross margins for FY 00.
15
           In Q4 01 Brocade generated $14.2 million in cash after
16   purchasing approximately $18.7 million in capital equipment. For FY
     01, Brocade generated more than $100 million in cash, after investing
17   $82.3 million in capital equipment. Brocade's total cash balance at the
     end of Q4 01 was a record $255.1 million.
18
           For Q4 01, accounts receivable days sales outstanding was 54
19   days, down from the 57 days achieved during Q3 01. Inventory at the
     end of the fourth quarter was $10.3 million and represented
20   annualized inventory turns of 18 times on a pro forma basis.

21         Greg Reyes, Brocade Chairman and CEO, commented on the
     quarter, "We are very pleased with our results for 2001 and our ability
22   to manage and optimize our business model in a challenging
     economic environment. We believe that our investments in 2001,
23   including our significant investment in research and development,
     will allow us to take full advantage of the next phase in the market's
24   evolution and position us for resumed growth in 2002."

25         353.   The above false and misleading financial data also was included in the following

26   Financial Statements filed by Brocade with the SEC and were signed by the following:

27   | Date of Filing | Name of Filing | Signed by |
     | --- | --- | --- |
28   | June 13, 2000 | 2Q 2000 10-Q | Byrd |

| | | |
|---|---|---|
| September 12, 2000 | 3Q 2000 10-Q | Byrd |
| January 26, 2001 | 10-K | Byrd and Defendants Reyes, Neiman, Dempsey, Sonsini |
| March 13, 2001 | 1Q 2001 10-Q | Byrd |
| June 12, 2001 | 2Q 2001 10-Q | Defendant Canova |
| September 11, 2001 | 3Q 2001 10-Q | Defendant Canova |

354. Each of the above-listed press releases and Financial Statements were false and misleading for the reasons set forth in Section VI, *supra*, because, *inter alia*, each such statement overstated Brocade's earnings per share and net income, and understated Brocade's compensation expenses and related tax expenses.

**B.   2002**

355. On January 24, 2002, the Company filed its SEC Form 10-K for the year ended 2001.

356. On February 13, 2002, the Company issued a press release entitled "Brocade Reports Financial Results for the First Quarter of Fiscal Year 2002." The press release stated in part:

> Brocade Communications Systems, Inc. reported today financial results for the first fiscal quarter of 2002 (Ql 02), which ended January 26, 2002. In Ql 02, net revenue was $123.1 million, gross margins were 60 percent, net income was $11.7 million, and diluted net income per share was $0.05. Quarterly sequential revenue growth for Q1 02 was nearly six percent.
>
> Brocade exited Q1 02 with $13.9 million in deferred revenue, an increase of $1.3 million over deferred revenue at the end of the fourth fiscal quarter of 2001 (Q4 01).
>
> In Ql 02 Brocade generated $568.7 million in cash including $537.6 million received from the issuance of convertible subordinated debt. Excluding the net proceeds from the convertible debt offering, cash increased $31.1 million after purchasing $24.5 million in capital equipment. Brocade's total cash, cash equivalents and short-term investments were $823.9 million at the end of Ql 02.
>
> For Ql 02, accounts receivable days sales outstanding were 54 days, consistent with Q4 01. Inventory at the end of Q1 02 was $9.2 million, down from the $10.3 million at the end ofQ4 01.
>
> Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are extremely pleased with our results for the first fiscal quarter of 2002.

357.  On May 15, 2002, the Company issued a press release entitled "Brocade Reports Financial Results for the Second Fiscal Quarter of 2002; And More Than 9 Percent Quarterly Sequential Revenue Growth." The press release stated in part:

> Brocade Communications Systems, Inc. reported today financial results for the second fiscal quarter ended April 27, 2002 (Q2 02). In Q2 02, net revenues were $135.0 million, which is an increase of more than 17 percent from the $115.2 million reported in the second fiscal quarter of 200 1 (Q2 01), and an increase of more than 9 percent from the $123.1 million reported in the first fiscal quarter of 2002 (Q1 02). Brocade exited Q2 02 with $16.1 million in deferred revenue, which is an increase of $2.2 million from Q 1 02.

> Net income for Q2 02 was $14.0 million, which is an increase of nearly 17 percent from the $12.0 million reported in Q2 01 and a nearly 20 percent increase from the $11.7 million reported in Q1 02. Diluted net income per share for Q2 02 was $0.06, an increase from the $0.05 reported in Q1 02 and $0.05 for Q2 01. During Q2 02, gross margins were 60.2 percent.

> In Q2 02 cash and investments increased by $23.8 million, after purchasing approximately $17.8 million in capital equipment. Total cash and investments at the end of Q2 02 were a record $847.7 million. For Q2 02, accounts receivable days sales outstanding were 53 days, an improvement of 1 day over that reported in Q102. Inventory at the end of Q2 02 was $5.5 million.

> Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are extremely pleased with our results for the second fiscal quarter of 2002."

358.  On November 21, 2002, the Company issued a press release entitled "Brocade Announces Q4 and Fiscal 2002 Financial Results; Storage Networking Leader Achieves 31 Percent Year over Year Revenue Growth in Q4 02; Reports Record Revenue for Fiscal 2002 of $562.4 12 Million."  The press release stated in part:

> Brocade Communications Systems, Inc. announced today financial results for its fourth quarter ended October 26, 2002 (Q4 02). For Q4 02, net revenue was $153.1 million, an increase of 31 percent from $116.5 million reported in the fourth quarter of fiscal 2001 (Q401). This compares to $151.2 million reported in the third quarter of fiscal 2002 (Q3 02). For fiscal 2002 (FY 02), revenue was a record $562.4 million, an increase of 10 percent from $513.0 million reported in fiscal 2001 (FY01).

> Net income for Q4 02 was $15.7 million, or $0.07 per share. This compares to a net loss of $53.7 million for Q4 01 or $0.24 per share. For FY 02, net income was $59.7 million or $0.25 per share, as compared to net income of $2.8 million or $0.01 per share, reported in FY 01.

1      Deferred revenue at the end of Q4 02 was $22.4 million, an
       increase of $4.1 million from $18.3 million at the end of Q3 02.
2      During Q4 02, gross margins were 58.5 percent.

3      359.    The above false and misleading statements were also made in the following

4  Financial Statements filed by Brocade with the SEC and were signed by the following Defendants:

5

6  | Date of Filing | Name of Filing | Signed by |
   | --- | --- | --- |
7  | June 24, 2002 | 2001 10-K | Defendants Reyes, Canova, Dempsey, Neiman, Sonsini |
8  | March 12, 2002 | 1Q 2002 10-Q | Defendant Canova |
   | May 30, 2002 | 2Q 2002 10-Q | Defendant Canova |
9  | August 27, 2002 | 3Q 2002 10-Q | Defendants Canova & Reyes |

10     360.    Each of the above-listed press releases and Financial Statements were false and

11 misleading for the reasons set forth in Section VI, *supra*, because, *inter alia*, each such statement

12 overstated Brocade's earnings per share and net income, and understated Brocade's compensation

13 expenses and related tax expenses.

14 **C.     2003**

15     361.    On January 22, 2003, the Company filed its SEC Form 10-K for the fiscal year ended

16 2002.

17     362.    On February 12, 2003, the Company issued a press release entitled "Brocade Reports

18 Financial Results for the First Quarter of Fiscal 2003; Storage Networking Leader Achieves

19 Business Optimization Targets and Expands Market Leadership Position." The press release stated

20 in part:

21          Brocade Communications Systems, Inc. reported financial
       results today for its quarter of fiscal year 2003 ended January 25, 2003
22     (Ql 03). Net revenue for Ql 03 was first $123.1 million. This
       compares to $153.1 million reported in the fourth quarter of fiscal
23     year 2002 (Q4 02), and $123.1 million reported in the first quarter of
       fiscal year2002 (Ql 02).
24
          Pro forma net income for Ql 03 was $0.3 million or $0.00 per
25     share. Pro forma net income excludes a restructuring charge of $10.1
       million associated with the 12 percent reduction in workforce that was
26     announced on November 21,2002. Reporting on a Generally
       Accepted Accounting Principles (GAAP) basis, net loss for Ql 03 was
27     $6.9 million, or $0.03 per share. This compares to GAAP net income
       for Q4 02 of $15.7 million, or $0.07 per share, and GAAP net income
28     of $11.7 million or $0.05 per share in Q1 02. A reconciliation

132

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1    between pro forma net income and net loss on a GAAP basis is
     provided in a table summary immediately following the Pro Forma
2    Condensed Consolidated Statements of Operations.

3         Greg Reyes, Brocade Chairman and CEO, commented on the
     quarter, "We are pleased with our financial results for the first quarter
4    of fiscal year 2003. This was a quarter of continued execution for
     Brocade. We met our business optimization goals, reducing operating
5    expenses by 12 percent quarter over quarter . . . .

6         363.    On May 14, 2003, the Company issued a press release entitled "Brocade Reports

7    Second Quarter Fiscal 2003 Financial Results." The press release stated in part:

8         Brocade Communications Systems, Inc. reported today
     financial results for its second quarter of fiscal year 2003, which
9    ended April 26, 2003 (Q2 03). Net revenue for Q2 03 was $130.9
     million, which compares to $123.1 million reported in the first quarter
10   of fiscal year 2003 (Ql 03), and $135.0 million reported in the second
     quarter of fiscal year 2002 (Q2 02).
11
12        Reporting on a Generally Accepted Accounting Principles
     (GAAP) basis, net loss forQ2 03 was $146.0 million, or $0.57 per
13   share. This compares to a GAAP net loss for Ql 03 of $6.9 million, or
     $0.03 per share, and GAAP net income of $14.0 million or $0.06 per
14   share in Q2 02.

15        Non-GAAP net loss for Q2 03 was $1.0 million or $0.00 per
     share, as compared to non-GAAP net income of $0.3 million or $0.00
16   per share in Ql 03. There was no difference between GAAP and non-
     GAAP net income in Q2 02. Non- GAAP net income for Q2 03
17   excludes in-process research and development, deferred stock
     compensation and other acquisition costs related to the acquisition of
18   Rhapsody Networks, Inc. (Rhapsody) in Q2 03, and severance, asset
     impairment, and other charges related to the restructuring of business
19   operations that was announced on April 10, 2003. A reconciliation
     between GAAP and non-GAAP information is attached to this press
20   release.

21        "I am pleased with the results that we have delivered in
     meeting our expectations of revenue, gross margin and operating
22   expense," said Greg Reyes, Brocade Chairman and CEO. "Moving
     forward, we remain committed to driving revenue growth and
23   profitability."

24        364.    On August 13, 2003, the Company issued a press release entitled "Brocade Reports

     Third Quarter Fiscal 2003 Financial Results; Storage Networking Leader Increases Revenue, Net
25
     Income, and EPS On a Sequential Basis." The press release stated in part:
26
27        Brocade Communications Systems, Inc. reported today
     financial results for its third quarter of fiscal year 2003 (Q3 03),
28   which ended July 26,2003. Net revenue for Q3 03 was $133.5 million,
     an increase from the $130.9 million reported in the second quarter of

133

fiscal year 2003 (Q203). Net revenue reported in the third quarter of fiscal year 2002 (Q3 02) was $151.2 million.

Non-GAAP net income for Q3 03 was $2.0 million, or $0.01 per share, as compared to a non-GAAP net loss of $1.0 million or $0.00 per share in Q2 03. Non- GAAP net income for Q3 03 excludes deferred stock compensation related to the acquisition of Rhapsody Networks, Inc. (Rhapsody) that was completed in Q2 03. A reconciliation between GAAP and non-GAAP information is contained in the tables below.

Reporting on a Generally Accepted Accounting Principles (GAAP) basis, net income for Q3 03 was $1.9 million, or $0.01 per share. This compares to a GAAP net loss for Q2 03 of $146.0 million, or $0.57 per share, and GAAP net income of $18.3 million or $0.08 per share in Q3 02. There was no difference between GAAP and non-GAAP net income in Q3 02.

We are pleased with our results for our third fiscal quarter in which we delivered increased revenue, operating income, and earnings per share to our shareholders," said Greg Reyes, Brocade Chairman and CEO.

365. On November 20, 2003, the Company issued a press release entitled "Brocade Reports Fourth Quarter and Fiscal Year 2003 Results; Storage Networking Leader Increases Revenue, Net Income, and EPS on a Sequential Basis." The press release stated in part:

Brocade Communications Systems, Inc. reported today financial results for its fourth quarter (Q4 03) and fiscal year 2003 (FY 03) which ended October 25,2003. Net revenue for Q4 03 was $137.8 million, an increase of three percent from $133.5 million reported in the third quarter of fiscal year 2003 (Q3 03). Net revenue reported in the fourth quarter of fiscal year 2002 (Q4 02) was $153.1 million. Net revenue for FY 03 was $525.3 million, as compared to net revenue of $562.4 million reported in fiscal year 2002 (FY 02).

Non-GAAP net income for Q4 03 was $4.6 million, or $0.02 per share, as compared to a non-GAAP net income of $2.0 million, or $0.01 per share, in Q3 03. Non-GAAP net income for Q4 03 excludes gains related to repurchases of convertible subordinated debt, a gain on the disposition of private strategic investments, a reduction of previously recorded restructuring costs, and deferred stock compensation expense related to the acquisition of Rhapsody Networks, Inc. For FY 03, non-GAAP net income was $5.6 million, or $0.02 per share. Non-GAAP net income for FY 03 excludes gains related to repurchases of convertible subordinated debt, net gains on the disposition of private strategic investments, restructuring costs, and deferred stock compensation and in-process research and development expenses related to the Rhapsody acquisition.

366. The above false and misleading statements were also made in the following Financial Statements filed by Brocade with the SEC and were signed by the following Defendants:

| Date of Filing | Name of Filing | Signed by |
|---|---|---|
| January 22, 2003 | 2002 10-K | Defendants Reyes, Canova, Dempsey, Neiman, and Sonsini |
| March 7, 2003 | 1Q 2003 10-Q | Defendants Canova & Reyes |
| June 9, 2003 | 2Q 2003 10-Q | Defendants Canova & Reyes |
| September 8, 2003 | 3Q 2003 10-Q | Defendants Canova & Reyes |

367.    Each of the above-listed press releases and Financial Statements were false and misleading for the reasons set forth in Section VI, *supra*, because, *inter alia*, each such statement overstated Brocade's earnings per share and net income, and understated Brocade's compensation expenses and related tax expenses.

**D.    2004**

368.    On January 20, 2004, the Company filed its SEC Form 10-K for the year ended 2003.

369.    On February 11, 2004, the Company issued a press release entitled "Brocade Reports First Quarter of Fiscal 2004 Results; Revenues Increase 5% Sequentially and 18% Year Over Year." The press release stated in part:

> Brocade Communications Systems, Inc. reported today financial results for its first quarter of fiscal year 2004 (Ql 04) which ended January 24,2004. Net revenues for Q 1 04 were $145.0 million, an increase of five percent from $137.8 million reported in the fourth quarter of fiscal year 2003 (Q4 03) and an increase of 18 percent from$123.1 million reported in the first quarter of fiscal 2003 (Ql 03).
>
> "Our first quarter was a good one, and fiscal 2004 is off to an excellent start for Brocade. During the first quarter, we saw revenue growth across our entire business," said Greg Reyes, Brocade Chairman and CEO. "This represents our 4th quarter in a row of improved revenue, gross margin and operating margin. With our upcoming product cycle and improving trends in the storage sector, we continue to be confident in our market position and future prospects."
>
> Non-GAAP net income for Ql 04 was $8.0 million, or $0.03 per share, as compared to non-GAAP net income of$4.6 million, or $0.02 per share, reported in Q4 03 and non-GAAP net income of $0.0 million, or $0.00 per share, reported in Q 103. Non-GAAP net income for Ql 04 excludes gains related to repurchases of convertible subordinated debt, deferred stock compensation expense related to the acquisition of Rhapsody Networks, Inc. (Rhapsody), and lease termination, facilities consolidation and other related costs. Non-GAAP net income for Q4 03 excludes gains related to repurchases of

convertible subordinated debt, a gain on the disposition of private strategic investments, a reduction of previously recorded restructuring costs, and deferred stock compensation expense related to the acquisition of Rhapsody. Non-GAAP net income for Ql 03 excludes net gains on the disposition of private strategic investments and restructuring costs associated with a company-wide workforce reduction in Ql 03. A reconciliation between GAAP and non-GAAP information is contained in the tables below.

Reporting on a GAAP basis, net loss for Ql 04 was $36.8 million, or $(0.14) per share. This compares to GAAP net income for Q4 03 of $14.8 million, or $0.06 per share, and GAAP net loss for Ql 03 of $6.9 million, or $(0.03) per share.

370. On May 19, 2004, the Company issued a press release entitled "Brocade Reports Second Quarter of Fiscal 2004 Results; Revenues and Gross Margins Increase for Fifth Consecutive Quarter." The press release stated in part:

Brocade Communications Systems, Inc. reported today financial results for its second quarter of fiscal year 2004 (Q2 04) which ended May 1, 2004. Net revenues for Q2 04 were $145.6 million, a slight increase from $145.0 million reported in the first quarter of fiscal year 2004 (Ql 04) and an increase of 11 percent from $130.9 million reported in the second quarter of fiscal 2003 (Q203).

"In addition to delivering our fifth consecutive quarter of improvement in revenue and gross margin, during the quarter we continued to execute on our long term strategy by extending our product portfolio with four major product introductions," said Greg Reyes, Brocade Chairman and CEO. "We also strengthened the company's position across the entire spectrum of the SAN market and have set the stage to accelerate the achievement of our previously stated financial model targets by a full year."

Non-GAAP net income for Q2 04 was $8.1 million, or $0.03 per share, as compared to non-GAAP net income of $8.0 million, or $0.03 per share, reported in Q 1 04 and non-GAAP net loss of $1.1 million, or $(0.00) per share, reported in Q203. N on-GAAP net income for Q2 04 excludes restructuring charges, settlement cost of a claim associated with the acquisition of Rhapsody Networks, Inc. (Rhapsody), deferred stock compensation expense related to Rhapsody, and gains on the disposition of private strategic investments. Non-GAAP net income for Ql 04 excludes lease termination, facilities consolidation and other related costs, deferred stock compensation expense related to the acquisition of Rhapsody, and gains related to repurchases of convertible subordinated debt. Non-GAAP net loss for Q2 03 excludes restructuring charges, in-process research and development, and deferred stock compensation expense related to the acquisition of Rhapsody, and gains related to repurchases of convertible subordinated debt. Non-GAAP net loss for Q2 03 excludes restructuring charges, in-process research and development, and deferred stock compensation expense related to the

acquisition of Rhapsody. A reconciliation between GAAP and non-GAAP net income (loss) is contained in the tables below.

Reporting on a GAAP basis, net loss for Q2 04 was $2.0 million, or $(0.01) per share. This compares to GAAP net loss for Q1 04 of $36.8 million, or $(0.14) per share, and GAAP net loss for Q2 03 of $146.0 million, or $(0.57) per share.

371.    On August 12, 2004, the Company issued a press release entitled "Brocade Announces Preliminary Q3 2004 Results; Revenue on Track, Exceeds EPS Guidance." The press release stated in part:

Brocade Communications Systems, Inc., the world's leading provider of infrastructure solutions for Storage Area Networks (SANs), today announced preliminary results for the third quarter of fiscal 2004 (Q3 04) ended July 31, 2004. Brocade expects to report net revenue for Q3 04 in a range of $149.5 to 150.5 million and GAAP net income per share of $0.06 to $0.07. The GAAP earnings include a pre-tax gain of $3.5 million, equivalent to $0.01 per share, related to repurchases of $47.4 million of the company's convertible subordinated debt.

"I am pleased to announce revenue that is in line with our previous outlook and better than expected EPS," said Greg Reyes, Brocade Chairman and CEO. "Given the unusually large number of pre-announcements by storage-related companies with lower than expected financial results, we believe that it is important to provide our preliminary results so the market can assess Brocade's performance and competitive position accurately."

372.    On November 22, 2004, the Company issued a press release entitled "Brocade Reports Fourth Quarter and Fiscal Year 2004 Results; Record Annual Revenue of $596.3 Million Increases 14% Year Over Year Fourth Quarter Operating Margin Increases to 16%." The press release stated in part:

Brocade Communications Systems, Inc. reported today financial results for its fourth quarter (Q4 04) and fiscal year 2004 (FY 04) which ended October 30, 2004. Net revenues for Q4 04 were $155.6 million, an increase of four percent from $150.0 million reported in the third quarter of fiscal year 2004 (Q3 04) and an increase of 13 percent from $137.8 million reported in the fourth quarter of fiscal 2003 (Q403). Net revenues for FY 04 were $596.3 million, an increase of 14 percent from $525.3 million reported in fiscal year 2003 (FY 03)

Non-GAAP net income for Q4 04 was $18.6 million, or $0.07 per share, as compared to non-GAAP net income of $15.2 million, or $0.06 per share, reported in Q3 04 and non-GAAP net income of $4.6 million, or $0.02 per share, reported in Q4 03. Non-GAAP net income for Q4 04 excludes deferred stock compensation expense related to

1    Rhapsody Networks, Inc. (Rhapsody), a reduction of previously
     recorded restructuring costs, and gains related to repurchases of the
2    Company's convertible subordinated debt. Non-GAAP net income for
     Q3 04 excludes deferred stock compensation expense related to the
3    acquisition of Rhapsody, gains related to repurchases of the
     Company's convertible subordinated debt, and gains on the
4    disposition of private strategic investments. Non-GAAP net income
     for Q4 03 excludes deferred stock compensation expense related to
5    the acquisition of Rhapsody, a reduction of previously recorded
     restructuring costs, gains related to repurchases of the Company's
6    convertible subordinated debt, and gains on the disposition of private
     strategic investments. A reconciliation between GAAP and non-
7    GAAP net income is contained in the tables below.

8           Reporting on a GAAP basis, net income for Q4 04 was $20.4
     million, or $0.08 per share basic and diluted. This compares to GAAP
9    net income for Q3 04 of $17.0 million, or $0.06 per share diluted,
     $0.07 per share basic, and GAAP net income for Q4 03 of $14.8
10   million, or $0.06 per share basic and diluted.

11          "Fiscal 2004 was a good year for Brocade and I am very proud
     of our results," said Greg Reyes, Brocade Chairman and CEO.
12   "During the year we expanded and extended our product line,
     introduced new products in new segments, executed on our business
13   strategy, achieved our financial model targets, and strengthened the
     overall position of the company."

14

15   373.    The following Financial Statements filed with the SEC also were materially false and

16   misleading and omitted material facts because each 10-K and 10-Q contained the same financial

17   data regarding Brocade's expenses, revenue, and earnings per share:

18   | Date of Filing | Name of Filing | Signed by |
     |---|---|---|
19   | January 20, 2004 | 2003 10-K | Defendants Reyes, Canova, Dempsey, Neiman and Sonsini |
     | March 8, 2004 | 1Q 2004 10-Q | Defendants Canova & Reyes |
20   | June 14, 2004 | 2Q 2004 10-Q | Defendants Canova & Reyes |
     | January 31, 2004 | 3Q 2004 10-Q | Defendants Canova, Dempsey, Neiman and Sonsini |
21
22   | March 9, 2005 | 1Q 2005 10-K | Defendant Canova |

23   **E.    2005**

24   374.    Further, Defendants' statements on January 6 and January 24, 2005 each were

25   materially false and misleading.  These statements are set forth in detail in Section VI., *supra*.  The

26   January 6th statement only revealed option-related errors for part of 1999-2000 and part of 2000-

27   2002.  The January 24th statement revealed that the scope of these errors was much larger,

28   expanding the scope from 1999 through the third quarter of 2003, and rendering previously reported

1  financial results for 2004 unreliable.  But, neither the January 6th nor the January 24th statements

2  told the whole truth.  Neither statement revealed that the Company's options related problems were

3  much more significant or that an investigation was ongoing.  In May 2005, the Company announced

4  that the January 6th and the January 24th statements were also materially false and misleading, could

5  no longer be relied upon, and would be restated to include up to an additional $52 million in option

6  related charges.

7      375.    Each of the above-listed press releases and Financial Statements were false and

8  misleading for the reasons set forth in Section VI., *supra*, because, *inter alia*, each such statement

9  overstated Brocade's earnings per share and net income, and understated Brocade's compensation

10  expenses and related tax expenses.

11              **XIII.   CLASS ACTION ALLEGATIONS**

12      376.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

13  Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the securities

14  of Brocade between May 18, 2000 and May 15, 2005, inclusive, and who were damaged thereby

15  (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at

16  all relevant times, members of their immediate families and their legal representatives, heirs,

17  successors or assigns and any entity in which Defendants have or had a controlling interest.

18      377.    The members of the Class are so numerous that joinder of all members is

19  impracticable. Throughout the Class Period, Brocade stock was actively traded on the NASDAQ.

20  While the exact number of Class members is unknown to Lead Paintiff at this time and can only be

21  ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or

22  thousands of members in the proposed Class. Record owners and other members of the Class may

23  be identified from records maintained by Brocade or its transfer agent and may be notified of the

24  pendency of this action by mail, using the form of notice similar to that customarily used in

25  securities class actions.

26      378.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

27  members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

28  law complained of herein.

379. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

380. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Brocade;

(c) whether the prices of Brocade's publicly traded securities were artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

381. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. LEAD PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE FOR DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER THE AFFILIATED *UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, UNDER THE FRAUD ON THE MARKET DOCTRINE

382. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are primarily predicated upon omissions of material fact of which there was a duty to disclose.

383. In the alternative, Lead Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine, first set forth in *Basic v. Levinson*, 485 U.S. 224 (1988), on Defendants' material misrepresentations and omissions for the following reasons:

i.   Brocade's publicly-traded securities were actively traded in an efficient market on the NASDAQ during the period in which Lead Plaintiff bought and/or sold Brocade securities;

ii.  As a regulated issuer, Brocade filed periodic public reports with the SEC;

iii. Brocade regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

iv.  The market reacted to public information disseminated by Brocade;

v.   Brocade was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

vi.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Brocade's shares; and

vii. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased Brocade securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

384.   In addition to the foregoing, Lead Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Brocade's business, financial results and business prospects, throughout the Class Period.

## XV.   NO SAFE HARBOR

385.   As alleged herein, Defendants acted with *scienter* in that they knew, at the time they issued them, that the public documents and statements issued or disseminated in the name of Brocade were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that members of the

1   investing public were likely to reasonably rely on those misrepresentations and omissions; and

2   knowingly and substantially participated or were involved in the issuance or dissemination of such

3   statements or documents as primary violations of the federal securities law.  As set forth elsewhere

4   herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts

5   regarding Brocade, their control over, and/or receipt of Brocade's allegedly materially misleading

6   misstatements and/or their association with the companies which made them privy to confidential

7   proprietary information concerning Brocade, which were used to inflate financial results and which

8   the Defendants caused or were informed of, participated in and knew of the fraudulent scheme

9   alleged herein.  With respect to non-forward-looking statements and/or omissions, the Defendants

10  knew and/or recklessly disregarded the falsity and misleading nature of the information which they

11  caused to be disseminated to the investing public.

12          386.    Defendants' false and misleading statements and omissions do not constitute

13  forward-looking statements protected by any statutory safe harbor.  The statements alleged to be

14  false and misleading herein all relate to facts and conditions existing at the time the statements were

15  made.  No statutory safe harbor applies to any of Brocade's material false or misleading statements.

16          387.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any

17  forward-looking statement pled herein, the Defendants are liable for the false forward-looking

18  statement pled because, at the time each forward-looking statement was made, the speaker knew or

19  had actual knowledge that the forward-looking statement was materially false or misleading, and

20  the forward-looking statement was authorized and/or approved by a director and/or executive

21  officer of Brocade who knew that the forward-looking statement was false or misleading.  None of

22  the historic or present tense statements made by the Defendants was an assumption underlying or

23  relating to any plan, projection or statement of future economic performance, as they were not

24  stated to be such an assumption underlying or relating to any projection or statement of future

25  economic performance when made nor were any of the projections or forecasts made by Defendants

26  expressly related to or stated to be dependent on those historic or present tense statements when

27  made.

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## XVI.   CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Brocade, Sonsini, Dempsey and Neiman

388.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

389.    During the Class Period, Brocade and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: ( a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Brocade publicly traded securities; and (c) cause plaintiff and other members of the Class to purchase Brocade publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

390.    Brocade, and the Officer Defendants; (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain an artificially high market price for Brocade's publicly traded securities in violation of § 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

391.    In addition to the duties of full disclosure imposed on Brocade, and the Officer Defendants, as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Brocade, and the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §21O.01, *et seq.*) and Regulation S-K (17 C.F.R. §229.1O, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's

1   operations, financial condition and earnings so that the market prices of the Company's securities

2   would be based on truthful, complete and accurate information.

3   392.    Brocade and the Individual Defendants, individually and in concert, directly and

4   indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

5   engaged and participated in a continuous course of conduct to conceal adverse material information

6   about the business, operations and future prospects of Brocade as specified herein.

7   393.    Brocade and the Individual Defendants employed devices, schemes and artifices to

8   defraud, while in possession of material adverse non-public information and engaged in acts,

9   practices, and a course of conduct as alleged herein in an effort to assure investors of Brocade's

10  value and performance and continued substantial growth, which included the making of, or the

11  participation in the making of, untrue statements of material facts and omitting to state material

12  facts necessary in order to make the statements made about Brocade and its business operations and

13  future prospects in the light of the circumstances under which they were made, not misleading, as

14  set forth more particularly herein, and engaged in transactions, practices and a course of business

15  which operated as a fraud and deceit upon the purchasers of Brocade publicly traded securities

16  during the Class Period.

17  394.    The Individual Defendants' primary liability, and controlling person liability, arises

18  from the following facts: (a) the Individual Defendants were high-level executives and/or directors

19  at the Company during the Class Period; (b) the Individual Defendants were privy to and

20  participated in the creation, development and reporting of the Company's internal budgets, plans,

21  projections and/or reports; and (c) the Individual Defendants were aware of the Company's

22  dissemination of information to the investing public which they knew or recklessly disregarded was

23  materially false and misleading.

24  395.    Brocade and the Individual Defendants had actual knowledge of the

25  misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard

26  for the truth in that they failed to ascertain and to disclose such facts, even though such facts were

27  available to them. Brocade's and the Individual Defendants' material misrepresentations and/or

28  omissions were done knowingly or recklessly and for Defendants' material misrepresentations

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Brocade's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Brocade's and the Individual Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Brocade and the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

396. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Brocade publicly traded securities were artificially inflated during the Class Period. In ignorance of the fact that the market prices of Brocade publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Brocade and the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Brocade publicly traded securities during the Class Period at artificially high prices and were damaged thereby.

397. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Brocade, which were not disclosed by Brocade and the Individual Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Brocade publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

398. By virtue of the foregoing, Brocade and the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

399.    As a direct and proximate result of Brocade's and the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Officer Defendants

400.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

401.    The Officer Defendants acted as controlling persons of Brocade within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

402.    In particular, the Officer Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

403.    During the Class Period, the Officer Defendants, as senior executive officers and/or directors of Brocade, were privy to confidential and proprietary information concerning Brocade, its operations, finances, financial condition and present and future business prospects.  The Officer Defendants also had access to material adverse non-public information concerning Brocade, as

discussed in detail below. Because of their positions with Brocade, the Officer Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Officer Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

404.    The Officer Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Officer Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Officer Defendants were able to and did, directly or indirectly, control the conduct of Brocade's business.

405.    The Officer Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Officer Defendants had the opportunity to commit the fraudulent acts alleged herein.

406.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and was traded on the NASDAQ and governed by the federal securities laws, the Officer Defendants had a duty to disseminate promptly accurate and truthful information with respect to Brocade's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that

the market price of Brocade's securities would be based upon truthful and accurate information. The Officer Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

407. The Officer Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Brocade publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

408. The Officer Defendants controlled the Company and all of its employees. As set forth above, Brocade and the Officer Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Brocade's and the Officer Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## XVII.  PRAYER FOR RELIEF

409. WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XVIII. JURY TRIAL DEMAND

410. Lead Plaintiff hereby demands a trial by jury.

DATED:  January 2, 2007                              Respectfully Submitted,

                                                    /s/
                                                    Jeffrey J. Angelovich (admitted *Pro Hac Vice*)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Bradley E. Beckworth (admitted *Pro Hac Vice*)
Susan Whatley (admitted *Pro Hac Vice*)
NIX, PATTERSON & ROACH, L.L.P.
205 Linda Drive
Daingerfield, Texas 75638
Telephone: 903-645-7333
Facsimile: 903-645-4415
BBeckworth@nixlawfirm.com
JAngelovich@nixlawfirm.com
SusanWhatley@nixlawfirm.com

George L. McWilliams (admitted *Pro Hac Vice*)
Sean Rommel (admitted *Pro Hac Vice*)
PATTON, ROBERTS, MCWILLIAMS
& CAPSHAW, LLP
Century Bank Plaza
2900 St. Michael Drive, Suite 400
Texarkana, TX 75505-6128
Telephone: 903-334-7000
Facsimile: 903-330-7007
gmcwilliams@pattonroberts.com
srommel@pattonroberts.com

Co-Lead Counsel

Laurence D. King (State Bar No. 206423)
Linda M. Fong (State Bar No. 124232)
KAPLAN FOX & KILSHEIMER LLP
555 Montgomery Street, Suite 1501
San Francisco, CA 94111
Telephone: 415-772-4700
Facsimile: 415-772-4707
LKing@KaplanFox.com
LFong@KaplanFox.com

Liaison Counsel

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT          No.: 3:05-CV-02042-CRB

1    I, Laurence D. King, am the ECF user whose identification and password are being used to

2    e-file this Amended Consolidated Class Action Complaint.  In compliance with General Order 45, I

3    hereby attest that Jeffrey J. Angelovich, whose signature is indicated by a "conformed" signature

4    (/S/) within this efiled document, has concurred in this filing.

5

6

7                                                              /s/
                                                       Laurence D. King

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB

| | |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | I, Arthur Bailey, declare that I am over the age of eighteen (18) and not a party to the within |
| 3 | action.  I am employed in the law firm of Kaplan Fox & Kilsheimer LLP, 555 Montgomery Street, |
| 4 | San Francisco, California 94111. |
| 5 | On January 2, 2007, I used the Northern District of California's Electronic Case Filing |
| 6 | System, with the ECF registered to Laurence D. King to file following document(s): |
| 7 | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| 8 | The ECF system is designed to send an e-mail message to all parties in the case, which |
| 9 | constitutes service.  According to the ECF/PACER system, for this case, the parties served are as |
| 10 | follows: |

| | |
|---|---|
| 11 | Richard A. Adams -- radams@pattonroberts.com; mcosta@pattonroberts.com |
| 12 | Jeffrey J. Angelovich -- jangelovich@nixlawfirm.com; bethgoodman@nixlawfirm.com |
| 13 | Brian Joseph Barry, Esq -- bribarry1@yahoo.com<br>Bradley E. Beckworth -- BBeckworth@nixlawfirm.com; sandiclark@nixlawfirm.com; SWhatley@nixlawfirm.com |
| 14 | Eric J. Belfi -- ebelfi@murrayfrank.com<br>Patrice L. Bishop -- service@ssbla.com |
| 15 | Norman J. Blears -- nblears@hewm.com; susan.griffen-preston@hellerehrman.com; yvonne.somek@hellerehrman.com; victor.gonzales@hellerehrman.com |
| 16 | Michael David Braun -- mdb@braunlawgroup.com<br>Timothy J. Burke -- service@ssbla.com |
| 17 | Jack Patrick DiCanio -- jdicanio@skadden.com; rmckaig@skadden.com; ljohnsto@skadden.com |
| 18 | Patrick C. Doolittle -- patrickdoolittle@quinnemanuel.com<br>Geoffrey M. Ezgar – gezgar@sidley.com; grodriquez@sidley.com; |
| 19 | ldonohue@sidley.com<br>Linda M. Fong – lfong@kaplanfox.com |
| 20 | Michael M. Goldberg -- info@glancylaw.com<br>Robert S. Green -- RSG@CLASSCOUNSEL.COM; |
| 21 | CAND.USCOURTS@CLASSCOUNSEL.COM<br>Steven Guggenheim -- sguggenheim@wsgr.com |
| 22 | Caz Hashemi -- CHASHEMI@WSGR.COM<br>Cameron Powers Hoffman -- choffman@wsgr.com; mstinson@wsgr.com |
| 23 | Matthew C. Holohan -- matthew.holohan@hellerehrman.com<br>Christopher R. Howald -- chowald@wsgr.com |
| 24 | Willem F. Jonckheer -- wjonckheer@schubert-reed.com<br>Laurence D. King, lking@kaplanfox.com |
| 25 | Scott G. Lawson -- scottlawson@quinnemanuel.com; robertchang@quinnemanuel.com |
| 26 | Nina F. Locker -- nlocker@wsgr.com; lkoontz@wsgr.com; calendar@wsgr.com<br>Alexander M.R. Lyon -- Alexander.lyon@hellerehrman.com |
| 27 | Betsy C. Manifold -- manifold@whafh.com<br>Robert B. Martin, III -- rbmartin@sidley.com; grodriquez@sidley.com; |
| 28 | mclemens@sidley.com |

David Andrew McCarthy -- dmccarthy@wsgr.com; vmendoza@wsgr.com
George L. McWilliams -- gmcwilliams@pattonroberts.com
Brian P. Murray -- bmurray@rabinlaw.com
Mark T. Oakes -- moakes@wsgr.com; jjohnstone@wsgr.com
Harriet S. Posner -- hposner@skadden.com; btravagl@skadden.com;
pmorriso@skadden.com
John M. Potter -- johnpotter@quinnemanuel.com
Sean F. Rommel -- srommel@pattonroberts.com; pdesantis@pattonroberts.com
Arthur L. Shingler, III -- ashingler@scott-scott.com; ssawyer@scott-scott.com
Kelly L. Sommerfeld -- ksommerfeld@cpsmlaw.com; jacosta@cpsmlaw.com
Robin Winchester -- ecf_filings@sbclasslaw.com

On this date, I served the below parties:

| | |
|---|---|
| Aaron L. Brody<br>Jules Brody<br>Tzivia Brody<br>STULL STULL & BRODY<br>6 East 45th Street<br>New York, NY 10017<br>Telephone:  212-687-7320<br>Facsimile:  212-490-2022 | Evan Jason Smith<br>BRODSKY & SMITH LLC<br>11 Bala Avenue, Suite 39<br>Bala Cynwyd, PA 19004<br>Telephone:  610-667-6200<br>Facsimile:  610-667-9029<br>Email: esmith@brodsky-smith.com |
| Thomas J. McKenna<br>GAINEY & MCKENNA<br>485 Fifth Avenue, 3rd Floor<br>New York, NY 10017<br>Telephone:  212-983-1300<br>Facsimile:  212-983-0383<br>Email: | Bruce G. Murphy<br>LAW OFFICES OF BRUCE G. MURPHY<br>265 Llwyds Lane<br>Vero Beach, FL 32963<br>Telephone:  561-231-4202<br>Facsimile:  561-231-4042<br>Email: |
| Gregory M. Nespole<br>Gustavo Bruckner<br>WOLF HALDENSTEIN ADLER FREEMAN<br>& HERZ LLP<br>270 Madison Avenue<br>New York, NY 10016<br>Telephone:  212-545-4600<br>Facsimile:  212-545-4653<br>Email: | Lee M. Gordon<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>700 South Flower Street, Suite 2940<br>Los Angeles, CA 90017-4101<br>Telephone:  213-330-7150<br>Facsimile:  213-330-7152<br>Email: |
| Stanley M. Grossman<br>Marc I. Gross<br>POMERANTZ HAUDEK BLOCK<br>GROSSMAN & GROSS LLP<br>100 Park Ave., 26 Floor<br>New York, NY 10017-5516<br>Telephone:  212-661-1100<br>Facsimile:  212-661-8665<br>Email: | Sandy A. Liebhard<br>Gregory M. Egleston<br>Joseph R. Seidman<br>Uri Seth Ottensoser<br>BERNSTEIN LIEBHARD & LIFSHITZ LLP<br>10 East 40th Street<br>New York City, NY 10016<br>Telephone:  212-779-1414<br>Facsimile:  212-779-3218<br>Email: |

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                                No.: 3:05-CV-02042-CRB

| | |
|---|---|
| Steve W. Berman<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>1301 Fifth Avenue<br>Suite 2900<br>Seattle, WA 98101<br>Telephone: 206-623-7292<br>Facsimile: 206-623-0594<br>Email: steve@hbsslaw.com | Andrew M. Schatz<br>Jeffery S. Nobel<br>Nancy A. Kulesa<br>SCHATZ & NOBEL P.C.<br>One Corporate Center<br>20 Church St., Suite 1700<br>Hartford, Connecticut 06103<br>Telephone: 860-493-6292<br>Facsimile: 860-493-6290<br>Email: |

_____ (BY FACSIMILE) I sent such document from facsimile machine on the above date. I certify that said transmission was completed and that all pages were received and that a report was generated by the facsimile machine which confirms said transmission and receipt.

_____ (U.S. MAIL) I placed the sealed envelope(s) for collection and mailing by following ordinary business practices of Kaplan Fox Kilsheimer LLP. I am readily familiar with Kaplan Fox Kilsheimer LLP's practice for collecting and processing of correspondence for mailing with the United States Postal Service, said practice being that, in the ordinary course of business, correspondence with postage fully prepaid is deposited with the United States Postal Service the same day as it is placed for collection.

_____ (PERSONAL SERVICE) I caused personal delivery of the document(s) listed above the person(s) at the address(es) set forth below.

_XXX_ (BY OVERNIGHT DELIVERY) I placed the sealed envelope(s) or package(s) designated by the express service carrier for collection and overnight delivery by following the ordinary business practices of Kaplan Fox Kilsheimer LLP. I am readily familiar with Kaplan Fox Kilsheimer LLP's practice for collecting and processing of correspondence for overnight delivery, said practice being that, in the ordinary course of business, correspondence for overnight delivery is deposited with delivery fees paid or provided for at the carrier's express service offices for next-day delivery the same day as the correspondence is placed for collection.

I declare under penalty of perjury under the laws of the United States of America and the

State of California that the foregoing is true and correct.

Executed January 2, 2007 at San Francisco, California.

_____
Arthur Bailey

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT                    No.: 3:05-CV-02042-CRB